UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

ANDREA GRAVAGNA,

        Plaintiff,

    v.

TERMINIX INTERNATIONAL, INC.,
THE SERVICEMASTER COMPANY,
JENNIFER HOWARD,

        Defendants.

-----------------------------------------------------------x

Index No.: 08-cv-5448 (LAK-THK)


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION


By:
Mark Lubelsky, Esq. (ML7958)
David Gottlieb, Esq. (DG6986)

Dated:
New York, New York
June 26, 2008


MARK L. LUBELSKY & ASSOCIATES
123 WEST 18th STREET
EIGHTH FLOOR
NEW YORK, NEW YORK 10011
(212) 242-7480

# TABLE OF CONTENTS

**TABLE OF CONTENTS**................................................................... i

**TABLE OF AUTHORITIES**............................................................. ii

**PRELIMINARY STATEMENT**......................................................... 1

**STATEMENT OF FACTS**............................................................... 2

**ARGUMENT**............................................................................ 6

I.    DEFENDANTS WAIVED THE RIGHT TO COMPEL
      ARBITRATION AS THE FAILURE TO TIMELY INVOKE
      ARBITRATION RESULTED IN SUBSTANTIVE
      PREJUDICE TO PLAINTIFF............................................................. 6

II.   DEFENDANTS EVINCED INTENT TO WAIVE THE
      RIGHT TO ARBITRATE.............................................................. 10

III.  DEFENDANTS MATERIALLY BREACHED THE
      ARBITRATTION AGREEMENT AND THEREFORE
      CANNOT SEEK TO ENFORCE IT.............................................. 11

IV.   WHILE ARBITRATION IS GENRALLY AFFORDED
      FAVORED STATUS, AS A MATTER OF PUBLIC POLICY
      SUCH STATUS CANNOT BE USED AS A SAFETY NET
      FOR DUPLICITOUS CONDUCT OF COUNSEL........................... 12

V.    DEFENDANTS ARE NOT ENTITLED TO COSTS, FEES
      OR SANCTIONS....................................................................... 13

**CONCLUSION**........................................................................ 14

# TABLE OF AUTHORITIES

## CASE LAW

Alyeska Pipeline Service, Co. v. Wilderness Society,............................................ 14
421 U.S. 240; 95 S.Ct. 1612 (1975)

Alexander v. Gardner-Denver........................................................................ 13
415 U.S. 36, 47 (1974)

Bruno v. Pembrook Management, Inc...............................................................9
212 A.D.2d 314, 628 N.Y.S.2d 971 (2d Dep't 1995)

Capasso v. Metropolitan Transp. Authority of State of N.Y.,................................. 9
198 F.Supp.2d 452 (S.D.N.Y. 2002)

Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.,................................... 11
301 A.D.2d 70, 79; 747 N.Y.S.2d 468 (1st Dep't 2002)

DeGaetano v. Smith Barney, Inc, ............................................................... 9, 13
983 F.Supp. 459, 469 (S.D.N.Y. 1997)

Doctor's Assocs., Inc. v. Distajo,............................................................ 10, 13
66 F.3d 438, 455 (2d Cir. 1995)

Great Northern Associates, Inc. v. Continental Casualty Co.,................................ 11
192 A.D.2d 976, 598 N.Y.S.2d 938 (3d Dep't 1993)

Hatfield v. Colter,.............................................................................. 11
188 A.D. 563; 177 N.Y.S.2d 382 (1st Dep't 1919)

Johanson Resources Inc. v. La Vallee,...................................................... 10, 13
271 A.D.2d 832, 706 N.Y.S.2d 266 (3d Dept 2000)

Kordich v. Povill....................................................................................7
244 A.D.2d 112, 114 (3d Dept.1998)

Marine Midland Bank v. New York State Div. of Human Rights..............................6
75 N.Y.2d 240, 244-245 (N.Y. 1989)

Matter of Universal Packaging Corp. v. New York State Div. of Human Rights,............ 6
270 A.D.2d 586, 587 (3d Dept.2000)

Thyssen, Inc., v. Calypso Shipping Corp, ...................................................6, 9, 13
310 F.3d 102 (2d Cir. 2002)

Thomas Jones Assocs. v. Jameson,.................................................... 13
102 F.3d 60 (2d Cir. 1996)

## STATUTES

New York State Executive Law §290 et seq................................... 6, 8, 9

Fed. R. Civ. P. 11............................................................... 13, 14

## OTHER SOURCES

Black's Law Dictionary 1598 (6th ed. 1990)................................. 8

Restatement (Second) of Contracts § 253(2) (1981)........................... 11, 12

Plaintiff Andrea Gravagna, by and through her counsel Mark L. Lubelsky & Associates, respectfully submits this memorandum of law in opposition to the motion of Defendants Terminix International, Inc. and The ServiceMaster Company (collectively, "Terminix" or "Defendants")[1] for an order to compel arbitration, stay the litigation pending the conclusion of arbitration proceedings, and granting Defendants their attorneys' fees and costs for the present motion. As Defendants failed to attach a copy of the Plaintiff's State Court complaint to its motion, as required by Your Honor's rules, Plaintiff has attached a copy hereto. (See, Verified Complaint, attached hereto as Exhibit A)

## PRELIMINARY STATEMENT

Defendants seek to be rewarded for the duplicitous conduct of its counsel. Defendants purposefully and deceitfully failed to timely disclose the existence of an arbitration agreement in order to induce Plaintiff to seek a dismissal of its complaint before the New York State Division of Human Rights (hereinafter, "Division of Human Rights"). Defendants are sophisticated parties with vast resources, while Plaintiff is a relatively unsophisticated player that had no recollection of any arbitration agreement. (See, Verified Complaint, Exhibit A, at 19). Miraculously, as Defendants would have the Court believe, the arbitration agreement that Defense counsel now seeks to enforce, simply "became apparent" to Defendants spontaneously the following day after Plaintiff's complaint had been dismissed. (Decl Joyce at 11). Had Defense counsel timely advised Plaintiff's counsel of the existence of the arbitration agreement during the many conversations between counsel when Plaintiff advised that it would seek dismissal specifically to commence an action in State Court, Plaintiff would not have sought the dismissal of its complaint from the Division of Human Rights. Defendants clearly preferred the arbitral forum to that of the Division of Human Rights, or Defendants would have promptly put Plaintiff

---

[1] Defense counsel alleged that Defendant Jennifer Howard has not been served.

on notice of the arbitration agreement prior to dismissal. In short, Defense counsel tricked Plaintiff into requesting the dismissal of her complaint before the Division of Human Rights, and now attempts to parlay that deceit as a basis upon which to compel arbitration. Plaintiff has suffered substantive prejudice as a result of Defense counsel's duplicitous conduct as she has been deprived of a statutory remedy to have her complaint heard before the Division of Human Rights.

## STATEMENT OF FACTS

Terminix terminated Andrea Gravagna less than two weeks after she complained of unlawful age discrimination both to her supervisor Defendant Jennifer Howard (hereinafter "Defendant Howard") and to the Division of Human Rights. Defendant Howard assaulted and battered Ms. Gravagna contemporaneously with her termination.

On or about February 15, 2007, Terminix hired Ms. Gravagna as an Account Manager. Terminix provides all employees a six-month training and orientation period. (See, Excerpt of Employee Handbook, attached hereto as Exhibit B). Ms. Gravagna was terminated during her six-month orientation period. During the course of Ms. Gravagna's employment with Terminix, Ms. Gravagna suffered adverse employment actions on account of her age and in retaliation for her complaints of discrimination.

Ms. Gravagna was treated as a liability on account of her age from the inception of her employment. Ms. Gravagna was suffered adverse employment actions on account of her age including but not limited to discriminatory remarks, failure to train and failure to provide standard job benefits. When Ms. Gravagna complained to her Supervisor, Defendant Howard about the aforesaid discrimination, Ms. Gravagna was further discriminated against.

2

On or about July 9, 2007, Defendant Howard forced Ms. Gravagna to sign a "Corrective Action Report" though Ms. Gravagna understood the document to be the creation of a pretext for a subsequent unlawful termination. (See, Corrective Action Report, attached hereto as Exhibit C). Immediately, Ms. Gravagna complained to Defendant Howard, "You're just discriminating against me because I'm older. I'm going to file a complaint." Consequently, Ms. Gravagna filed a complaint with the Division of Human Rights. (See, DHR Complaint dated July 9, 2007 attached hereto as Exhibit D)

Shortly thereafter, on or about July 23, 2007, Terminix terminated Ms. Gravagna and Defendant Howard assaulted and battered her. (See, Police Incident Report dated July 23, 2007 attached hereto as Exhibit E)

On or about September 23, 2007, Terminix submitted a Position Statement to the Division of Human Rights. (See, DHR Position Statement dated September 23, 2007 attached hereto as Exhibit F). On or about November 1, 2007, Ms. Gravagna submitted a Verified Rebuttal to the Division of Human Rights. (See, DHR Rebuttal dated November 1, 2007, attached hereto as Exhibit G).

On or about December 26, 2007, the Division of Human Rights informed all counsel that a fact-finding conference between the parties was necessary in order for the Division of Human Rights to make a proper probable cause determination. The conference was originally scheduled for January 3, 2008, but for the convenience of all counsel was adjourned and ultimately scheduled for January 15, 2008.

On or about January 9, 2008 Plaintiff's counsel and Defense counsel spoke regarding Ms. Gravagna's pending Division of Human Rights complaint. Plaintiff's counsel stated its intention to remove the action from the Division of Human Rights, prior to the conference scheduled for January 15, 2008, in order to commence a state court action and also discussed a potential settlement. Defense counsel stated that it would get back to Plaintiff's counsel after a discussion with its client. Defense

3

counsel made no mention of any arbitration agreement. (See, Correspondence dated January 10, 2008, attached hereto as Exhibit H).

On or about January 10, 2008, Plaintiff's counsel sent correspondence to Defense counsel, again reiterating its intention to seek dismissal of Plaintiff's Division of Human Rights complaint and commence an action in State Court. Plaintiff's counsel asked Defense counsel to "promptly advise" of Defendants' position with regard to settlement and otherwise, on account of the impending fact-finding conference. (See, Correspondence dated January 10, 2008, Exhibit H).

On or about January 11, 2008, counsel for both parties again spoke and Defense counsel informed Plaintiff's counsel that it was not interested in a settlement at that time, presumably because Defense counsel's position would be greatly strengthened if it could induce a dismissal of Ms. Gravagna's Division of Human Rights complaint. Accordingly, Plaintiff fell right into Defendant's trap. On or about January 11, 2008, Plaintiff's counsel informed both Defendant and the Division of Human Rights that plaintiff would request that Ms. Gravagna's complaint would be dismissed in order to pursue a state court remedy. Correspondence to both the State Division and Defense counsel explained that a State Court action would be commenced. In correspondence to Defense counsel, Plaintiff's counsel inquired as to whether service of a State Court complaint would be accepted on behalf of the defendant. Defense counsel was on actual notice that Plaintiff had no recollection of any arbitration agreement. (See, Correspondence dated January 11, 2008 to Defense counsel, attached hereto as Exhibit J; Correspondence dated January 11, 2008 to DHR, attached hereto as Exhibit K). Of course, Defense counsel did not respond during the next four days.

On January 15, 2008, the Division of Human Rights officially dismissed Ms. Gravagna's complaint upon the plaintiff's request. (See, DHR Dismissal dated January 15, 2008, attached hereto as Exhibit K).

4

On January 16, 2008, and not coincidentally the very next day after Ms. Gravagna had irreparably foreclosed her access to redress in the Division of Human Rights, Defense counsel informed Plaintiff's counsel for the first time of the existence of an arbitration agreement. (See, Email correspondence from Defense counsel dated January 17, 2008, attached hereto as Exhibit L; Arbitration Agreement, attached hereto as Exhibit M).

Defense counsel affirmatively admitted that on January 11, 2008 it simply "became apparent" that the parties were subject to an arbitration agreement. (Decl. Joyce at 11). Defense counsel affirmatively admitted that it waited five days to disclose the arbitration agreement to Plaintiff's counsel. (Decl. Joyce at 12). It is completely disingenuous that Defense counsel claims it "promptly" advised Plaintiff's counsel of the arbitration agreement, as during the five-day waiting period, Plaintiff's complaint was dismissed from the Division of Human Rights. (Decl. Joyce at 12).

On or about March 14, 2008, Plaintiff's counsel advised Defense counsel that it believed Defendant had waived its right to arbitration on account of its misleading and duplicitous conduct. As a courtesy, Plaintiff's counsel detailed the timeline of events that had transpired, and again offered to attempt to resolve the case before commencement of the action. (See, Correspondence dated March 14, 2008 attached hereto as Exhibit N). However, Plaintiff's counsel never received any further contact from Defense counsel whatsoever. Defense counsel never sought to convince Plaintiff's counsel of its position that no waiver had occurred, nor made any attempt to settle the case. As such, Plaintiff was forced to commence the action in state court.

On or about June 3, 2008, after Plaintiff's counsel had already commenced the action in State Court, Defense counsel finally contacted Plaintiff's counsel to discuss the action and address its duplicitous conduct. Plaintiff's counsel advised Defense counsel of its position that arbitration had been waived because Defendants' intentional and malicious conduct had resulted in substantive prejudice to

Plaintiff. Defense counsel, obviously embarrassed and concerned by the conduct of an associate and its potential consequences before the Court, asked Plaintiff to voluntarily withdraw the complaint and consent to arbitration. Defense counsel neither provided any believable justification for its behavior nor acknowledged the wrongfulness of its conduct.

## ARGUMENT

**I.    DEFENDANT WAIVED ITS RIGHT TO COMPEL ARBITRATION AS ITS FAILURE TO TIMELY INVOKE ARBITRATION RESULTED IN SUBSTANTIVE PREJUDICE TO PLAINTIFF.**

The Second Circuit Court of Appeals has unequivocally held that a party's right to arbitration may be waived where a party's failure to timely invoke that right results in prejudice to the opposing party. Thyssen, Inc., v. Calypso Shipping Corp, 310 F.3d 102 (2d Cir. 2002); Cotton v. Slone, 4 F.3d 176 (2d Cir. 1993); Kramer v. Hammond, 943 F.2d 176 (2d Cir. 1991). It is well established that, "[t]he key to a waiver analysis is prejudice." Thyssen 310 F.3d at 105. The Courts of this Circuit recognize "two types of prejudice" that may result in a waiver of the right to arbitration, "substantive prejudice and prejudice due to excessive cost and time delay." Id. at 105. In the case at bar, as a direct result of Defense counsel's duplicitous conduct and failure to timely invoke its right to arbitration, Plaintiff has suffered extreme substantive prejudice as she has been deprived of her statutory right to have her employment discrimination and retaliation case heard before the Division of Human Rights.

Pursuant to New York State Executive Law §290 et seq., (hereinafter "Human Rights Law") a person claiming to have been harmed by unlawful discrimination and/or retaliation must elect to either (1) bring either an administrative proceeding before the State Division of Human Rights, or (2) to bring an action in court. Such remedies are mutually exclusive. See, Marine Midland Bank v. New York State Div. of Human Rights, 75 N.Y.2d 240, 244-245 (N.Y. 1989); Matter of Universal Packaging Corp.

v. New York State Div. of Human Rights, 270 A.D.2d 586, 587 (3d Dept.2000); Kordich v. Povill, 244 A.D.2d 112, 114 (3d Dept.1998). This choice of forums is commonly known as an "election of remedies." Plaintiff invoked her substantive statutory right to this "election of remedies" when she filed a complaint with the Division of Human Rights on or about July 9, 2007. (See, DHR Complaint, Exhibit D)

Plaintiff and Defendant engaged in extensive administrative litigation before the Division of Human Rights. On or about September 24, 2007, Defendant filed a Position Statement with a multitude of Exhibits. (See, DHR Position Statement, Exhibit F). No arbitration agreement was mentioned or attached. On or about November 1, 2007, Plaintiff filed an extensive Verified Rebuttal. (See, DHR Rebuttal, Exhibit G). The Division of Human Rights originally set the matter down for a fact-finding conference on January 3, 2008. This date was later adjourned to January 15, 2008 for the convenience of all parties. As the date for the fact-finding conference neared, Plaintiff's counsel and Defense counsel spoke numerous times to discuss the matter. On or about January 9, 2008, a full six days before the scheduled fact-finding conference, Plaintiff's counsel advised Defense counsel that it intended to invoke its State Court remedy, rather than continue the action within the Division of Human Rights. Plaintiff advised that rather than waste the time and resources of all parties, and the Division of Human Rights, that Plaintiff's counsel would seek dismissal of the complaint prior to the fact-finding conference, specifically so that plaintiff could commence an action in State Court. Plaintiff's counsel also suggested the parties explore settlement negotiations. (See, January 10, 2008 Correspondence, Exhibit H). The following day, Plaintiff's counsel reiterated that it would seek dismissal of the Division of Human rights complaint specifically to commence an action in State Court. (See, January 10, 2008 Correspondence, Exhibit H). On or about July 11, 2008, Defense counsel informed Plaintiff's counsel that it was not interested in settlement negotiations, and encouraged Plaintiff's counsel to dismiss the action from the

7

Division of Human Rights prior to the fact-finding conference. As a result, on or about January 11, 2008, Plaintiff requested dismissal of the Division of Human Rights complaint. (See, January 11, 2008 Correspondence to DHR, Exhibit J). On or about January 15, 2008, the Division of Human Rights dismissed Plaintiff's complaint. (See, DHR Dismissal, Exhibit K). The following day, after Plaintiff had been duped into a deprivation of her administrative remedy, Defense counsel advised Plaintiff of the arbitration agreement. (See, January 17, 2008 Email, Exhibit L).

Defense counsel affirmatively admitted that the arbitration agreement "became apparent" on January 11, 2008. (Decl. Joyce at 11). Defense counsel affirmatively admitted that it failed to disclose the arbitration agreement for five days days, until after Plaintiff's complaint had been dismissed from the Division of Human Rights. (Decl. Joyce 12). It is with complete consistency that Defense counsel dishonestly alleged that it "promptly" disclosed the arbitration agreement, in spite of its affirmative allegations to the contrary. (Decl. Joyce at 12). Black's Law Dictionary defines "prompt" as "to act immediately, responding on the instant." Waiting five days to disclose an arbitration agreement, where Defense counsel is aware that Plaintiff's counsel requested dismissal from the Division of Human Rights specifically to commence State Court litigation, is in no manner "immediate" or "instant".

Plaintiff's counsel would never have sought dismissal of the complaint from the Division of Human Rights had Defense counsel timely advised Plaintiff's counsel of the existence of an arbitration agreement. Obviously Defense counsel was cognizant of that fact and for that reason purposely withheld the arbitration agreement from Plaintiff's counsel. Once the Division of Human Rights officially effectuated the dismissal, Defense counsel only then informed Plaintiff's counsel of its deceit, advising Plaintiff's counsel of the arbitration agreement. (See, January 17, 2008 Email, Exhibit L).

The significance of Plaintiff's prejudice and Defendant's duplicitous conduct must be examined in light of the import and purpose behind the Human Rights Law. The purpose of the Human Rights

Law is to "promote individual opportunity" and "bar discrimination against persons based upon personal attributes" including but not limited to race, gender, national origin and religion, and to provide protection for making complaints about such discrimination. <u>Capasso v. Metropolitan Transp. Authority of State of N.Y.</u>, 198 F.Supp.2d 452 (S.D.N.Y. 2002)(citing <u>Bruno v. Pembrook Management, Inc.</u> 212 A.D.2d 314, 628 N.Y.S.2d 971 (2d Dep't 1995)). The Human Rights Law is an outgrowth of the basic moral, social and political foundations upon which the United States was formed; that is, that "all [persons] are created equal." <u>See</u>, The Declaration of Independence para. 1 (U.S. 1776). Enforcement of anti-discrimination laws is only effectuated through a vast network of individual Plaintiffs. The Supreme Court has emphasized on numerous occasions that an individual Plaintiff pursuing claims under the civil rights laws...is "cast...in the role of 'private attorney general,' vindicating a policy that Congress considered of the highest priority." <u>DeGaetano v. Smith Barney, Inc</u>, 983 F.Supp. 459, 469 (S.D.N.Y. 1997). Defense counsel's conduct induced and encouraged Plaintiff's deprivation of this right. Defendants deceitfully deprived Plaintiff of substantive rights provided for enforcement of anti-discrimination laws through its failure to disclose the arbitration agreement.

Plaintiff is aware that waiver of arbitration rights on the basis of substantive prejudice is most often found where protracted litigation has occurred. <u>Cotton</u>, <i>supra</i>, 4 F.3d at 176; <u>Kramer</u>, <i>supra</i> 943 F.2d at 176. In the protracted litigation context, waiver may result where a party's failure to timely compel arbitration results in a prejudice to the adverse party, "such as where a party loses a motion on the merits, and then attempts, in effect, to relitigate the issue by invoking arbitration." <u>Thyssen</u> 310 F.3d at 105. However, the Courts have not limited a waiver of arbitration rights to such circumstances. Defendants cited no caselaw to support the proposition that substantive prejudice may be found *only* in the context where arbitration is compelled after protracted litigation. Defendants surely would have cited to such cases if such cases exist.

9

## II.    DEFENDANTS EVINCED INTENT TO WAIVE THE RIGHT TO ARBITRATE.

A party's conduct may amount to a waiver of its right to arbitrate if its actions are inconsistent with that right. See, Doctor's Assocs., Inc. v. Distajo, 66 F.3d 438, 455 (2d Cir 1995)(stating "A party waives his right to arbitrate when he takes...action inconsistent with that right"); Johanson Resources Inc. v. La Vallee, 271 A.D.2d 832, 706 N.Y.S.2d 266 (3d Dept 2000)(stating "a contractual right to arbitrate may be waived or abandoned if the party invoking arbitration "manifest[s] a preference 'clearly inconsistent with [his] later claim that the parties were obligated to settle their differences by arbitration'").

Defense counsel unequivocally evinced intent to waive the right to arbitrate. As Defense counsel was made unmistakably aware, Plaintiff's complaint was dismissed from the Division of Human Rights specifically so that Plaintiff could commence an action in State Court.   (See, January 11, 2008 Correspondence to Defense counsel, Exhibit I).  Plaintiff's counsel explained to Defense counsel that it considered a judicial venue to be favorable to Plaintiff and for that specific reason would seek dismissal of Plaintiff's Division of Human Rights complaint.   Rather than inform Plaintiff's counsel of the arbitration agreement which Defense counsel now argues precludes litigation of the matter, Defense counsel refused to disclose the existence of the arbitration agreement until *after* Plaintiff's complaint was dismissed. (See, January 17, 2008 Email, Exhibit L).  Defense counsel's refusal to disclose the arbitration agreement duped Plaintiff to seek dismissal of the Division of Human Rights complaint. Defense counsel tricked Plaintiff's counsel into believing that a judicial forum was available, and now claims that it is not.

Defense counsel's conduct constituted a clear intent to forgo arbitration in favor of a judicial forum.  Had Defense counsel intended to invoke the arbitration clause, Defense counsel should have informed Plaintiff that dismissal would *not* lead to a judicial forum for resolution of Plaintiff's unlawful

termination and retaliation action. Defense counsel acceded to a waiver of the arbitration agreement when it induced, encouraged and allowed Plaintiff to act as if no arbitration existed. Defense counsel took affirmative actions and inactions consistent with the position that no arbitration agreement existed. Therefore, Defense counsel's duplicitous actions "manifest a preference clearly inconsistent with [its] later claim that the parties were obligated to settle their differences by arbitration." Id. at 835. Defense counsel's failure to timely disclose the arbitration agreement, to the prejudice of Plaintiff, must be viewed as intent to waive the arbitral forum.

Plaintiff is aware that lack of intent to arbitrate is also most often found where a party engages in protracted litigation before invocation of its right to arbitrate. However, case law does not provide, as Defendants would have the Court believe, that lack of intent to arbitrate will *only* be found in such circumstances. See, Great Northern Associates, Inc. v. Continental Casualty Co., 192 A.D.2d 976, 598 N.Y.S.2d 938 (3d Dep't 1993)(stating, "While there are **many** actions that can manifest waiver, one of the more common is the prior commencement of a judicial action or proceeding...")[emphasis added]. Defendants' conduct clearly evinced intent to waive the right to arbitrate, as it feigned the absence of an arbitration agreement, and used the prospect of State Court litigation to entice and induce Plaintiff to dismiss its complaint before the Division of Human Rights.

## III. DEFENDANT MATERIALLY BREACHED THE ARBITRATION AGREEMENT AND THEREFORE CANNOT SEEK TO ENFORCE IT.

A party that materially breaches a contract cannot later seek to enforce it, and the non-breaching may declare the contract terminated. Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp., 301 A.D.2d 70, 79; 747 N.Y.S.2d 468 (1st Dep't 2002)(stating, "where one party to a contract repudiates its obligations thereunder, the other party may [elect to] treat the contract as terminated"); Hatfield v. Colter, 188 A.D. 563; 177 N.Y.S.2d 382 (1st Dep't 1919); See also, Restatement (Second) of Contracts §

11

253(2) (1981). It is well established that all contracts contain an implied covenant of good faith and fair dealing. Allis-Chalmers, Corp. v. Lueck, 471 U.S. 202 (1985); Murphy v. American Home Products Corp., 58 N.Y.2d 293, 448 N.E.2d 86 (N.Y. 1983); Restatement (Second) of Contracts § 205 (1981). Defendants breached the duty of good faith and fair dealing inherent in every contract and Plaintiff is thus entitled to treat the contract as if it has been terminated.

The untimely-disclosed arbitration agreement explicitly provides that Plaintiff with a "Right to File [an] Administrative Complaint" with the "Equal Employment Opportunity Commission or…any other federal or state agency." (See, Arbitration Agreement, Exhibit M, at 10). The covenant of good faith and fair dealing requires that Defendants not only allow Plaintiff to "file" a complaint, but to fully engage in the administrative process free from the deception of Defendants. Defense counsel duped Plaintiff into a dismissal of her complaint before the Division of Human Rights, through its unethical choice to keep the existence of the arbitration agreement a secret. Put simply, Defense counsel tricked Plaintiff into a deprivation of her contractual right. As such, Defendants breached the arbitration contract.

Defendant breached the arbitration agreement by deceitfully depriving Plaintiff of her contractual right to have a complaint heard before the Division of Human Rights, yet Defendants now seek to enforce that contract. Plaintiff, as the non-breaching party, may declare the contract terminated. As such, the arbitration agreement is a nullity.

## IV.    WHILE ARBITRATION AGREEMENTS ARE GENRALLY AFFORDED FAVORED STATUS, AS A MATTER OF PUBLIC POLICY SUCH STATUS CANNOT BE USED AS A SAFETY NET FOR DUPLICITOUS CONDUCT OF COUNSEL

Plaintiff is aware of the "favored" status of arbitration by the Courts. However, while arbitration is a valuable mechanism for the resolution of disputes, it cannot be favored at the expense of

12

fundamental fairness and the proper administration of justice. It has been strongly urged that, "[c]ourts must not be timid in voiding agreements which tend to injure the public good or contravene some established interest of society." DeGaetano, 459 F.Supp. at 465(quoting Thomas Jones Assocs. v. Jameson, 102 F.3d 60 (2d Cir. 1996)). The Supreme Court has recognized that the elimination of discrimination is the "highest priority." Alexander v. Gardner-Denver 415 U.S. 36, 47 (1974). In the case at bar, Plaintiff engaged in duplicitous conduct aimed at depriving Plaintiff of statutory remedies provided to enforce civil rights that the Supreme Court has deemed to be of the "highest priority." Defense counsel cannot be encouraged to engage in duplicitous conduct that deprives Plaintiff of her rights under anti-discrimination laws, and then simply hide behind the shield of arbitration's "favored" status.

## V.    DEFENDANTS ARE NOT ENTITLED TO COSTS AND/OR FEES AND/OR SANCTIONS.

Defendants seek attorneys' costs and/or fees from Plaintiff where Defense counsel's duplicitous and deceitful conduct resulted in substantial prejudice to Plaintiff. That Defendant is being "called to task" for its unethical behavior is not grounds for an issuance of costs, fees, or sanctions.

As detailed above, a party may waive its right to arbitrate where its conduct results in substantive prejudice to the moving party and/or where it evinces intent to waive the right to arbitrate. See, Thyssen 310 F.3d at 105; Doctor's Assocs., Inc, 66 F.3d at 455; Johanson Resources Inc., 271 A.D.2d at 832. These principles are well grounded in existing case law. Defense counsel purposefully and deceitfully failed to timely disclose the existence of an arbitration agreement in order to induce Plaintiff to seek a dismissal of its complaint before the Division of Human Rights. Had Defense counsel timely advised Plaintiff's counsel of the existence of the arbitration agreement, Plaintiff would not have sought the dismissal of its complaint from the Division of Human Rights. Defense counsel tricked Plaintiff into

13

requesting the dismissal of her complaint before the Division of Human Rights, and as a result Plaintiff suffered substantive prejudice. Defense counsel's conduct constitutes an intention to waive the right to arbitrate.

As all counsel are aware, the general American rule is that a prevailing party may not recover attorneys' fees as costs or otherwise. One exception to this rule is where a party has acted "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Alyeska Pipeline Service, Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612 (1975). Plaintiff's actions are not frivolous or in bad faith in any manner. Furthermore, "[a] motion for sanctions must be made separately from any other motion" Fed. R. Civ. 11(c)(2). Defense counsel's request for sanctions was not separate from its underlying motion and therefore is procedurally defective. Therefore, Defense counsel's request for costs, fees and sanctions is both legally and procedurally improper.

## CONLCUSION

On account of the aforementioned reasons, Plaintiff respectfully requests that Defendants' motion be denied in its entirety. Defendant should be deemed to have waived its right to compel arbitration on account of its duplicitous conduct that resulted in substantive prejudice to Plaintiff and evinced intent to waive the right to arbitrate. Furthermore, Defendant materially breached the arbitration agreement, and Plaintiff may now unilaterally terminate the contract. Defense counsel should not be rewarded for its unethical conduct.

Dated: June 26, 2008           MARK L. LUBELSKY & ASSOCIATES
       New York, New York

                               Mark Lubelsky, Esq. (ML7958)

14

David Gottlieb, Esq. (DG6986)

Attorneys for Plaintiff
123 West 18th Street
Eighth Floor
New York, New York 10011
(212) 242-7480

15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

ANDREA GRAVAGNA,

               Plaintiff,

    v.

TERMINIX INTERNATIONAL, INC.,
THE SERVICEMASTER COMPANY,
JENNIFER HOWARD,

               Defendants.
------------------------------------------------------------x

Index No.: 08-cv-5448 (LAK-THK)

**DECLARATION OF**
**DAVID GOTTLIEB, ESQ.**

    **DAVID GOTTLIEB**, an attorney duly admitted to practice law in the State of New York and in Southern District of New York, under penalty of perjury, hereby states:

    1.    I am an associate of the firm of Mark L. Lubelsky & Associates, attorneys for Plaintiff Andrea Gravagna in the above captioned matter, and as such I am fully familiar with the facts and circumstances therein.

    2.    Plaintiff Andrea Gravagna alleges that she was subjected to age discrimination and then retaliated against when Defendants unlawfully terminated her, less than two weeks after she made a lawful complaint of such discrimination both to Defendant Jennifer Howard (hereinafter, "Defendant Howard") and to the New York State Division of Human Rights (hereinafter, "Division of Human Rights").

    3.    On July 9, 2007, after several months of adverse employment actions including but not limited to discriminatory remarks, failure to train, failure to provide standard job benefits and issuance of a pretextual corrective action report, Ms. Gravagna complained to Defendant Howard that, "You're just discriminating against me because I'm older. I'm going to file a complaint."

1

4.      On July 9, 2007, Ms. Gravagna filed a complaint with the Division of Human Rights, alleging unlawful age discrimination against Defendants. (See, DHR Complaint, attached to Plaintiff's Memorandum at Exhibit D).

5.      Shortly thereafter, on or about July 23, 2007, Defendants terminated Ms. Gravagna and Defendant Howard assaulted and battered her. (See, Police Incident Report, attached to Plaintiff's Memorandum at Exhibit E).

6.      On September 23, 2007, Defendants submitted a Position Statement to the Division of Human Rights. (See, DHR Position Statement, attached to Plaintiff's Memorandum as Exhibit F). On or about November 1, 2007, Ms. Gravagna submitted a Verified Rebuttal to the Division of Human Rights. (See, DHR Rebuttal attached to Plaintiff's Memorandum as Exhibit G).

7.      On December 26, 2007, Stuart Palatnik of the Division of Human Rights informed all counsel that a fact-finding conference between the parties was necessary in order for the Division of Human Rights to make a probable cause determination on or before January 4, 2008. The conference was originally scheduled for January 3, 2008, but for the convenience of all counsel was adjourned and ultimately scheduled for January 15, 2008.

8.      On January 3, 2008, Mr. Palatnik informed Plaintiff that the fact-finding conference had been adjourned and that a probable cause determination would not be issued by January 4, 2008. During the course of that conversation Mr. Palatnik stated that when he contacted Defense counsel that he would ask if they were interested in conciliation, and if so, ask that they contact me. Later that week I received a message from Rosemary Joyce of Defense counsel.

9.      On January 7, 2008 I contacted Ms. Joyce and left a voicemail message requesting that she return my call to discuss the matter.

10.    On January 7, 2008, the Division of Human Rights scheduled the previously adjourned fact-finding conference to January 15, 2008.

11.    On or about January 9, 2008, Ms. Joyce and I finally spoke. I stated Plaintiff's intention to remove the action from the Division of Human Rights, prior to the conference scheduled for January 15, 2008, in order to commence a State Court action and also discussed a potential settlement. Ms. Joyce said she would discuss settlement with her client and get back to me shortly so I could make a timely decision regarding the fact-finding conference. Ms. Joyce made no mention of any arbitration agreement. (See, Correspondence dated January 10, 2008, attached to Plaintiff's Memorandum at Exhibit H).

12.    On January 10, 2008, I sent Ms. Joyce correspondence asking her to "promptly advise" me of Defendants position on the matter as the fact-finding conference was nearing. I again reiterated my intention to seek dismissal of Plaintiff's Division of Human Rights complaint and commence an action in State Court. (See, Correspondence dated January 10, 2008, attached to Plaintiff's Memorandum at Exhibit H).

13.    On January 11, 2008, Ms. Joyce and I again spoke and she informed me that Defendants were not interested in a settlement at that time. Ms. Joyce made no mention of any arbitration agreement.

14.    On January 11, 2008, I informed both Ms. Joyce and the Division of Human Rights that Plaintiff would request that Ms. Gravagna's complaint to be dismissed in order to pursue a State Court remedy. Correspondence to both the State Division and Ms. Joyce explained that a State Court action would be commenced. In correspondence to Ms. Joyce, I inquired as to whether service of a State Court complaint would be accepted on behalf of the Defendants. Ms. Joyce was on actual notice that Plaintiff had no recollection of any arbitration agreement. (See, Correspondence dated January 11, 2008 to Defense counsel, attached to Plaintiff's Memorandum at Exhibit J; Correspondence dated January 11, 2008 to DHR, attached to Plaintiff's Memorandum at Exhibit K).

3

15.    On January 15, 2008, the Division of Human Rights officially dismissed Ms. Gravagna's complaint upon the plaintiff's request. (See, DHR Dismissal dated January 15, 2008, attached to Plaintiff's Memorandum at Exhibit K).

16.    On January 16, 2008, and not coincidentally the very next day after Ms. Gravagna had irreparably foreclosed her access to redress in the Division of Human Rights, Ms. Joyce finally informed me for the first time of the existence of an arbitration agreement.  (See, Email correspondence from Defense counsel dated January 17, 2008, attached to Plaintiff's Memorandum at Exhibit L; Arbitration Agreement attached to Plaintiff's Memorandum at Exhibit M).

17.    Per my numerous conversations with Ms. Gravagna and my extensive work on this case, Ms. Gravagna had no recollection of having signed any arbitration agreement. (See, Verified Complaint, attached to Plaintiff's Memorandum at Exhibit A, para. 19).

18.    On or about March 14, 2008, I advised Ms. Joyce that Defendants had waived the right to arbitration on account of its misleading and duplicitous conduct.  As a courtesy, I detailed the timeline of events that had transpired, and again offered to attempt to resolve the case before commencement of the action. I asked Ms. Joyce to "[p]lease advise if you would like to resolve this case or if we should proceed to motion practice on the waiver of defendant's arbitration agreement." (See, Correspondence dated March 14, 2008 attached to Plaintiff's Memorandum at Exhibit N).  I never received any further contact from Ms Joyce whatsoever.   Ms. Joyce never sought to convince me that no waiver had occurred, nor made any attempt to settle the case. As such, Plaintiff was forced to commence the action in State Court.

19.    On or about June 3, 2008, after Plaintiff had already commenced the action in State Court, Defense counsel finally contacted me to discuss the action.  Plaintiff's counsel advised Defense counsel of its position that arbitration had been waived because Defense counsel's intentional and malicious conduct

had resulted in substantive prejudice to Plaintiff. Defense counsel neither provided any believable

justification for its behavior nor acknowledged the wrongfulness of its conduct.


Dated: June 26, 2008                                   MARK L. LUBELSKY & ASSOCIATES
       New York, New York

                                          David Gottlieb, Esq.
                                          Attorneys for Plaintiff
                                          123 West 18th Street
                                        Eighth Floor
                                          New York, New York 10011
                                        (212) 242-7480

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------x

ANDREA GRAVAGNA,

        Plaintiff

    -against-

TERMINIX INTERNALTIONAL, INC.,
THE SERVICEMASTER COMPANY,
JENNIFER HOWARD,

        Defendants.

-------------------------------------------------------------------x

Index No.:
Date Purchased:

Plaintiff(s) designate(s)
NEW YORK COUNTY
as the place of trial

The basis of the venue is
Defendant's Residence

## SUMMONS

Plaintiff resides at:
County of Queens
166-31 9th Avenue
Whitestone, NY 11357

To the above named Defendant(s)

    **You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or if the complaint is not served with the summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
      May 6, 2008

Defendant's address:

TERMINIX INTERNATIONAL, INC.
C/O C T CORPORATION SYSTEM
NEW YORK, NEW YORK 10011

THE SERVICEMASTER COMPANY
C/O C T CORPORATION SYSTEM
NEW YORK, NEW YORK 10011

JENNIFER HOWARD
30-50 WHITESTONE EXPRESSWAY
SUITE 100
FLUSHING, NEW YORK 11354

MARK L. LUBELSKY AND ASSOCIATES

Mark L. Lubelsky, Esq.
Attorneys for Plaintiff(s)
123 West 18th Street, 8th Floor
New York, New York 10011
(212) 242-7480
FILE:  6575

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x
ANDREA GRAVAGNA,

        Plaintiff,

    - against -

TERMINIX INTERNATIONAL, INC.,
THE SERVICEMASTER COMPANY
JENNIFER HOWARD,

        Defendants.
-----------------------------------------------------------------x

**VERIFIED COMPLAINT**

Index No.:

      Plaintiff, by her attorneys, MARK L. LUBELSKY AND ASSOCIATES, complaining of the

Defendants, alleges as follows:

## PARTIES

1. Plaintiff ANDREA GRAVAGNA is a resident of the State of New York, United States of America.

2. Defendant TERMINIX INTERNATIONAL, INC., (hereinafter, "TERMINIX") is a corporation

doing business in New York and is subject to the jurisdiction of this Court.

3. Defendant THE SERVICEMASTER COMPANY (hereinafter, "SERVICEMASTER") is a

corporation doing business in New York and is subject to the jurisdiction of this Court.

4. Defendant TERMINIX is a corporation maintaining a place of business within New York City, New

York County, and New York State.

5. Defendant SERVICEMASTER is a corporation maintaining a place of business within New York

City, New York County, and New York State.

6. Defendant TERMINIX is a corporation authorized to do business in the State of New York.

7. Defendant SERVICEMASTER is a corporation authorized to do business in the State of New York.

8. Upon information and belief, Defendant TERMINIX at all material times herein employed Defendant JENNIFER HOWARD.

9. Upon information and belief, Defendant SERVICEMASTER at all material times herein employed Defendant JENNIFER HOWARD.

10. Upon information and belief, Defendant JENNIFER HOWARD at all material times herein maintained a supervisory and/or managerial position with Defendant TERMINIX.

11. Upon information and belief, Defendant JENNIFER HOWARD at all material times herein maintained a supervisory and/or managerial position with Defendant SERVICEMASTER.

## FACTS

12. Defendants unlawfully terminated Plaintiff ANDREA GRAVAGNA on account of her age and in retaliation for her complaints of unlawful discrimination.

13. Defendant JENNIFER HOWARD aided and abetted TERMINIX and SERVICEMASTER's unlawful termination of Plaintiff ANDREA GRAVAGNA on account of her age and in retaliation for her complaints of unlawful discrimination.

14. Defendants TERMINIX and SERVICEMASTER subjected Plaintiff ANDREA GRAVAGNA to a hostile work environment on account of her age and in retaliation to her complaints of unlawful discrimination.

15. Defendant JENNIFER HOWARD subjected Plaintiff ANDREA GRAVAGNA to a hostile work environment on account of her age and in retaliation to her complaints of unlawful discrimination.

16. Defendants TERMINIX and SERVICEMASTER discriminated against Plaintiff ANDREA GRAVAGNA on account of her age and in retaliation her for complaints of discrimination.

2

17. Defendant JENNIFER HOWARD intentionally aided and abetted Defendants TERMINIX and SERVICEMASTER's discrimination against Plaintiff ANDREA GRAVAGNA on account of her age and in retaliation for her complaints of discrimination.

18. On or about February 16, 2007, Defendants TERMINIX and SERVICEMASTER hired Plaintiff ANDREA GRAVAGNA as an account manager.

19. Plaintiff ANDREA GRAVAGNA was hired by the Defendants TERMINIX and SERVICEMASTER at the branch location at 30-50 Whitestone Expressway, Flushing, New York.

20. Plaintiff was qualified for her position at all material times herein.

21. From the onset of Plaintiff ANDREA GRAVAGNA's employment, she was treated differently than other similarly situated employees on account of her age.

22. Defendants retaliated against Plaintiff ANDREA GRAVAGNA when she complained about the hostile work environment, harassment and age discrimination.

23. Throughout the duration of her employment at Defendants TERMINIX and SERVICEMASTER, Plaintiff ANDREA GRAVAGNA suffered a multitude of adverse employment actions including but not limited to failure to train, denial of orientation, withholding of performance evaluations, issuance of a false discipline report, verbal harassment, hostile work environment, retaliation after complaints of discrimination, wrongful discharge as well as physical assault.

24. Throughout the duration of her employment Defendants TERMINIX and SERVICEMASTER refused to provide Plaintiff ANDREA GRAVAGNA with adequate job training including but not limited to refusing to train her on the computer program called "Mission", an integral aspect of employment.

3

25. Throughout the duration of her employment, Plaintiff ANDREA GRAVAGNA requested appropriate computer training but Defendant JENNIFER HOWARD repeatedly refused Plaintiff's requests and responded with disparaging remarks about Plaintiff's age.

26. Despite Defendants' intentional failure to train Plaintiff ANDREA GRAVAGNA, Plaintiff received an overwhelmingly positive 30-Day Performance Evaluation.

27. . Plaintiff ANDREA GRAVAGNA was at an extreme disadvantage compared to other employees on account of her lack of computer training and the hostility to which she was subjected.

28. Defendants TERMINIX and SERVICEMASTER failed to provide Plaintiff ANDREA GRAVAGNA with 60-Day and 90-Day Performance Evaluations.

29. Defendants TERMINIX and SERVICEMASTER has a policy and procedure to provide employees with 60-Day and 90-Day Performance Evaluations.

30. Defendants TERMINIX and SERVICEMASTER failed to provide Plaintiff ANDREA GRAVAGNA with a 6-month orientation period.

31. Defendants TERMINIX and SERVICEMASTER have a policy and procedure to provide employees with a 6-month orientation period.

32. In or about mid-April 2007, Plaintiff ANDREA GRAVAGNA complained to Defendant JENNIFER HOWARD that she did not feel she had been treated fairly and equally with regard to her training and Defendant JENNIFER Howard responded, "I know, it's hard for older people to get in the swing of things." Plaintiff ANDREA GRAVAGNA told Ms. Howard that she took offense to the comment, which seemed to have the opposite effect Plaintiff expected. Thereafter, comments of this nature from Ms. Howard became commonplace.

33. In or about late-April 2007, Plaintiff ANDREA GRAVAGNA complained to Defendant JENNIFER HOWARD regarding her lack of training on the "Mission" computer program. Plaintiff said, "You're

4

not treating me properly, I need to be taught how to use Mission." Defendant JENNIFER HOWARD responded, "I know it's hard for older people, they aren't very computer savvy."

34. In or about mid-April 2007, Plaintiff ANDREA GRAVAGNA complained to employee Karla Arana, "Jennifer never told me how to do this, she looks at me like I am older, not computer savvy and not as smart."

35. In or about mid-April 2007, Plaintiff ANDREA GRAVAGNA complained to employee Jose Morales, "Jennifer never took time to show me because I am older than the rest of you"

36. In or about June 2007, Regional Director Bill Gausch visited the Terminix branch at which Plaintiff ANDREA GRAVAGNA worked. Mr. Gausch asked Plaintiff for copies of the proposals from "Mission" that she had submitted to potential clients. Plaintiff said, "I can't do that, I don't know how to do that." Mr. Gausch responded, "Didn't Jennifer [Howard] show you how to use Mission?" Ms. Gravagna complained, "No, she never did. She doesn't think I can learn how to use the computer because I'm too old."

37. On or about July 7, 2007, Plaintiff ANDREA GRAVAGNA complained to employee Karla Arana, "I'm going to bring her into court for this [forcing her to sign the corrective action report]; I am going to make a complaint of age discrimination."

38. On or about July 7, 2007, Plaintiff ANDREA GRAVAGNA informed Defendant JENNIFER HOWARD that she was going to file a complaint of discrimination.

39. On or about July 9, 2007, Plaintiff ANDREA GRAVAGNA submitted a complaint to the New York State Division of Human Rights (hereinafter "SDHR").

40. On or about July 23, 2007, Plaintiff ANDREA GRAVAGNA was terminated and subsequently physically assaulted.

41. On or about September 24, 2007, defense counsel Rosemary Joyce of Seyfarth Shaw, submitted a Position Statement to the SDHR, responding to the complaint previously submitted by Plaintiff ANDREA GRAVAGNA.

42. On or about November 1, 2007, plaintiff's counsel submitted a Rebuttal to the SDHR, responding to the Position Statement of Defendant TERMINIX.

43. The SDHR scheduled the matter for a conference between all parties for January 15, 2008, during which time the SDHR would gather information and evidence necessary for a determination in the case.

44. On or about January 9, 2008, plaintiff's counsel and defense counsel Rosemary Joyce spoke regarding the action then pending in SDHR. Plaintiff's counsel stated its intention to request a dismissal of the action from SDHR prior to January 15, 2008 conference in order to commence a state court action. Plaintiff's counsel additionally discussed entering into settlement negotiations. (See, Confirming Correspondence dated January 10, 2008 attached hereto as Exhibit A).

45. On or about January 11, 2008, plaintiff's counsel and defense counsel again spoke and defense counsel merely informed plaintiff's counsel that it was not interested in settlement at that time. Defense counsel provided no further information whatsoever.

46. Plaintiff ANDREA GRAVAGNA had no recollection of her own of having signed arbitration agreement.

47. As a result, on or about January 11, 2008, plaintiff's counsel requested a dismissal of the action from the SDHR so that Plaintiff could pursue a remedy in state court. Correspondence to both the SDHR and defense counsel explained that a state court action would be commenced. (See, Request for Dismissal dated January 11, 2008 attached hereto as Exhibit B).

48. On or about January 11, 2008, plaintiff's counsel also sent correspondence to defense counsel whereby plaintiff's counsel inquired as to whether defense counsel would accept service of a state court

6

on behalf of Defendant TERMINIX. (See, Correspondence dated January 11, 2008 attached hereto as Exhibit C).

49. On or about January 15, 2008, the SDHR dismissed Plaintiff ANDREA GRAVAGNA's complaint. (See, SDHR Dismissal of Complaint dated January 15, 2008 attached hereto as Exhibit D).

50. On or about January 16, 2008, defense counsel informed plaintiff's counsel via telephone, for the first time, of the existence of an arbitration agreement. (See, Confirming Correspondence dated January 17, 2008 with attached Arbitration Agreement attached hereto as Exhibit E)

51. It is plainly evident that defense counsel hid the existence of any arbitration agreement prior to this correspondence, as an arbitration agreement would preclude commencement of a state court action.

52. Defense counsel obviously knew that Plaintiff's counsel was not in possession of, and did not know of the existence of, the arbitration agreement. However, defense counsel intentionally failed to either provide plaintiff's counsel with a copy of the arbitration agreement or even inform Plaintiff's counsel that an arbitration agreement existed.

53. Though Plaintiff is now aware of the alleged arbitration agreement, it is Plaintiff's position that Defendants have waived their right to invoke arbitration on account of the intentional and malicious conduct of Defendants. Plaintiff has been prejudiced, as she has been deprived of a substantive statutory remedy to prosecute her allegations of discrimination with an administrative agency, on account of defense counsel's hide-and-seek with documents.

## FIRST CAUSE OF ACTION

54. Plaintiff repeats and reiterates each and every allegation contained in paragraphs numbered "1" through "53" inclusive, with the same force and effect as if more fully set forth at length herein.

7

55. Defendants TERMINIX and SERVICEMASTER engaged in unlawful discriminatory practice by discriminating against Plaintiff ANDREA GRAVAGNA with regard to the terms and conditions of employment because of her age and in retaliation to her complaints of unlawful discrimination in violation of New York State Executive Law, Human Rights Law, sections 291 and 296, et. seq.

56. Defendant JENNIFER HOWARD aided and abetted Defendants TERMINIX and SERVICEMASTER by discriminating against Plaintiff ANDREA GRAVAGNA with regard to the terms and conditions of employment on account of her age and in retaliation to her complaints of discrimination in violation of New York State Executive Law, Human Rights law, sections 291 and 296, et. seq.

57. Defendants acted with specific intent and/or malice and/or reckless and/or callous disregard of Plaintiff's civil rights and Defendants' civil obligation.

58. Defendants acted with a criminal like indifference to Plaintiff's civil rights and to Defendants' civil obligations.

59. Pursuant to the aforementioned, Plaintiff demands a monetary award of the following:

    a)    A monetary award of damages to Plaintiff retroactive, for all lost wages and benefits resulting from Defendants' unlawful termination of Plaintiff on account of her age and in retaliation for her complaints of discrimination, and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practice;

    b)    A monetary award of future income to Plaintiff in an amount to be proven representing all loss of future earnings, including reasonable and expected increases, bonuses, loss of retirement income and all other benefits Plaintiff would have been expected to earn during Plaintiff's entire lifetime had it not been for Defendants' unlawful employment practice;

8

c)   A monetary award to Plaintiff for compensatory damages for mental, emotional and physical injury, medical expenses, distress, pain, suffering and injury to Plaintiff's reputation in an amount to be proven;

d)   A monetary award to Plaintiff for punitive damages;

e)   An award to Plaintiff for attorneys' fees, costs and expenses incurred in the prosecution of this action;

f)   A monetary award to Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy defendants' unlawful employment practices.

60. That as a result of the foregoing, Plaintiff ANDREA GRAVAGNA has been damaged in the sum of FIVE MILLION DOLLARS ($5,000,000.00).

## SECOND CAUSE OF ACTION

61. Plaintiff repeats and reiterates each and every allegation contained in paragraphs numbered "1" through "60" inclusive, with the same force and effect as if more fully set forth at length herein.

62. Defendants TERMINIX and SERVICEMASTER engaged in unlawful discriminatory practice by discriminating against Plaintiff ANDREA GRAVAGNA with regard to the terms and conditions of employment because of her age and in retaliation to her complaints of unlawful discrimination in violation of New York City Administrative Code Section 8-107 et. seq.

63. Defendant JENNIFER HOWARD aided and abetted Defendants TERMINIX and SERVICEMASTER by discriminating against Plaintiff ANDREA GRAVAGNA with regard to the terms and conditions of employment on account of her age and in retaliation to her complaints of discrimination in violation of New York City Administrative Code Section 8-107 et. seq.

64. Defendants acted with specific intent and/or malice and/or reckless and/or callous disregard of Plaintiff's civil rights and Defendants' civil obligation.

65. Defendants acted with a criminal like indifference to Plaintiff's civil rights and to Defendants' civil obligations.

66. Pursuant to the aforementioned, Plaintiff demands a monetary award of the following:

    a)    A monetary award of damages to Plaintiff retroactive, for all lost wages and benefits resulting from Defendants' unlawful termination of Plaintiff on account of her age and in retaliation for her complaints of discrimination, and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practice;

    b)    A monetary award of future income to Plaintiff in an amount to be proven representing all loss of future earnings, including reasonable and expected increases, bonuses, loss of retirement income and all other benefits Plaintiff would have been expected to earn during Plaintiff's entire lifetime had it not been for defendants' unlawful employment practice;

    c)    A monetary award to Plaintiff for compensatory damages for mental, emotional and physical injury, medical expenses, distress, pain, suffering and injury to Plaintiff's reputation in an amount to be proven;

    d)    A monetary award to Plaintiff for punitive damages;

    e)    An award to Plaintiff for attorneys' fees, costs and expenses incurred in the prosecution of this action;

    f)    A monetary award to Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy defendants' unlawful employment practices.

67. That as a result of the foregoing, Plaintiff ANDREA GRAVAGNA has been damaged in the sum of FIVE MILLION DOLLARS ($5,000,000.00).

## THIRD CAUSE OF ACTION

68. Plaintiff repeats and reiterates each and every allegation contained in paragraphs numbered "1" through "67" inclusive, with the same force and effect as if more fully set forth at length herein.

69. Defendants TERMINIX, SERVICEMASTER and JENNIFER HOWARD intentionally and/or recklessly engaged in extreme and outrageous conduct, which resulted in Plaintiff ANDREA GRAVAGNA suffering severe emotional distress.

70. Defendants acted with specific intent and/or malice and/or reckless and/or callous disregard of Plaintiff's civil rights and Defendants' civil obligation.

71. Defendants acted with a criminal like indifference to Plaintiff's civil rights and to Defendants' civil obligations.

72. That as a result of the foregoing damages Plaintiff should be awarded a monetary sum in the amount of FIVE MILLION DOLLARS ($5,000,000.00).

## FOURTH CAUSE OF ACTION

73. Plaintiff repeats and reiterates each and every allegation contained in paragraphs numbered "1" through "72" inclusive, with the same force and effect as if more fully set forth at length herein.

74. By subjecting Plaintiff to a hostile work environment, retaliating against Plaintiff on account of her complaints of discrimination and for unlawful termination on account of Plaintiff's age and in retaliation for her complaints of discrimination, Defendants TERMINIX, SERVICEMASTER and JENNIFER HOWARD committed an egregious, malicious and willful tortious act in violation of state and city laws.

11

75. Defendants TERMINIX, SERVICEMASTER and JENNIFER HOWARD acted with specific intent and/or malice and/or reckless and/or callous disregard of Plaintiff's civil rights and Defendants' civil obligations.

76. Defendants TERMINIX, SERVICEMASTER and JENNIFER HOWARD acted with a criminal like indifference to Plaintiff's civil rights and to Defendants' civil obligations.

77. Defendants TERMINIX, SERVICEMASTER and JENNIFER HOWARD's conduct was directed at the public generally.

78. An award of punitive damages is necessary to deter the Defendants and other similarly situated from engaging in similarly egregious conduct in the future.

79. That as a result of the foregoing Plaintiff should be awarded a monetary award of punitive damages in the amount of FIVE MILLION DOLLARS ($5,000,000.00).

## FIFTH CAUSE OF ACTION FOR ASSAULT AND BATTERY

80. Plaintiff repeats and reiterates each and every allegation contained in paragraphs numbered "1" through "79" inclusive, with the same force and effect as if more fully set forth at length herein.

81. Plaintiff was assaulted and/or battered by Defendant JENNIFER HOWARD.

82. Defendant JENNIFER HOWARD's actions toward Plaintiff put Plaintiff in imminent apprehension of harmful contact.

83. Defendant JENNIFER HOWARD intentionally touched Plaintiff without Plaintiff's consent.

84. Defendant JENNIFER HOWARD intentionally made bodily contact in an offensive in nature with Plaintiff, without Plaintiff's consent.

85. That as a result of the foregoing Plaintiff should be awarded a monetary award in the amount of FIVE MILLION DOLLARS ($5,000,000.00).

12

WHEREFORE, Plaintiff demands a judgment against Defendant in the sum of FIVE MILLION

DOLLARS ($5,000,000.00) on the first cause of action; in the sum of FIVE MILLION DOLLARS

($5,000,000.00) on the second cause of action; in the sum of FIVE MILLION DOLLARS

($5,000,000.00) on the third cause of action; in the sum of FIVE MILLION DOLLARS

($5,000,000.00) on the fourth cause of action, in the sum of FIVE MILLION DOLLARS

($5,000,000.00) on the fifth cause of action; together with the costs and disbursements of this action

and interest form the date of verdict rendered thereon.


Dated:     New York, New York     MARK L. LUBELSKY AND ASSOCIATES
          May 6, 2008

By:
Mark L. Lubelsky, Esq.
Attorneys for Plaintiff
123 West 18th Street, 8th Floor
New York, NY 10011
212-242-7480

13

CLIENT VERIFICATION

ANDREA GRAVAGNA, being duly sworn deposes and says the following under the penalties of perjury:

I am the plaintiff in the within action, and as such, I am fully familiar with all the facts and circumstances herein. I have read the foregoing VERIFIED COMPLAINT, and know the contents thereof; the same is true to my own knowledge, except as to the matters therein alleged to be on information and belief, and as to those matters, I believe them to be true.

Dated:    New York, New York
          May 6, 2008

                                        _____
                                        ANDREA GRAVAGNA

State of New York      )
                       ) ss.:
County of New York     )

On the  6  day of  May  in the year 2008 before me, the undersigned, a Notary Public in and for the State, personally appeared ANDREA GRAVAGNA, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument

Diana Morales
Notary Public:State of New York
No.01MO5183056
Qualified in Bronx County
Commission Expires March.10.2012

# MARK L. LUBELSKY AND ASSOCIATES
ATTORNEYS AT LAW

123 WEST 18ᵗʰ STREET, 8ᵗʰ FLOOR
NEW YORK, NEW YORK 10011
TELEPHONE: (212) 242-7480
FACSIMILE: (646) 619-4631

VIA FACSIMILE AND FIRST CLASS MAIL

January 10, 2008

Ms. Rosemary Joyce
Seyfarth Shaw
620 Eighth Avenue
New York, NY 10018

Re: Gravagna, Andrea v. Terminix
DHR Case No.: 10118919
Federal Case No.: 16GA703979
File no.: 6575

Dear Rosemary:

I write this letter to memorialize our conversation of January 9, 2008.

During that conversation we discussed the above-referenced matter. I indicated our intention to remove the action from the State Division of Human Rights prior to the currently scheduled conference of January 15, 2008, and commence a state court action and/or file an EEOC charge of discrimination, the administrative prerequisite to commencement in federal court.

We discussed a potential resolution of the matter and you indicated that defense counsel would respond to plaintiff's counsel by today, January 10, 2008, so that plaintiff's counsel could proceed accordingly.

Please promptly advise of your position on this matter.

Thank you.

Very truly yours,

MARK L. LUBELSKY AND ASSOCIATES

David Gottlieb

# MARK L. LUBELSKY AND ASSOCIATES
ATTORNEYS AT LAW

123 WEST 18th STREET, 8th FLOOR
NEW YORK, NEW YORK 10011
TELEPHONE: (212) 242-7480
FACSIMILE: (646) 619-4631

January 11, 2008

Mr. Stewart Palatnik
State Division of Human Rights
Brooklyn Regional Office
55 Hanson Place, Room 304
Brooklyn, NY 11217

Re: Gravagna, Andrea v. Terminix
DHR Case No.: 10118919
Federal Case No.: 16GA703979
File no.: 6575

Dear Stewart:

I write this letter to memorialize our conversation earlier today, January 11, 2008.

During that conversation I explained that our client Andrea Gravagna, complainant in the above referenced matter, respectfully requests that the State Division of Human Rights dismiss her complaint on the grounds that the election of remedies is annulled. Ms. Gravagna shall maintain all rights to bring suit as if no complaint had been filed with the State Division of Human Rights.

Thank you for all your efforts on this matter. Please feel free to contact me for any reason.

Very truly yours,

MARK L. LUBELSKY AND ASSOCIATES

David Gottlieb

# MARK L. LUBELSKY AND ASSOCIATES
ATTORNEYS AT LAW

123 WEST 18th STREET, 8th FLOOR
NEW YORK, NEW YORK 10011
TELEPHONE: (212) 242-7480
FACSIMILE: (646) 619-4631

<u>VIA FACSIMILE AND FIRST CLASS MAIL</u>

January 11, 2008

Ms. Rosemary Joyce
Seyfarth Shaw
620 Eighth Avenue
New York, NY 10018

Re: Gravagna, Andrea v. Terminix International
File no.: 6575

Dear Rosemary:

I write this letter to inform you that the above-referenced matter has been withdrawn from the State Division of Human Rights.

Please advise if you will accept service of the state court complaint.

A courtesy copy of our EEOC charge of discrimination will be forthcoming as well.

Please feel free to contact me.

Very truly yours,

MARK L. LUBELSKY AND ASSOCIATES

David Gottlieb

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION OF
HUMAN RIGHTS on the Complaint of

ANDREA GRAVAGNA,

                          Complainant,

                    v.

TERMINIX INTERNATIONAL, INC.,

                          Respondent.

ANNULMENT
DETERMINATION

Case No.
10118919

---

Federal Charge No. 16GA703979

On 7/10/2007, Andrea Gravagna filed a verified complaint
with the New York State Division of Human Rights ("Division")
charging the above-named respondent with an unlawful
discriminatory practice relating to employment because of age in
violation of N.Y. Exec. Law, art 15 ("Human Rights Law").

Pursuant to Section 297.9 of the Human Rights Law, a
complainant, at any time prior to a hearing before a hearing
officer, may request that the Division dismiss the complaint and
annul the election of remedies so that the case may be pursued
in court, and the Division may, upon such request, dismiss that
case on the grounds that the complainant's election of an
administrative remedy is annulled.

The above named complainant has made such a request.  The
complaint is ordered dismissed, on the grounds that the
complainant's election of an administrative remedy is annulled.

Section 297.9 of the Human Rights Law provides that:

... where the Division has dismissed such complaint on
the grounds of the administrative convenience, ...
such person shall maintain all rights to bring suit as
if no complaint had been filed.  ...  [I]f a complaint
is so annulled by the division, upon the request of
the party bringing such complaint before the division,
such party's rights to bring such cause of action
before a court of appropriate jurisdiction shall be
limited by the statute of limitations in effect in

such court at the time the complaint was initially filed with the division.

PLEASE TAKE NOTICE that any party to this proceeding may appeal this Determination to the New York State Supreme Court in the County wherein the alleged unlawful discriminatory practice took place by filing directly with such court a Notice of Petition and Petition within sixty (60) days after service of this Determination. A copy of this Notice and Petition must also be served on all parties including General Counsel, State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. DO NOT FILE THE ORIGINAL NOTICE AND PETITION WITH THE STATE DIVISION OF HUMAN RIGHTS.

Dated: 1/15/08
       Brooklyn, New York

                          STATE DIVISION OF HUMAN RIGHTS

            By:  _____
                 Joyce Yearwood-Drury
                 Director O.S.H.I.

- 2 -

**David Gottlieb**

From:          Joyce, Rosemary [RJoyce@seyfarth.com]
Sent:          Thursday, January 17, 2008 11:29 AM
To:            dgottlieb@mllassociates.com
Subject:       Andrea Gravagna


E-Copy Scan
01162008.pdf

                  Mr. Gottlieb,

Further to our discussion yesterday, attached please find a copy of the
Arbitration Agreement signed by Ms. Gravagna.  As I noted during our
conversation, we are authorized to accept service on behalf of our
client, but we assume that you will be filing and serving a demand for
arbitration in light of the attached agreement.  Please be advised that
if you do initiate a state court action, we will be forced to move to
compel arbitration and will seek attorneys' fees and costs associated
therewith.

  <<E-Copy Scan 01162008.pdf>>

Please do not hesitate to contact me if you have any questions.

Thank you,
Rosemary

Please note our new office address:
Rosemary P. Joyce
Seyfarth Shaw LLP
620 Eighth Avenue
New York, New York  10018-1405
(212) 218-5549 - Direct
(917) 344-1207 - Fax
rjoyce@seyfarth.com

Any tax information or written tax advice contained herein (including any attachments) is
not intended to be and cannot be used by any taxpayer for the purpose of avoiding tax
penalties that may be imposed on the taxpayer. (The foregoing legend has been affixed
pursuant to U.S. Treasury Regulations governing tax practice.)

This email may contain privileged or confidential information and is for the sole use of
the intended recipient(s). If you are not the intended recipient, any disclosure, copying,
distribution, or use of the contents of this information is prohibited and may be
unlawful. If you have received this electronic transmission in error, please reply
immediately to the sender that you have received the message in error, and delete it.
Thank you.

1

# TERMINIX

## THE TERMINIX INTERNATIONAL COMPANY LIMITED PARTNERSHIP ARBITRATION AGREEMENT

This Arbitration Agreement ("Agreement") is between The Terminix International Company Limited Partnership ("Employer" or "Company") and Employee. In consideration for the promises and undertakings set forth below, Employer and Employee agrees to the following terms:

1.    **Agreement to Arbitrate All Employment Disputes.** Private arbitration is the referral of a dispute to an impartial third party, instead of a court or jury, for a final and binding decision. Any dispute arising out of Employee's employment and/or termination of employment with Employer will be submitted to binding arbitration in accordance with the then-current National Rules for the Resolution of Employment Disputes of the American Arbitration Association ("AAA").   Employer and Employee each expressly waive entitlement, if any, to have any such dispute heard before a court or a jury.

2.    **Arbitrable Claims.** Except as otherwise provided by law, this Agreement applies to any dispute arising out of or related to Employee's employment and/or termination of employment with Employer, including but not limited to, claims for breach of contract, express or implied, claims of discrimination and/or retaliation, claims alleging violation of public policy, whistleblower claims, torts and/or any other claims based upon any federal, state or local ordinance, regulation, statute, constitutional provision and any other non-statutory claims (excluding claims for workers compensation benefits and unemployment insurance benefits).

3.    **Initiating Arbitration.** In the case of a dispute involving statutory claims, arbitration is initiated by filing a demand for arbitration with the AAA in accordance with the AAA's applicable rules and procedures within the time limit established by statute. In the case of a dispute involving non-statutory claims, arbitration is initiated by filing a demand for arbitration with the AAA in accordance with the AAA's applicable rules and procedures within one year of the occurrence of the event giving rise to the non-statutory claim.

4.    **Time Limits for Initiating Arbitration.** Failure to initiate arbitration within the applicable statutory period or within the applicable one-year non-statutory period, or such extended period as may be mutually agreed upon in writing, will constitute a waiver of any and all claims and such claims will be forever barred.  The arbitrator will resolve all disputes regarding the timeliness or propriety of the demand for arbitration.  Rules and forms of the AAA may be obtained at any AAA office, at www.adr.org or by calling the AAA at 1- 800-778-7879.

5.    **Selection of the Arbitrator.** Both parties will attempt to agree upon a mutually acceptable arbitrator from the AAA's (or other mutually agreeable arbitration association/group) national employment panel. If the parties are unable to agree upon an arbitrator, then an arbitrator will be selected in accordance with the then-current National Rules for the Resolution of Employment Disputes of the AAA.  The location of the arbitration proceeding will be in the general geographical vicinity of the place where the Employee last worked for the Company, unless each party to the arbitration agrees in writing otherwise.

6.    **Arbitrator's Authority.** The arbitration will be conducted in accordance with the then-current National Rules for the Resolution of Employment Disputes of the AAA.  The Arbitrator will base the decision on the evidence presented at the hearing and in accordance with governing law, including statutory and judicial authority.    The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies will be limited to those that would be available to a party in a court of law for the claims presented to and decided by the Arbitrator. The Arbitrator will issue a written decision, which will contain the essential findings and conclusions on which the decision is based. The Arbitrator's decision will be final and binding upon all parties.

7.    **Discovery.** The parties may engage in discovery in accordance with the then-current National Rules for the Resolution of Employment Disputes of the AAA.  The arbitrator will rule on all

1

Revised 01/04/07

# TERMINIX

discovery disputes and may limit discovery to that reasonably necessary to arbitrate the issues presented.

8. **Fees.** Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. The Employee will bear only those costs of arbitration that he or she would have borne if the Employee brought a claim covered by this Agreement in court.

9. **Award.** Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties. A court of competent jurisdiction will have the authority to enter a judgment upon the award made pursuant to the arbitration.

10. **Right to File Administrative Complaint.** Nothing in the Agreement will prevent Employee from filing a complaint with the Equal Employment Opportunity Commission or National Labor Relations Board, or any other federal or state agency.

11. **Governing Law.** This Agreement will be governed and construed in accordance with the Federal Arbitration Act, 9 U.S.C. § 1 et seq.

12. **Integration.** This Agreement and the Employee's Employment Agreement reflect the parties' full and final agreement relating to the resolution of arbitrable claims.

13. **Survivability.** This Agreement will continue in full force and effect for the duration of the Employee's employment with the Company and will continue thereafter until termination through a written instrument signed by both parties. This Agreement, however, does not extend or waive any statutes of limitations or other provisions of law that specify the time within which any claim must be brought.

The Terminix International Company L.P.:

By: _Jennifer Howard_

Its: _B.M._

Date: _2/15/07_

Employee:

_Andrea J Gravagna_

_Andrea J Gravagna_
(Print Name)

_2-15-07_
Date

2

Revised 01/04/07

# TERMINIX INTERNATIONAL GUIDELINES FOR THE WORKPLACE

## SIX MONTH ORIENTATION PERIOD

All new full-time employees have a six-month (6) orientation period. This six-month period will provide new full-time employees an adjustment period to become more acquainted with their new company and position while providing an opportunity to demonstrate their ability to achieve a satisfactory level of performance.

## INTERNAL TRANSFERS

It is the policy of this company that all new hires or internal candidates must remain or have been in their initial positions twelve months (12) prior to being considered for an internal move, transfer to another business unit or promotion. Employees must be in good standing (i.e. good attendance record and no counseling of any type within a twelve month (12) period). The Corporate Human Resources Manager or the appropriate Regional Human Resources Manager must approve any exception.

## PERSONAL APPEARANCE

It is expected that the personal appearance and grooming of each employee will project a professional business image. Each employee is expected to report to work dressed and groomed in a way that conforms to generally accepted standards for a professional business work place, the duties they perform and the amount of face-to-face public contact they encounter.

(18)

# TERMINIX
# INTERNATIONAL



## Employee Handbook

Key #32015 R/P 07/05

# Terminix International
# Substance Abuse Policy

Consistent with the policy of providing a drug free workplace, all employees involved in a motor vehicle accident, or a worker's compensation accident will be drug tested immediately.  A positive result on a drug test may disqualify the employee from coverage under the worker's compensation insurance and may result in disciplinary action up to and including discharge.

# TABLE OF CONTENTS

SUBSTANCE ABUSE POLICY ...................................................................1
TABLE OF CONTENTS .........................................................................2
INTRODUCTION .................................................................................3
COMPANY OBJECTIVES ........................................................................4
COMPANY HISTORY ............................................................................5
TERMINIX WEBSITE ............................................................................7

BENEFITS...........................................................................................8
    Holidays.....................................................................................9
    Vacation .....................................................................................9
    Paid Sick Time and Personal Time.................................................11
    Leaves of Absence.....................................................................13
    Family Medical Leave Act.............................................................15
    Funeral Leave............................................................................16
    Jury Duty ..................................................................................16
    Voting Time ...............................................................................16
    Benefits Reminder ......................................................................17

TERMINIX INTERNATIONAL GUIDELINES FOR THE WORKPLACE
    Six-Month Orientation Period.........................................................18
    Internal Transfers ......................................................................18
    Personal Appearance ..................................................................18
    Workweek and Hours ..................................................................20
    Payday .....................................................................................20
    Pay Advances.............................................................................21
    Attendance ...............................................................................21
    Nondiscrimination Policy .............................................................22
    Nepotism: Hiring of Relatives .......................................................22
    Sexual Harassment Policy............................................................23
    Prohibited Acts ..........................................................................24
    Drug Testing After Job Related Accidents .......................................27
    Clean Air Policy .........................................................................27
    Breaks/Lunch Periods .................................................................27
    Electronic Communications Resource Policy ....................................28
    Solicitation and Distribution ..........................................................31
    Acceptance of Gifts and Favors ....................................................32
    Employee Personnel File..............................................................32

CONCLUSION ....................................................................................33
EMPLOYEE ACKNOWLEDGMENT.............................................................34

# BENEFITS

Group Insurance Benefits
Comprehensive Medical Insurance
Basic Term Life Insurance
Supplemental Life Insurance
Dependent Life Insurance
Dental Insurance
Long Term Disability Insurance (LTD)
Group Long Term Care Insurance (GLTC)
24-Hour Accidental Death and Dismemberment (AD&D)
Company Travel Accidental Death and Dismemberment
Profit Sharing Retirement Plan (401K)
Share Purchase Plan (ESPP)
Flexible Spending Accounts (FSA)
Vision Care Insurance
Paid Vacation
Paid Holidays

IF YOU HAVE ANY QUESTIONS REGARDING
AVAILABLE BENEFITS, PLEASE CALL
**THE SERVICEMASTER BENEFITS RESOURCE CENTER**
IN MEMPHIS, TENNESSEE
AT
**1-877-282-6372**

# HOLIDAYS

Terminix International observes the following holidays in accordance with work schedule requirements.

> New Years Day (January 1)
> Memorial Day (last Monday in May)
> Independence Day (July 4)
> Labor Day (first Monday in September)
> Thanksgiving (fourth Thursday in November)
> Christmas Eve (December 24)
> Christmas Day (December 25)

*In order to receive holiday pay, the employee must work the scheduled day before and the scheduled day after the holiday. If the holiday falls during an employee's vacation, the employee will receive equivalent time off without loss of pay during the vacation year. If the employee works a scheduled holiday, the employee will receive regular pay and will receive a holiday off at a later date. Employees classified as part-time, seasonal or temporary are not benefit eligible.*

# VACATION

Vacation time off with pay is available to qualified full-time employees to provide time away from their duties at Terminix International.

All full-time employees who are regularly scheduled to work a minimum of thirty (30) hours per week are eligible to earn a vacation allowance beginning the first day of the calendar month coinciding with or following the completion of six (6) months of employment. For example, an employee hired on February 12 completes six (6) months of employment on August 12 and begins earning vacation on September 1 in the year in which he/she is hired.

Part-time and temporary employees are not eligible to earn vacation.

HIRED   Feb 15

(9)

## Earning Vacation Time Off

The established vacation year is the calendar year January 1 through December 31. Vacation time is earned each calendar year, based on the employee's length of service, as shown in the following schedule:

| Length of Service | Maximum Vacation Accruals |
|---|---|
| Less than 6 months | * 0 Days |
| Greater than 6 months but less than 5 years | * 1 day per month, up to 10 days per calendar year<br>* Accrual beginning on the 1st of the month following the completion of 6 months of service |
| Greater than 5 years but Less than 15 years | * Up to 15 days per calendar year<br>* Accrual beginning on January 1st of the year following the 5th year anniversary |
| 15 years and greater | * Up to 20 days per calendar year.<br>* Accrual beginning on January 1st of the year following the 15th year anniversary. |

## Scheduling Vacation

Vacation time off must be taken <u>during the calendar year in which days are earned</u>. Subject to appropriate supervisory approval, employees may be allowed to use vacation days before actual eligibility. However, if an employee terminates his/her employment before full eligibility, unearned vacation that has been taken in advance will be deducted from the final payroll check.

Vacation time off is granted when convenient during the vacation year, considering both the wishes of the employee and the operation of the Company.

As stated previously, employees are encouraged to use earned vacation time for rest, relaxation and personal pursuits as time away from their employment duties. In the event that earned vacation time is not used by the end of the calendar year, the employee will forfeit the unused time (except where state laws apply). Eligible employees will not receive pay in lieu of vacation time.

(10)

Unused vacation will not be accumulated and carried forward into the next vacation year except in entirely unusual circumstances and then only with the specific approval of the Human Resources Department. In states where laws apply, vacation accruals may not exceed two times the annual accrual rate. Employees reaching the accrual cap will cease to accrue vacation until the previously accrued vacation is taken.

## Vacation Pay Upon Termination

Upon termination of employment, employees will be paid for unused vacation time that has been earned through the last day of work. However, in order to receive this pay, the employee must give a two-week notice and be available to work prior to the voluntary resignation. No one terminated for "cause" will receive vacation pay (except where state laws apply).

# PAID SICK TIME AND PERSONAL TIME

It is recognized that tardiness and absences cannot always be avoided and there are adverse or legitimate circumstances, which affect attendance. In these cases, resulting tardiness or absences can be excused within reasonable limits. For this reason, this policy describes forms of income protection to help cushion the effects excused absences may have upon employees. **Full-time employees are not eligible for paid sick time or paid personal time off until after they have completed the six- (6) month orientation period.**

## All Employees

1.  **Unexcused Absences** - Pay should be withheld for all unexcused absences to act as a deterrent against future absenteeism.

2.  **Excused Absences** - Employees with legitimate reasons for absenteeism which are excused by the supervisor should be paid as follows:

    A.  **Short-term Absences**: Excused absences resulting in five (5) or less consecutive workdays may receive full pay. Employees may be eligible for full pay up to six (6) excused workdays' days per calendar year.

    B.  **Personal Time**: After 6 months of full time employment, employees have available two (2) paid personal days per full calendar year to be used as needed. As with sick days, there is no carryover to the next calendar year. Advance notice and approval from management is necessary for payment.

(11)

# TERMINIX INTERNATIONAL GUIDELINES FOR THE WORKPLACE

## SIX MONTH ORIENTATION PERIOD

All new full-time employees have a six-month (6) orientation period. This six-month period will provide new full-time employees an adjustment period to become more acquainted with their new company and position while providing an opportunity to demonstrate their ability to achieve a satisfactory level of performance.

## INTERNAL TRANSFERS

It is the policy of this company that all new hires or internal candidates must remain or have been in their initial positions twelve months (12) prior to being considered for an internal move, transfer to another business unit or promotion. Employees must be in good standing (i.e. good attendance record and no counseling of any type within a twelve month (12) period). The Corporate Human Resources Manager or the appropriate Regional Human Resources Manager must approve any exception.

## PERSONAL APPEARANCE

It is expected that the personal appearance and grooming of each employee will project a professional business image. Each employee is expected to report to work dressed and groomed in a way that conforms to generally accepted standards for a professional business work place, the duties they perform and the amount of face-to-face public contact they encounter.

All employees will adhere to the following guidelines during scheduled work hours except when business activities and proper authority dictates otherwise. Appropriate professional appearance includes:

**Office and Professional Business Attire:**

**Men:**

> **Acceptable**: Business suits, sport jackets/blazers with coordinating slacks, collared shirts, dress shoes and socks are required at all times.
>
> Clothing should be clean and neat. Good personal hygiene and grooming is essential at all times. Hair must be professional, conservative and must be maintained at the shirt collar and trimmed around the ears. (NO earrings or any type of visible body piercing is acceptable for the work place).

**Women:**

> **Acceptable**: Suits, pantsuits, slacks (with a coordinating blouse or sweater). Conservative length dress, skirt, or skort. NO SHORTS.
>
> Earrings may be worn in the earlobes ONLY and any type of visible body piercing is unacceptable for the workplace.

All employees must maintain a conservative and professional appearance at all times. Anything in excess or extreme is not acceptable.

**Uniformed Employees:**

Employees required to wear a uniform or company clothing of any type are expected to keep the uniform clean, pressed and presentable.

Inappropriate wear includes, but is not inclusive to: jeans or any type of denim, t-shirts, jerseys, sweatshirts, midriff and halter tops, form fitting pants or leggings, see through sheer fabrics, shorts, mini skirts, tennis shoes, sandals, or beach type wear.

OSHA regulations and good customer relations require all employees servicing our customers to be cleanly shaven. Facial hair (beards) can retain chemicals and can prevent a satisfactory face seal when using respirators, masks, etc. Beards are prohibited on employees who, in the course of their job assignments, have customer contact. These employee classifications include:

(19)

(a)    Branch Managers;
(b)    Supervisors;
(c)    Sales Representatives;
(d)    Service Representatives;
(e)    Division and Regional employees who have customer or branch contact.

See your immediate supervisor to discuss any specific dress or grooming requirements in your specific work environment.

# WORKWEEK AND HOURS

Full-time employees normally work a forty-hour (40) week, made up of five (5) eight-hour (8) days. Your Manager or Supervisor schedules the workdays in each week and the hours of work based on needs and conditions. However, there will be times when employees are required to work more than eight (8) hours per day, and/or five (5) days per week, in order to complete scheduled work.

# PAYDAY

Terminix International employees are paid on either a semi-monthly payroll or a weekly payroll. Semi-monthly employees receive their checks on the fifteenth (15th) and the last day of the each month. Semi-monthly payroll is paid currently. Terminix International **does not** hold back a check for any semi-monthly employee. Pay received on the 15th of the month pays the employee from the 1st of the month through the 15th of the month. Pay received on the last day of each month pays the employee from the 16th of the month through the last day of the month. If the payday falls on Saturday or Sunday, checks will be received on Friday.

Incentive earning employees must sign sales or service agreement outlining incentive payroll procedures.

Incentives earning sales and service employees are paid an advance against incentive plan earnings. Earned incentives, which exceed the monthly advance, will be calculated at month end and paid at the end of the following month. For example, incentives earned during May, which exceed the monthly advance for May, will be paid at the end of June.

(20)

Employees paid <u>hourly</u> will receive pay weekly on Fridays. Due to payroll procedures, hourly employees are paid a week in arrears, on a Friday through Thursday work week basis.

If a payday falls during an employee's vacation, the paycheck will be available upon the employee's return.

<u>Hourly paid</u>, Office Administrative, and Service Technicians must keep proper time records for all hours worked. The branch timeclock is the preferred method.

## PAY ADVANCES

Pay advances on unearned wages cannot be provided to employees.

# <u>ATTENDANCE</u>

Regular attendance is required and each employee is expected to be present for all scheduled hours of work, except where excused or authorized by Management.

- Proper notification of the reason for absence or tardiness requires the employee to request authorization from Management as far in advance as possible.

- Any employee who is absent for two (2) consecutive scheduled workdays without notifying their manager and without a justifiable reason for his/her absence will be considered as having voluntarily resigned.

- Employees in their orientation period may be considered as having a record of excessive absenteeism in the first six (6) months of employment:

    1.    As of the first unexcused absence.

    2.    If absent for two (2) for any reason within the first six (6) months of employment.

- All other employees are considered as having a record of excessive absenteeism:

    1.    As of the first unexcused absence.

(21)

2.    If absent for more than four (4) days in any six (6) month period or more than eight (8) days in any twelve (12) month period.

-    A manager has the discretion to require medical documentation in support of an absence.

# NONDISCRIMINATION POLICY

Terminix International is an equal opportunity employer committed to the principle of equal opportunity.  It is the policy of Terminix International that employment decisions shall be based on merit, qualifications, and competence.  Except where required or permitted by law, employment practices shall not be influenced or affected by virtue of

an applicant's or employee's race, color, religion, sex, national origin, age, disability, marital status, veteran status or any other characteristic protected by law.  In addition, it is the policy of Terminix International to provide an environment that is free of unlawful harassment of any kind.  This policy governs all aspects of employment, promotion, assignment, training, termination, and other terms and conditions of employment.

# NEPOTISM:  HIRING OF RELATIVES

It is the policy of the Company to discourage employment of relatives in the same branch or office location.

It is well accepted that employment of relatives in the same area of an organization can cause serious conflicts and problems with favoritism and employee morale.  In these circumstances, all parties, including supervisors, leave themselves open to charges of inequitable consideration in decisions concerning work assignments, transfer opportunities, time-off privileges, training and development opportunities, performance evaluations, promotions, demotions, disciplinary actions, and terminations.

In addition to claims of partiality in treatment at work, personal conflicts from outside the work environment can be carried into day-to-day working relationships.

If already employed, an employee (or relative) cannot be transferred into the same Business Unit.  If the relationship is established after employment, the individuals

(22)

concerned and their supervisor(s) will decide who is to be transferred. If that decision is not made within 30 calendar days, management will decide. If another comparable position is not available, one of the employees will be asked to accept a demotion or be required to resign. The appropriate supervisor and the affected employee should reach this decision jointly.

In other cases where a conflict arises, the parties may be separated by reassignment or, one or both terminated from employment.

For purposes of this policy, a relative is defined to include: spouse, parent, child(ren), brother, sister, stepparent, stepbrother, stepsister, stepchild(ren), brother and sister-in-law, father and mother-in-law, former spouse, and grandparent.

Terminix reserves the right to allow exceptions to this policy when, through acquisitions, the Company acquires an employee whose employment is contrary to this policy. Specific prior approval is required from the local Human Resources Manager or the Corporate Human Resources Department in Memphis, Tennessee.

# SEXUAL HARASSMENT POLICY

**PURPOSE**: The purpose of this policy is to state clearly that Terminix International prohibits sexual harassment and set forth procedures, by which allegations of sexual harassment may be filed, investigated, and resolved.

1.  **POLICY**: Sexual harassment of employees or applicants for jobs by employees, supervisors, vendors or customers is unacceptable behavior and will not be tolerated. The Company will take appropriate corrective action to remedy any situation, which is brought to its attention.

2.  **DEFINITIONS**: Sexual harassment is a type of misconduct which interferes with work productivity and wrongfully deprives employees of the opportunity to work in an environment free from unwelcome sexual overtones. Sexual harassment includes all unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:

    A.  Submission to such conduct is made either an explicit or implicit term or condition of an individual's employment, or

    B.  Submission to or rejection of the conduct is used as a basis for an employment decision affecting the individual subjecting or submitting to the conduct, or

(23)

C.   Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

3.   **VIOLATIONS**: Any employee, supervisor, or agent who violates this policy will be subject to discipline up to and including discharge. This disciplinary position does not establish, and should not be interpreted as establishing, employment for any definite period or as a condition of employment. All ServiceMaster employees are employees at will.

4.   **COMPLAINTS OR QUESTIONS**: Any questions regarding this policy should be addressed to the Vice President for Human Resources, (901) 820-8475.

Any employee who feels that he or she is a victim of sexual harassment, including but not limited to, any of the conduct listed above, by any supervisor, employee, or agent should immediately bring the matter to the attention of their supervisor or designated person or persons in the Human Resources Department. An employee, who is uncomfortable for any reason in bringing such matter to the attention of his or her supervisor, should report the matter to the Vice President, Human Resources Department, Terminix International. Where investigation confirms the offensive behavior, prompt corrective action will be taken including immediate termination.

5.   **INVESTIGATION**: All complaints will be investigated, and information will be treated as confidentially as necessary for the investigation.

Any employee found making false and malicious accusations would be subject to disciplinary action, up to and including termination.

6.   **REPRISALS**: Employees reporting incidents of sexual harassment will be protected from reprisals in any form.

# PROHIBITED ACTS

The following are prohibited acts (not an inclusive list):

1. Negligence, carelessness, or acts, which result, or could result in damage to Company property or equipment.

2. Defying the authority or supervision of a supervisor, or other displays of conduct that may harm or injure operations or jeopardize the successful operation of the Company.

(24)

3. Unauthorized possession, use or loan of Company property including, but not limited to: Company keys, tools, equipment, and vehicles, including having any passenger in a Company vehicle without prior knowledge and consent of appropriate supervisor or manager.

4. Unauthorized posting of notices, or any markings or defacing of walls, elevators, or other Company property.

5. Violating safety policies and procedures, which endanger you or other employees.

6. Stealing, embezzlement, dishonest, conduct, or falsification of Company records, timecards or reports, including but not limited to employment applications, or willful misrepresentation of facts.

7. Reporting to work under the influence of alcohol or illegal drugs; possession, sale, or use of marijuana or illegal drugs or chemicals or consumption of alcohol while working on job sites, on Company property, or in or while operating Company vehicles or equipment.

8. The possession of dangerous or unauthorized materials, such as explosives or weapons in any Company vehicle, or on Company property, or during the course of Company business.

9. Violation of any local, state, or federal law on Company premises or while on company business.

10. Refusal or failure to perform assigned work, or refusal or failure to follow the directions or instructions of a supervisor unless such assignment, directions or instructions are later established to have been a violation of Company policy, safety hazard, or violation of applicable law or regulation.

11. Striking, or threatening to strike, anyone on Company property, or engaging in horseplay, fighting, scuffling, or any type of physical altercation with any employee, customer, vendor, or visitor. Provocation shall also be unacceptable conduct.

12. Abusive, profane or threatening, harassing, or intimidating language or conduct toward a fellow employee, customer, vendor, or visitor.

13. Failure to work scheduled overtime or working overtime without authorization from your supervisor.

(25)

14. Being absent from work area without authorization, sleeping on the job or while on the work premises, loitering in work area or department, distracting or interfering with another employee's work duties, and distributing materials or soliciting funds during active working hours or in working areas.

15. Presence in or on Company property during other-than-scheduled work hours without proper authorization.

16. Disclosing confidential Company information.

17. Gambling of any kind on Company premises.

18. Dishonesty of any kind in relations with the Company, its customers or other employees.

19. Breach of trust.

20. Conviction for a crime of dishonesty.

21. Unsatisfactory pre-employment or employment screening results.

22. Failure to immediately report any job-related injury, no matter how slight, to management.

23. Performing Company-related services for any person, firm or corporation not authorized by the Company.

24. Failure to comply with Company guidelines, policies, procedures, and rules.

25. Making false, deceptive or artificial entries in the books or records of the Company.

26. Any employee action outside the scope of the job that in any way reflects negatively on the Company.

27. Gross negligence or gross misconduct.

(26)

# DRUG TESTING AFTER JOB RELATED ACCIDENTS

It is Terminix International's policy to require an immediate drug test in the event of any job related accident/injury requiring medical treatment.

# CLEAN AIR POLICY

In helping with Terminix International's intent to provide a safe and healthful work environment, smoking in the workplace is prohibited in the office environment except in designated areas. This policy applies equally to all employees, customers, vendors, and visitors.

# BREAKS/LUNCH PERIODS

Terminix International allows non-exempt employees two fifteen- (15) minute daily breaks within an eight- (8) hour work schedule if the workload allows (one morning and one afternoon break). Breaks must be approved by the supervisor and cannot interfere with business operations.

Unpaid lunch periods of between thirty (30) minutes and sixty (60) minutes in length are required of all employees working more than seven (7) hours per day. Employees working during lunch periods will receive compensation. State laws vary.

* TeleCenter employees should see their immediate supervisor or manager for scheduling of their breaks.

(27)

# ELECTRONIC COMMUNICATIONS RESOURCE POLICY

This policy sets forth the acceptable uses of the electronic communication resources of the Company.

<u>Purpose</u>

The purpose of this policy is to protect our employees, our customers, and the public from inappropriate use of electronic communication resources, and to ensure that the use of these resources is consistent with the Company's objectives and business growth.

This policy applies to all electronic communication resources, including computers, computer networks, e-mail (Internet and Intranet-based), telephone systems (including voice-mail), faxes, mobile phones, pagers, personal digital assistants, software and hardware resources, intranets, and all resources that allow employees access to the Internet.

All employees must comply with this policy at all times. Breach of this policy may result in the loss of access privileges or in disciplinary action up to and including termination. The Company reserves the right to determine what constitutes a breach of this policy. The prohibitions contained in this policy do not apply to legitimate actions expressly authorized by a manager as part of an employee's legitimate job duties.

This policy cannot set forth all forms of permitted, required, and impermissible conduct. If you have questions about a particular use of an electronic communication resource, contact your supervisor of Human Resources Representative.

<u>Employee's Responsibilities</u>

Employees should utilize electronic communication resources in a professional and thoughtful manner. Employees are responsible for the content of all communications that they access, create, transmit, receive, or store by means of these resources. With respect to "public" activities, such as visits to web sites and other Internet use, employees are associated with the Company and must conduct themselves accordingly.

Electronic communication resources are available to assist you to successfully perform your job duties. They are not intended for misuse or excessive personal

(28)

use. Employees cannot engage in personal advocacy of any type nor solicit or advertise for charitable, religious, political, or non-business purposes. Further, employees cannot engage in gambling or external chat room activities at any time by means of electronic communication resources.

Prohibited Acts

- Engaging in any illegal activities.
- Transmitting or accessing defamatory, threatening, offensive, suggestive, obscene or harassing materials, including adult material, pornography and "off-color" jokes.
- Transmitting or accessing racist, sexist, or other "hate" materials, materials that advocate illegal acts, or materials that advocate violence or discrimination toward others.
- Making on-line statements about the Company, its employees, its products, and services or its position on any issues (unless authorized by senior management).
- Transmitting or installing destructive programs or files (such as a worm or virus) or unauthorized software, or any actions intended to damage or place an excessive load on a computer system or network.
- Spamming, chain letters, multi-level marketing, mass, or unsolicited e-mails.
- Disabling or changing the configuration of any anti-virus software preloaded on a workstation or failing to scan attachments with anti-virus software before opening.
- Accessing, reviewing, duplicating, installing, damaging, removing, tampering with, or modifying computer systems, programs, documents, databases, applications, accounts, access codes, user profiles, passwords, existing files, or intranet sites.
- Concealing, altering, forging, or obscuring their identifies or another's identity as the source of a communication or accessing electronic communication resources by using another's password.
- Circumventing data or system firewalls or security measures or accessing unauthorized information.
- Intercepting, redirecting, or otherwise interfering with e-mail or other communications intended for others.
- Gaining access to any third-party computer system or to any unauthorized electronic communication resource, and
- Violating Company policies and procedures relating to electronic communication resources.

(29)

The Right to Monitor All Electronic Communications

EMPLOYEES HAVE NO LEGITIMATE EXPECTATION OF PRIVACY IN ANY USE OF COMPANY ELECTRONIC COMMUNICATION RESOURCES.

All electronic communication resources and all data, information, messages, or other communications created, accessed, or distributed through them are the property of the Company. In accordance with applicable law, the Company can, at any time, with or without notice, monitor, intercept, or investigate any use of its electronic communication resources, and can retrieve, display, and review the contents of any communication to or from an employee.

Security Procedures

Much of the information contained within Company electronic communication resources is classified as confidential or proprietary. The Company has also adopted a policy regarding securities trading and confidentiality. Employees should contact their supervisor or Human Resources Representative with any questions regarding their confidentiality obligations.

Employees are required to take all steps to prevent unauthorized access to the Company's confidential or proprietary information, including the following:

- Comply with company security policies and procedures and password utilization and maintenance procedures.
- Log off or password-protect terminals when unattended.
- Safeguard log on Ids and passwords, and
- Report any known or suspected compromise of security policies and procedures.

The Company reserves the right to take steps necessary to preserve the security of its electronic communication resources.

Protection of the Company's and Third-Party Intellectual Property Rights

All Company business materials and information are to be considered copyrighted and proprietary. The vast majority of third-party materials on the Internet are also protected by copyright, trademark, and other laws, regardless of whether a copyright notice appears on the work. Employees must assume that, unless expressly specified, all third-party information, software, and data are intended to remain the intellectual property of the sender/owner. It is unacceptable for employees to install, copy, use or redistribute any company or third-party materials except by permission and/or in compliance with applicable

(30)

license rights. Employees will be responsible for any damages resulting from any breach of license or infringement of proprietary rights resulting from their unauthorized copying, posting, or transmission of protected materials. Employees should not knowingly receive or download files that cannot be legally distributed and should not send mail or files that contain copyrighted software or protected material unless they own or control the rights to the materials or have received the necessary license rights or consents. In addition, employees should not delete author attributions, legal notices, or proprietary designations from materials that they distribute.

Procedures

- All employees must read this policy and direct all questions regarding this policy to your Human Resources Representative.
- Any person who becomes aware of a violation of this policy must immediately notify his/her supervisor or Human Resources Representative.

# SOLICITATION AND DISTRIBUTION

Because Terminix International wants to minimize work interruptions, solicitation by one employee of another is prohibited if either employee is on worktime or it interrupts others who are supposed to be working. Solicitation includes such activities as requests for signatures, contributions for charities, support of political or organizing activities, merchandise purchases and requests for donations. Work time is all time when the employee's duties require him or her to be engaged in work tasks. It does not include the employee's own time, such as meal periods, scheduled breaks and time before and after work. Solicitation by non-employees on company premises is prohibited at all times.

In addition, distribution by employees of advertising materials, handbills, and other non-company printed and written literature of any kind is prohibited in work areas at any time. Distribution of literature by non-employees on company premises, including parking lots, is prohibited at all times.

Using company stationery, supplies or equipment for solicitation or distribution is also prohibited.

Requests from outside people, organizations or current employee to sell merchandise, solicit contributions, distribute literature, arrange displays or use company facilities should be referred to the appropriate Human Resources Representative.

(31)

# ACCEPTANCE OF GIFTS AND FAVORS

Neither you nor any member of your immediate family should solicit Terminix's current or potential suppliers, contractors, outside agencies or other business colleagues for any money, gift, free services or special favors. The purpose of this policy is to avoid any actual or perceived conflict of interest in awarding Terminix business to suppliers.

If you receive from a supplier or potential supplier an unsolicited gift valued at $100.00, but less than $500.00, you must report it and gain approval from your direct supervisor. Any gift valued in excess of $500.00 must be reported to and approved by one of the following: Terminix President, COO, or Vice President of Human Resources.

Under no circumstances should an employee accept cash or cash equivalents (i.e. gift cards) from current or potential suppliers, contractors, outside agencies or other business colleagues.

If you have any questions regarding this policy, please discuss it with your supervisor or Human Resources Manager.

# EMPLOYEE PERSONNEL FILE

*It is your responsibility* to promptly notify Terminix International of any changes in your personnel data. Examples include changes to your mailing address, telephone numbers, number and names of dependents, individuals to be contacted in an emergency, educational accomplishments, and other such status reports.

Personnel files are the property of Terminix International. Records in them are kept confidential in accordance with applicable laws, and access to personnel files is restricted. Personnel file information can only be released to individuals other than the employee on a need-to-know basis. With reasonable advance notice, you may review (not copy) material in your file, but only in the manager's office and in the presence of your manager.

Letters of recommendation will not be written under any circumstances. The company uses VerifyJob.com to provide employment verification services on behalf of all Terminix employees.

# CONCLUSION

This revised edition of the full-time employee "Welcome to Terminix International" summary is dated May 1, 2005. This edition supersedes the original and all previous issues of the summary, all of which are now void.

This summary is not to be considered a Summary Plan Description or contract of employment. Contact the Human Resources Department, Memphis, Tennessee, for the most current plan status and costs. Additional Company policies and/or details concerning policies contained in this summary can be found in the Personnel Policies and Procedures Manual.

For interpretation of any Company policy, contact your Human Resources Representative.

For benefits questions, contact the ServiceMaster Benefits Resource Center, Memphis, TN, 1-877-282-6372.

Payroll issues must be referred to your Direct Supervisor or a Human Resources Manager for resolution. Employees are not to personally contact a payroll representative.

(33)

# INTRODUCTION

During the days ahead, you will be given information concerning your job, your department and Terminix International. It is important that you understand this information so you will be better equipped to carry out your duties and responsibilities.

This Employee Summary is provided to you as a way to answer many of the questions you may have about your job, your employment responsibilities and the procedures you are to follow as an employee of Terminix International. It also will inform you about some of the expectations that Terminix International has for you as an employee. It is very important that you read this Summary thoroughly and direct any questions to your supervisor, or to the Human Resources Department, Memphis, Tennessee.

***Employment with Terminix International is voluntarily entered into, and the employee is free to resign at will at any time, with or without cause. Similarly, Terminix International may terminate the employment relationship at will at any time, with or without cause.***

Policies set forth in this Summary are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between Terminix International and any of its employees. The provisions of the Summary have been developed at the discretion of management and may be amended or canceled at any time at Terminix International's sole discretion. This policy of at-will employment may only be amended or changed in writing signed by the President of the company.

Terminix International encourages you to read this Summary at least once. It also is important that you familiarize yourself with the way the summary is organized and the subjects covered. You should keep it handy so that you can refer to it whenever you have a question about your employment.

# Our Company Objectives

To honor God in all we do

To help people develop

To excel with customers

To grow profitably

# COMPANY HISTORY

**Terminix International** has been reinventing itself to meet the changing needs of its customers from the beginning. A look at the history of the company shows that change is nothing new.

Back in 1927 no one had ever heard of outsourcing. That's why a Memphis, TN. man named E. L. Bruce took it upon himself to develop a way to control the termites that were a constant problem in his hardwood flooring business.

He founded the Bruce – Terminix Research Laboratory (the name came from "nix on Termites") and recruited Frank Lyons. Lyons developed the first termiticide, for which the company earned the first-ever United States patent for a termite control formula.

Originally, Bruce and Lyons had in mind to develop a chemical that flooring companies and others with termite problems could apply themselves. As research progressed, however, it became evident that it was impractical for end-users to apply the chemical on their own.

They got the idea of creating a service company to apply their patented treatment method. But how a small company like Bruce – Terminix Research Laboratory could do that without a massive capital infusion was a problem.

Arthur Bruce, E. L. Bruce's founder, got the idea of selling franchises, and that responsibility fell to Evan Fellman. Franchising was a good fit – Terminix would provide the treatment materials and expertise and the franchises would provide the capital and handle service delivery.

The idea worked, and throughout the 1930's and 1940's, the company expanded through franchises. It continued its innovations, and in 1954 began offering termite protection guarantee contracts to its customers – if termites damaged a structure Terminix was contracted to protect, Terminix would pay for the repairs.

Founded to deal with termites, Terminix did not add pest control services until 1957 when a Houston franchisee began providing the service as an experiment. That idea proved poplar, and Terminix reinvented itself as a firm offering both termite and pest control services in 1958.

By this time, growth was a part of the Terminix corporate culture. That trend accelerated in 1968 when Cook Industries acquired Terminix and the rest of the.

(5)

By 1969, Terminix had 185 total branches, of which 150 were franchises and 35 company owned.

Cook Industries' knowledge of Mexico led them to purchase the second largest termite and pest control company in Mexico.

Mexican operations were turned over to a young Cook employee named Carlos Cantu. A native of Brownsville, TX. Cantu was bilingual and familiar with life on both sides of the border. With Mexican operations well established, Cantu transferred to the United States. He moved rapidly up the company hierarchy and was named President of Terminix – now called Terminix International in acknowledgement of the Mexican operations – in 1978.

Cantu began a period of even more aggressive growth. By 1979, there were 263 total Terminix branches, of which 180 were franchises and 83 company owned. Cantu was determined to do even more – he wanted Terminix International to be the largest termite and pest control company in the industry.

The "International" part of the company name became even more important in 1987 with the beginning of franchising in Japan. Duskin – Terminix, the Japanese operation, was an unqualified business triumph, experiencing an annual growth rate of more than 20 percent.

By 1989, there were 459 total Terminix branches. The ratio between company-owned branches and franchises had changed dramatically – there now were 265 company branches and 194 franchise outlets. By 1990, with the purchase of the pest control operations of Waste Management, Inc., Cantu's goal had been reached; Terminix was the largest termite and pest control company in the world.

Growth continued. By 1996, Duskin – Terminix was doing $50 million in business annually in Japan and Terminix had made several other major pest control acquisitions in the United States. By 1998, there were 460 total Terminix branches – 285 company owned and 175 franchises.

Today Terminix has 9,000 plus employees in 340 company owned branches.

### Today's Terminix International

The organization of today's Terminix is centered on the branch. It is the most important part of the organization because it is the point of contact with the customer – on whom the entire business relies.

(6)

Terminix branches are organized into 42 geographic regions; each headed by a Region Vice President or Region Manager. The regions, in turn, make up four divisions – the Southeast Division, the West Division, the Central Division and the Northeast Division – each with a Division Vice President.

## Regions

The regions reflect the very real geographic differences in the termite and pest control environment that exist in various parts of the country. Each region is able to give customized and specific support to its branches in meeting the situations that are likely to be encountered in their area of the country with appropriate treatments, materials and methodologies.

# Visit the

# Terminix Website

# At

# ACCESSTMX.COM

(7)

## EMERGENCY PERSONAL LEAVE OF ABSENCE

Employees who have successfully completed six (6) months of service, and who have personal reasons for being away from work, may apply to their immediate supervisor for a personal leave of absence without pay.

## MILITARY LEAVE OF ABSENCE

1.  Employees who leave their jobs voluntarily or involuntarily to enter any branch of the Armed Services are eligible for a military leave of absence in accordance with the Uniformed Services Employment and Reemployment Rights Act of 1994 and other Veterans rights statutes.

2.  A certificate relating to satisfactory completion of military service or other proper documentation is required for reemployment.

3.  Employees who are military reservists or are members of the National Guard will receive time off to attend regular encampments, which are normally two (2) weeks of active training. Supervisors should be notified as far in advance as possible of the reserve training commitments. The employee will not receive his/her regular pay earned for the encampment.

4.  Employees on a military leave of absence must apply for reemployment within ninety (90) days after release from active military service (or thirty [30] days in the case of "Active Duty for Training Reservists"). The leave may be extended in cases of hospitalization continuing after discharge for a period of not more than one (1) year.

## WORKER'S COMPENSATION LEAVE OF ABSENCE

Terminix International provides a comprehensive worker's compensation insurance program at no cost to employees. This program covers any injury or illness sustained in the course of employment that requires medical, surgical or hospital treatment. Subject to applicable legal requirements, worker's compensation insurance provides benefits after a short waiting period or, if the employee is hospitalized, immediately.

Employees absent from work due to a job-related injury or illness will be placed on a worker's compensation leave of absence. A first report of injury form must be completed and a doctor's statement must be available before any type of compensation is considered. A written release to return to work without restrictions must be submitted by the physician.

It is the employee's responsibility to immediately report a work-related injury or accident

(14)

during work hours to his/her supervisor. A first report of injury form should be completed and a call must be made by management to the workers compensation carrier to report the incident.

To be placed on a leave, the above steps must be taken, including a doctor's statement.

An employee who fails to report an injury or accident may be subject to forfeiting their worker's compensation benefits as well as disciplinary action up to and including discharge.

Any inquiries about a worker's compensation claim may be directed to the Risk Management Department.

## THE FAMILY MEDICAL LEAVE ACT (FMLA)

This program provides up to twelve (12) weeks of unpaid job protected leave per year for an employee who has worked at least 1,250 hours during the previous twelve- (12) months. Employees must be employed for at least twelve (12) months prior to leave. Thirty- (30) days notice is required if the leave is foreseeable. The employee is required to pay the employee's portion of any benefit premiums while on an FMLA Leave. Employees returning from leave within the FMLA guidelines are entitled to be restored to their former or equivalent position with equivalent pay, benefits and other terms and conditions of employment.

Additional information can be obtained by contacting your local Human Resources Manager. Contact information is posted in your branch.

(15)

# FUNERAL LEAVE

In the event of the death of a member of the immediate family, employees are generally allowed personal leave without loss of pay up to a maximum of three (3) workdays to include the day of the funeral. The intent of this policy is to ensure that employees arrange with their supervisor for the necessary amount of funeral leave.

Time off for funerals with pay will not be considered as time worked in the calculation of overtime. Only those days in which work was scheduled will be eligible for funeral pay.

The immediate family includes parents, grandparents, parents-in-law, spouse, children, legal wards, legal guardians, brothers, and sisters, brother-in-laws, sister-in-laws and step parents. When deemed appropriate, the employee's manager may make special family considerations. Normally, other family considerations are made without pay.

# JURY DUTY

Employees serving on jury duty will receive their regular pay less any jury pay for that period. Employees will be expected to work all scheduled hours not required for jury duty. To qualify for regular pay, the employee is required to notify his/her supervisor in advance and present a copy of the jury notice. Only actual hours on the job will be considered in the calculation of overtime.

# VOTING TIME

All employees eligible to vote will notify their supervisor at least two (2) days in advance and be allowed reasonable time, as determined within the sole discretion of the Company, off from work with pay to vote on election day at their local polls. This practice will apply to all elections for local, state and national offices. This policy is restricted to where there is not sufficient time, as specified by state law, for the employee to go to the local polls to vote before or after work.

{16}

# BENEFITS REMINDER

## STEPS TO FOLLOW WHEN A FAMILY STATUS CHANGE OCCURS

Family status changes occur when there is:

1.  A birth or adoption of a child of the employee.
    **Supportive documentation required**:  Proof of birth – for example, the hospital certification or copy of baby's feet imprint.

2.  A marriage or divorce of the employee.
    **Supportive documentation required**:  marriage certificate or divorce papers.

3.  A death of the employee's spouse or dependent.
    **Supportive documentation required**:  death certificate

4.  A termination of employment or the commencement of employment of the employee's spouse.
    **Supportive documentation required**:  letter from the employer of the spouse stating insurance termination date and/or the hire date with effective date for insurance.

If any of the above changes have occurred, please contact the Hewitt website, http://resources.hewitt.com/sbrc or call the ServiceMaster Benefits Resource Center at 1-877-282-6372.  The change request must be submitted within forty-five (45) days of the occurrence.

**REMEMBER:**

**ALL family status changes must be reported to the ServiceMaster Benefits Resource Center within forty-five (45) days of the qualifying event, otherwise coverage may be denied.**

(17)

The Income Protection Program Guidelines govern this Short Term Disability Provision. Under certain conditions, reimbursement of Short-Term Disability benefits paid may be required.

Questions concerning Short Term Disability should be addressed to your Human Resources Manager.

# LEAVES OF ABSENCE

Regular full-time classified employees who are scheduled to work thirty (30) or more hours per week, which are absent from work for an extended period of five (5) or more consecutive working days for medical or personal reasons are required to apply for an authorized leave of absence.

**ONLY EMPLOYEES WHO HAVE COMPLETED THEIR FIRST SIX (6) MONTHS OF EMPLOYMENT ARE ELIGIBLE FOR A LEAVE OF ABSENCE WITH THE EXCEPTION OF MILITARY OR WORKER'S COMPENSATION LEAVE.**

A leave may normally be approved for a period of up to three (3) months. The leave may be extended for an additional three (3) months with prior approval of the Medical Review Panel, up to a maximum consecutive period of one (1) year. Any approved leave also will qualify under the Family Medical Leave Act.

## MEDICAL LEAVE OF ABSENCE

1.  To request a medical leave of absence, employees must notify their supervisor of the nature and approximate length of the disability.

2.  Request of a medical leave of absence must include the following fully completed documentation:

    A.  Application for Leave of Absence, which includes medical certification.

    B.  Leave of Absence Agreement

    C.  Integration of Benefit Agreement

    D.  Family Medical Leave Act Rights

See your Manager for the above forms.

(13)



**CORRECTIVE ACTION REPORT**

All corrective conversations and actions are to be documented in writing following the conversation and action taken.

Name: <u>Andrea Gravagna</u>                    Date: <u>July 9, 2007</u>

(X) Report of Conference -- 1st ( ); 2nd ( ); 3rd ( )
( ) Report of Suspension for ( ) days without pay
( ) Recommendation for Discharge

1. <u>REASON FOR CONFERENCE</u>: <u>I have made the following observation of employee's conduct /</u> <u>performance:</u>
- Andrea had $3,650 in sales for the month of May, and $1,750 for the month of June.
- Andrea currently has no sales for the month of July.
- As of today, only two "creative" leads have been created by Andrea, with one proposal.

2. <u>STANDARDS EXPECTED</u>: <u>I have informed employee of the following standards that will be expected of</u> <u>him/her in the future:</u>
- Andrea is expected to make budget of $12,000 in sales for July.
- $5,000 in sales need to be turned in by Friday, July 13, 2007.
- Each day, at least three proposals should be submitted to 'creative' contacts; copies are to be submitted to me the next morning.
- Start time in the office is no later than 8:00am.
- One Saturday off per month is guaranteed: Remaining Saturday's off will be performance based, based on above standards.

3. <u>FUTURE CORRECTIVE ACTION, IF REQUIRED</u>: <u>I have advised employee of the following</u> <u>consequences if he/she fails to follow the above standards:</u>
- Failure to follow these standards, and/or to meet budgeted proposals and sales requirements, will result in immediate termination.

I acknowledge that I am familiar with the above statements. I wish to submit the following written comments of my won on this matter:

On this date I talked with this employee about the above statements.

_Andrea Gravagna_
Employee's Signature

_____
Supervisor's Signature

_____
Signature of Witness – When Applicable

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION OF
HUMAN RIGHTS on the Complaint of

ANDREA GRAVAGNA,

                    Complainant,

              v.

TERMINIX INTERNATIONAL, INC.,

                    Respondent.

VERIFIED COMPLAINT
Pursuant to Executive
Law, Article 15

Case No.
**10118919**

Federal Charge No. 16GA703979

I, Andrea Gravagna, residing at 166-31 9th Ave., Whitestone, NY, 11357, charge the above named respondent, whose address is 900 Hollydell Court, Sewell, NJ, 8080 with an unlawful discriminatory practice relating to employment in violation of Article 15 of the Executive Law of the State of New York (Human Rights Law) because of age.

Date most recent or continuing discrimination took place is 7/9/2007.

The allegations are:

1. I am 61 years of age. Because of this, I have been subject to unlawful discriminatory actions.

2. I began my employment with respondent as a sales person in February of this year out of respondent's location at 30-50 Whitestone Expressway in Flushing, Queens. Since being given a four day orientation in Waterbury, Connecticut at the start of my employment, I have not been given any training from Branch Manager Jennifer Howard, who is in her twenties. Ms. Howard was supposed to train me and show me how to use respondent's computer program "Mission," the system used to record appointments and client information. Ms. Howard would not train me, however, and, instead, I had to ask my co-workers for help.

3. My sales figures have been low compared to my more experienced co-workers but last month everyone's sales figures were low. In mid-June of 2007, Ms. Howard told everyone to come in at 8:00 AM and on the first Saturday of the month. Yesterday, July 9, 2007, Ms. Howard told me that if I didn't reach $5,000 RECEIVED

in sales for the month of July by Friday, July 13, 2007, then I had to go into on Saturday again. She threatened to fire me and then pressured me to sign a piece of paper without having a chance to read what it said. I was so nervous that I signed it without knowing what it said. After signing, I saw that the paper criticized my work performance and threatened to terminate my employment.

4.    I believe that Ms. Howard is treating me in this manner and trying to terminate my employment because of my age.  I am the oldest person in the office. Most of the employees are in their twenties. There was an older, part-time sales person, Edward (whose surname I don't recall), who brought in a lot of sales but respondent fired him, claiming that they didn't want part-time employees.

Based on the foregoing, I charge respondent with an unlawful discriminatory practice relating to employment because of age, in violation of the New York State Human Rights Law (Executive Law, Article 15), Section 296.

I also charge the above-named respondent with violating the Age Discrimination in Employment Act (ADEA) as amended (covers ages 40 years of age or older in employment).  I hereby authorize SDHR to accept this verified complaint on behalf of the U.S. Equal Employment Opportunity Commission (EEOC) subject to the statutory limitations contained in the aforementioned law(s).

I have not commenced any other civil action, nor do I have an action pending before any administrative agency, under any state or local law, based upon this same unlawful discriminatory practice.


Andrea Gravagna

- 2 -

STATE OF NEW YORK  }
COUNTY OF New York }   SS:

Andrea Gravagna, being duly sworn, deposes and says: that he/she
is the complainant herein; that he/she has read (or had read to
him or her) the foregoing complaint and knows the  content
thereof; that the same is true of his/her own knowledge except
as to the matters therein stated on information and belief; and
that as to those matters, he/she believes the same to be true.

_____
Andrea Gravagna

Subscribed and sworn to
before me this 10th day
of  July  , 2007

_____
Signature of Notary Public

LEON    C. DIMAYA
Notary Public, State of New York
No. 43-4986892
Qualified in Richmond County
Commission Expires Nov. 18  2009

- 3 -

**INCIDENT INFORMATION SLIP**
P-ID-321-104 (Rev. 3-08)-Pant (RMU)

Date: 1/23/07

718-321-2250

come to   109 Precinct   37-05 Union Street
      (Command)            (Address)                            (Telephone No.)

hope  that your business with us was handled satisfactorily. Your particular matter has been assigned the following number(s):

plain 1 Report No.: 6670 ____   Accident Report No.: _____   Aided Report No.: _____

orted to: PO Johnson 25742   Date of Occurrence: 1/23/07  Time: 0915
     (Rank)  (Name)  (Shield No.)

ation of Occurrence:  30-50 Whitestone Exp.

ne:  HARASMENT

ase keep this report should you have to refer to this matter in the future. If you need any further assistance feel free to

tact us at telephone number  718-321-2256/57/58  . Please let us know if you have any suggestions on how we can

ter serve you. As you may already know, we will provide you with a crime prevention survey of your residence or business.

ase ask for more information on this and other crime prevention initiatives. Our goal is to make you and your property safe.

### COURTESY — PROFESSIONALISM — RESPECT

### REMEMBER: CALL "911" FOR EMERGENCIES ONLY!!!!

p.5     718-767-1042     nicholas gravagna     Jul 24 07 04:09p

SEYFARTH
ATTORNEYS SHAW LLP

620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500
fax (212) 218-5526
www.seyfarth.com

OCT - ‹ ‹

Writer's direct phone
(212) 218-5549

Writer's e-mail
rjoyce@seyfarth.com

September 24, 2007

**BY FEDEX**

Mr. William LaMont
New York State Division of Human Rights
55 Hanson Place, Room 304
Brooklyn, New York 11217

    Re:   <u>Andrea Gravagna v. Terminix International, Inc., Case No. 10118919</u>

Dear Mr. LaMont:

This Statement of Position is submitted on behalf of The Terminix International Company L.P. ("Terminix"), in response to the Verified Complaint filed with the New York State Division of Human Rights ("SDHR" or the "Division") by complainant Andrea Gravagna, a former employee.[1] In her Complaint, Ms. Gravagna alleges that she was discriminated against because of her age in violation of Article 15 of the Executive Law of the State of New York (the "Human Rights Law" or "NYHRL"). As set forth below, Ms. Gravagna's claims are without merit and should be dismissed in their entirety.

---

[1] This position statement represents the undersigned's present understanding based upon an investigation of the facts at the time of submitting this position statement. By submitting this statement, Terminix does not waive or intend to waive its right to present new or additional facts or arguments based on subsequently acquired information. While believed to be true and correct in all respects, this position statement does not constitute an affidavit. This statement is submitted on the express condition that it is not to be used as evidence of any kind in any administrative court or proceeding. Please be advised that the information and supporting documentation provided herein, as well as any and all information which may be provided to the SDHR in the future, are strictly confidential and are not to be used for any reason other than the resolution of the instant charge. Moreover, this information, as well as any which may be submitted hereafter, is not to be disseminated without Terminix's prior written approval. Further, the submission of any information and the assertion of any defense by Terminix herein (or any future submissions) does not constitute a waiver of the right to submit any other information or of any and all defenses which Terminix may not have submitted or asserted herein but may wish to submit or assert in the future.

NYI 26483667.1



## PRELIMINARY STATEMENT

As set forth in detail below, Terminix vehemently denies Ms. Gravagna's claims of discrimination. Age played no role in any employment decision regarding Ms. Gravagna. Indeed, Ms. Gravagna was hired at the age of 61 by the same individual whom Ms. Gravagna now claims has discriminated against her because of age. Notably, Ms. Gravagna's Complaint contains admissions that further dispel any inference of discrimination and demonstrate that Ms. Gravagna was not treated any differently from her peers – for example, she admits that all employees were required be in at 8:00 a.m. and at least one Saturday per month. Moreover, Ms. Gravagna was probably not aware that <u>all</u> sales representatives were counseled regarding their performance in July 2007, due to new standards that were being implemented across-the-board by the new Regional Manager. Thus, Ms. Gravagna was not treated any differently than other sales representatives in this respect.

However, to the extent Ms. Gravagna <u>was</u> treated any differently, it was solely because of her poor performance. As she admits in her Complaint, her sales figures were much lower than her colleague's sales (even when compared to one colleague who was equally experienced as Ms. Gravagna) and far below the level expected and required by Terminix. Simply put, she was not making the sales that her job required, and she did not improve her sales performance despite being provided with ample training and warnings that her performance needed improvement. Accordingly, at the end of July 2007, after making <u>no sales</u> for the entire month, Ms. Gravagna's employment was finally terminated.

These facts, combined with Ms. Gravagna's documented poor performance and the lack of any evidence whatsoever of age discrimination, compel dismissal of any possible claim of discrimination by Ms. Gravagna.

## FACTUAL BACKGROUND

### A.    Terminix's Business and Policy Against Discrimination

Terminix is an insect and pest control company, with a network of 864 service centers worldwide. Terminix offers its termite and pest control services to residential, commercial, and industrial establishments. Terminix has grown to become the largest termite and pest control company in the world, safeguarding over 1.9 million homes and businesses against all types of pests in 45 U.S. states and in 14 countries internationally.

Terminix is an equal opportunity employer and provides equal employment opportunities to all individuals without regard to race, religion, sex, <u>age</u>, national origin, citizenship, marital status, sexual orientation, U.S. veteran status, disability, or any other legally protected class. All employment decisions at Terminix – including, but not limited to, recruitment, hiring, placement, training, disciplinary decisions, transfer, promotion, demotion, termination, and other terms and conditions of employment – are based on job-related criteria and without regard to any protected

SEYFARTH SHAW LLP
ATTORNEYS

characteristics.  (A copy of Terminix's Equal Employment Opportunity & Affirmative Action Policy and Procedures is attached hereto as Exhibit A.)[2]

### B.    Ms. Gravagna's Employment with Terminix

#### (1)    Hiring

Ms. Gravagna was hired by Terminix on or around February 15, 2007 as a Commercial Account Manager in Terminix's Flushing, New York branch at the age of 61. Ms. Gravagna was extended an offer of employment by Branch Manager Jennifer Howard after Ms. Howard personally interviewed Ms. Gravagna (i.e., the interview was conducted in-person). (A copy of Ms. Gravagna's offer letter, signed by Ms. Howard, is attached hereto as Exhibit B.)

#### (2)    Training

From the time she was hired and throughout the duration of her employment, Ms. Gravagna participated in numerous training programs, as well as several days of riding with other sales representatives and Ms. Howard as further training opportunities.   The formal training Ms. Gravagna was given during her 5 ½ month employment period included the following:

| TRAINING | | |
|---|---|---|
| **Course** | **Instructor** | **Date** |
| PACE Six-Point Satisfaction Formula | Jennifer Howard, Branch Manager | 2/16/07 |
| PACE Managing Commercial Accounts | Jennifer Howard, Branch Manager | 2/16/07 |
| PACE Understanding Workplace Harassment | Jennifer Howard, Branch Manager | 2/16/07 |
| PACE Six Sigma | Jennifer Howard, Branch Manager | 2/19/07 |
| "Sales Kickoff" Meeting | Carl Money, Commercial Market Manager – Northeast Division, and Bill Gausch, NY Region Manager, then Boston Commercial Branch Manager | 2/21/07 |
| "Chemical Handling / Hazard Communication / Spill Control" Branch Meeting | Jennifer Howard, Branch Manager | 2/22/07 |
| PACE Commercial Sales Training | Jennifer Howard, Branch Manager | 2/26/07 |
| 4 Day "ASPIRE Classroom" | Colin Hickey, Entomologist / Technical Specialist for the | 2/27-3/2/07 |

---

[2]     Terminix is a brand of The ServiceMaster Company, which serves residential and commercial customers through a network of over 5,500 company-owned locations and franchised licenses.  As such, the attached policies bear the name "ServiceMaster," but are applicable to all ServiceMaster brands and operations, including Terminix.



|  | Northeast |  |
|---|---|---|
| PC Applicator Skills/Site Ride | Anthony Hangas, Certified Technician / Terminix Field Trainer | 3/8/07 3/9/07 3/12/07 3/13/07 3/15/07 |
| ASPIRE Commercial 5th Day | Colin Hickey, Entomologist / Technical Specialist for the Northeast | 5/7/07 |
| "Heat Stress and Workplace Hazards" Branch Meeting | Jennifer Howard, Branch Manager | 6/7/07 |
| New Hire Commercial Sales Training | Carl Money, Commercial Market Manager – Northeast Division | 6/12-6/13/07 |

Ms. Gravagna never complained about not receiving enough training during her employment with Terminix. With respect to the "Mission" system (the system used to record appointments and client information), Ms. Howard did offer to help Ms. Gravagna. Nevertheless, Ms. Gravagna could (and did) ask other co-workers for help when Ms. Howard was not readily available. The Mission system takes at least a year of use to learn fully and is not something that can be easily taught in a training session.

### (3)    Job Duties and Expectations

As a Commercial Account Manager, Ms. Gravagna acted as an outside sales representative for commercial clients. Her job duties included networking, cold calling, setting appointments, making site visits, performing inspections, and making proposals and closings on a sale for Terminix's services. As stated in the Sales Compensation Plan for Commercial Branch Account Managers, which was signed by Ms. Gravagna, the minimum expected performance for this sales position $200,000 in sales per year (which equates to approximately $17,000 in sales per month, which is viewed as an average per month over a 90-day period).

### (4)    Performance Deficiencies and Corrective Action Report

From the beginning of her employment, Gravagna's performance did not meet Terminix's expectations, nor did her performance improve. In her 30-Day Employment Evaluation, Ms. Gravagna was given a rating of "1" in the performance category of "level of productivity is increasing at an acceptable rate," which indicates that her performance was satisfactory, but that continued improvement was expected. Nevertheless, Ms. Howard did not elect to terminate Ms. Gravagna's employment at this time, with the hope that her performance would improve. (A copy of Ms. Gravagna's 30-Day Performance Evaluation is attached hereto as Exhibit C.)

By July 2007, after nearly five months of employment, Ms. Gravagna's sales were far below the level at which they should have been. Indeed, her monthly sales were drastically lower than all of the other sales representatives in the Flushing branch (including an individual who had been





hired on the same day as Ms. Gravagna). Further, there was no improvement in her sales – in fact, things only seemed to get markedly worse. Ms. Gravagna had made only approximately $8,829 in sales for the month of May, $3,475 for the month of June, and no new sales for the month of July. In contrast, her peers' sales results ranged from $13,588 to $21,660 for May; $6,765 to $11,930 for June; and $15,497 to $24,292 for July.

During a one-on-one meeting in early July 2007 (which Ms. Howard held with all Commercial Account Managers in the Flushing branch),[3] Ms. Howard informed Ms. Gravagna of the standards that were expected of her, and a written Corrective Action Report was issued. Ms. Gravagna was given new, adjusted sales goals (which were lower than the expectations set for other sales representatives). As reflected in the Report, Ms. Howard made clear to Ms. Gravagna that a failure to meet the budgeted proposals and sales requirements would result in immediate termination.

Ms. Gravagna signed the Corrective Action Report but then returned to Ms. Howard's desk approximately 5-10 minutes later, and interrupted Ms. Howard while she was in the middle of a phone call. While Ms. Howard was still on the phone, Ms. Gravagna removed the Corrective Action Report from Ms. Howard's desk, claiming that she had not read it, and refused to have her signature on file. (A copy of the unsigned Corrective Action Report issued to Ms. Gravagna is attached hereto as Exhibit D.)

Thereafter, Ms. Gravagna failed to meet the newly adjusted sales goals given to her in July, even after having been warned about her performance. In fact, she failed to make any sales during the month of July. Because Ms. Gravagna's performance did not approve, Terminix was left with no recourse but to terminate her employment on July 23, 2007 for unsatisfactory job performance. As stated in her Separation Notice, Ms. Gravagna had "failed to perform job to a satisfactory level," she had received a previous written warning regarding her performance, but she had made no new sales for the month of July. (A copy of the Separation Notice is attached hereto as Exhibit E.) Ms. Howard – the same individual who had made the decision to hire Ms. Gravagna – participated in the decision to terminate Ms. Gravagna's employment based on her poor performance. Bill Gausch, New York Region Manager for Terminix, who had frequent conversations with Ms. Howard about Ms. Gravagna's poor performance (and who is 55 years old himself), approved the ultimate

---

[3] In June 2007, a new Regional Manger, Bill Gausch, was put in charge of the Flushing branch. This was the impetus for these meetings. Mr. Gausch was charged with setting the bar higher for everyone with respect to schedules and sales activity levels. As such, all sales representatives from that point on were required to begin work promptly at 8 a.m. and were required to work at least one Saturday per month (with additional Saturdays if the individual was not meeting his or her targeted goals for the month). This was a policy that had already been followed in other branches and was now being applied in the Flushing branch. It was at this time that Edwin Cowan (whom Ms. Gravagna mentions in her Complaint) voluntarily resigned (he was not terminated) because he did not want to work the new schedules now being required by Terminix. (See Compl. ¶ 4.)



decision to terminate Ms. Gravagna's employment. Ms. Gravagna's termination occurred <u>before</u> Terminix received, or was aware of, the instant Complaint from the Division.[4]

## LEGAL ARGUMENT

Ms. Gravagna's allegations of discrimination are analyzed under the three-stage analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).[5]  Accordingly, the complainant bears the initial burden of establishing a *prima facie* case of discrimination. <u>Id.</u> at 802. Should the complainant establish a *prima facie* case, the respondent need only produce a legitimate, nondiscriminatory reason for the challenged employment action. <u>Id.</u> Once the respondent makes such a showing, any presumption of discrimination disappears, and the complainant must show that the reason given by defendant was a pretext for the type of discrimination alleged. <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 507 (1993). At all times the employee retains the ultimate burden of proving she was discriminated against. <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981). In the instant case, Ms. Gravagna fails to satisfy her burden.

### A.    Ms. Gravagna Cannot Make Out a Prima Facie Case of Age Discrimination

In order to establish a *prima facie* case of discriminatory discharge, Ms. Gravagna must establish that she was (1) a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was qualified to hold the position at issue; and (4) that adverse employment action occurred under circumstances giving rise to an inference of discrimination. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802.

In her Complaint, Ms. Gravagna does not sufficiently allege that she suffered an adverse employment action. Indeed, all she complains of is the fact that she was issued a Corrective Action Notice for her performance, which does not qualify as an adverse employment action. <u>See, e.g.</u>, <u>Lumhoo v. Home Depot USA</u>, 229 F. Supp. 2d 121, 150 (E.D.N.Y. 2002) (finding that plaintiffs failed to show how the disciplinary notices affected their compensation or other benefits of employment); <u>Thomas v. Bergdorf Goodman, Inc.</u>, No. 03 Civ. 3066 (SAS), 2004 WL 2979960, at *10 (S.D.N.Y. Dec. 22, 2004) ("[The] warning plaintiff received, whether deserved or not, is not a materially adverse action. It is undisputed here that the ... warning had no effect on plaintiff's employment status – she was not demoted, her wages were not decreased, and no further disciplinary action was taken. The mere threat of disciplinary action, including the threat of termination, does not constitute an adverse action materially altering the conditions of employment.").

---

[4]     The cover letter from the Division accompanying the Complaint is dated August 3, 2007.

[5]     Both federal and state case law aid this analysis of Ms. Gravagna's discrimination claims. Aside from the definition of "age," the standards the New York Human Rights Law, N.Y. Exec. Law § 296 <u>et seq.</u> are in accord with the federal Age Discrimination in Employment Act, 29 U.S.C. § 621 <u>et seq.</u> See <u>Gambello v. Time Warner Comms., Inc.</u>, 186 F. Supp. 2d 209, 220 (E.D.N.Y. 2002) (citing <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001)).



However, even if Plaintiff's Complaint did include an allegation of discriminatory discharge. Ms. Gravagna would not be able to establish the third or fourth prongs of her *prima facie* case because her deficient performance shows that she was not qualified for the Commercial Account Manager position, and because her written performance warning and ultimate termination did not occur under circumstances giving rise to an inference of discrimination.

### (1)    Ms. Gravagna Was Not Qualified for the Position of Commercial Account Manager

Ms. Gravagna cannot demonstrate that she was "qualified" for the position of Commercial Account Manager. It is well-settled that "[i]n cases of alleged discriminatory termination, a discharged employee must show that he or she was satisfactorily performing the job at the time of the discharge in order to show that he or she was qualified for the position." Cole v. Millard Fillmore Hosp., 116 F.3d 465, 465 (2d Cir. 1997). Moreover, "[s]atisfactory performance is performing the job at a level that meets the legitimate expectations of the employer." Id. See also Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir.), cert. denied, 473 U.S. 829 (1985); Thornley v. Penton Publ'g, Inc., 104 F.3d 26, 30 (2d Cir. 1997) (to establish claim of discriminatory discharge, plaintiff must demonstrate "satisfactory job performance, in accordance with the particular employer's criteria for satisfactory performance.").

As set out in detail above, Ms. Gravagna's job performance was far from the level that met Terminix's criteria for satisfactory performance. For this reason alone, her *prima facie* case fails.

### (2)    Ms. Gravagna Was Not Issued a Written Performance Warning or Terminated under Circumstances Giving Rise to an Inference of Discrimination

Ms. Gravagna also cannot establish that her written performance warning and ultimate termination occurred under circumstances giving rise to an inference of discrimination, as required to make out the fourth element of her *prima facie* case.

First, Ms. Gravagna cannot, for example, demonstrate that similarly-situated employees of a younger age were treated more favorably. Indeed, all Commercial Account Managers (not just Ms. Gravagna) were required to work least one Saturday per month beginning in July 2007. Furthermore, Ms. Howard held a one-on-one conference with each Commercial Account Manager (not just Ms. Gravagan) in early July 2007, during which each one was given a Corrective Action Report that outlined his or her sales goals for July.

Second, of the 22 current employees at the Flushing branch, 13 employees are over the age of 40, and 5 employees are over the age of 50 (including 3 employees within 2-3 years of Ms. Gravagna's age). See Hill v. Westchester Aeronautical Corp., 112 A.D.2d 977, 978, 492 N.Y.S.2d 789, 791 (2d Dep't 1985) (employee's assertions were insufficient to establish age discrimination, in light of evidence indicating that six of 22 of employer's other employees were employee's age or older).

Third, Ms. Gravagna has not pointed to any age-related comments. See Newsom-Lang v,


Warren Intern., Inc., 249 F. Supp. 2d 292, 300-02 (S.D.N.Y. 2003) (noting absence of age-related comments in dismissing age discrimination claim).

Fourth, the fact that Ms. Gravagna was 61 years of age when she was hired by Terminix, and was terminated less than six months later, further refutes any possible inference of discrimination. See Times Mirror Magazines, Inc. v. Houghton, 268 A.D.2d 355, 702 N.Y.S.2d 265 (1st Dep't 2000) ("record can hardly be said to establish that complainant was discriminated against" because of her age where she was 53 when hired); Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (affirming award of summary judgment to former employer where, among other things, the plaintiff alleged age discrimination was hired "when [plaintiff] was already 60 years old").

Fifth, any inference of discriminatory animus is undermined by the fact that Ms. Howard hired Ms. Gravagna, and later issued her a written performance warning (given to all other outside sales representatives) and made the decision to terminate her. See Schnabel, 232 F.3d at 91 (fact that same actor hired and terminated plaintiff is "a highly relevant factor"); Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute ... an invidious motivation that would be inconsistent with the decision to hire.").

Sixth, Bill Gausch, who is 55 years old himself, approved the ultimate decision to terminate Ms. Gravagna. See Connell v. Consolidated Edison Co. of N.Y., 109 F. Supp. 2d 202, 209 (S.D.N.Y. 2000) (inference against discriminatory intent when decision maker(s) in same protected class as plaintiff).

Together, all of these facts demonstrate the lack of any circumstances giving rise to an inference of discrimination.

## B.    Ms. Gravagna was Issued a Written Performance Warning and Ultimately Terminated for Legitimate, Non-Discriminatory Reasons

Ms. Gravagna was counseled on her performance and later fired for the simple fact that her performance was unsatisfactory. It is well-settled that poor performance constitutes a legitimate, nondiscriminatory reason for terminating an employee. See Cifra v. General Electric Co., 252 F.3d 205, 207 (2d Cir. 2001) (company's assertion of plaintiff's poor work performance constituted a legitimate, nondiscriminatory explanation for her termination); Underkofler v. Community Health Care Plan, Inc., 225 F.3d 646 (2d Cir. 2000) (same); Feldman v. Looms, Div. of Levcor Intern., Inc.,198 F.3d 233, 1999 WL 973518, at *2 (2d Cir. 1999) (employer "clearly articulated a legitimate, nondiscriminatory reason for termination, namely that [former employee's] performance was unsatisfactory, and has supported this contention with ample evidence in the record"); Hines v. Hillside Children's Ctr., 73 F. Supp. 2d 308, 315 (W.D.N.Y. 1999) (granting summary judgment for employer where it terminated employee because of poor job performance and failure to correct problems identified by supervisor).

Ms. Gravagna's subjective disagreement with the Terminix's assessment of her poor



performance – as well as Ms. Gravagna's statement that she "believe[s] that Ms. Howard [was] treating [her] in this manner and trying to terminate [her] employment because of [her] age" (Compl. ¶ 4) – are insufficient to establish this legitimate, non-discriminatory reason as pretextual (or render Ms. Gravagna "qualified"). See Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985) ("In determining whether an employee's job performance is satisfactory ... [t]he ultimate inquiry is whether an employee's performance meets his *employer's* legitimate expectations.") (internal quotations omitted) (emphasis added); Holt v. KMI-Continental, Inc., 95 F.3d 123, 129-30 (2d Cir. 1996) (plaintiff's personal belief that she was qualified for a position is insufficient to demonstrate that an adverse action was discriminatory); Rosengarten v. J.C. Penney Co., Inc., 605 F. Supp. 154, 157 (E.D.N.Y. 1985) ("It is the perception of the decision-maker, and not that of the plaintiff himself, which is relevant."); Shabat v. Blue Cross Blue Shield, 925 F. Supp. 977, 988 (W.D.N.Y. 1996) ("[E]mployee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough ...").

Accordingly, in light of Ms. Gravagna's documented poor performance – combined with the utter absence of any evidence of age discrimination – Ms. Gravagna's allegations of discrimination should be dismissed. See Jordan v. American Intern. Group, Inc., 283 A.D.2d 611, 612, 725 N.Y.S.2d 232 (2d Dep't 2001) (there was ample evidence that the plaintiff was discharged, not because of unlawful discrimination, but because of her unsatisfactory job performance); Dubois v. Brookdale University Hosp., 6 Misc.3d 1023(A), 2004 WL 3196952 (N.Y. Sup. Ct. Dec. 1, 2004) (discrimination complaint dismissed where plaintiff was disciplined not because of unlawful discrimination, but because of her unsatisfactory job performance).

## CONCLUSION

For all the foregoing reasons, the SDHR should find that "no probable cause" exists to believe that Terminix discriminated against Ms. Gravagna in any way. Accordingly, Terminix respectfully requests that Ms. Gravagna's Complaint be dismissed in its entirety.

Respectfully submitted,

SEYFARTH SHAW LLP

Rosemary Joyce

cc:    Robert J. Nobile

| *ServiceMASTER*. Policy and Procedures Equal Employment Opportunity (EEO) & Affirmative Action | Date Issued: October 3, 2005 | Revision Date: February 16, 2007 | Approved Date: February 16, 2007 |
|---|---|---|---|
| Approved by ServiceMaster Human Resources | | | |

## Policy

ServiceMaster believes in the principle of respect for the dignity of each individual. ServiceMaster provides equal opportunities to all individuals without regard to race, color, religion, sex, age, national origin, citizenship, marital status, sexual orientation, U.S. veteran status, disability or any other legally protected class.

All employment decisions including but not limited to recruitment, hiring, placement, training, transfer, promotion, demotion, termination, and other terms and conditions of employment, are based on job-related criteria and equal employment opportunity principles.

## Scope

This policy applies to all associates.

## Definitions

Not applicable

## Guidelines

ServiceMaster prohibits unlawful discrimination of any person and all persons involved in the operation of ServiceMaster are prohibited from engaging in that type of conduct.

ServiceMaster's goal is to maintain a culturally diverse workforce that reflects the diversity of the various communities in which the Company conducts business. All employment decisions including, but not limited to, the following practices are based on job-related criteria and equal employment opportunity principles:

- Recruitment
- Hiring
- Placement
- Compensation
- Company-sponsored training

- Transfer
- Promotion
- Demotion
- Termination
- Other terms and conditions of employment

In accordance with applicable federal and state law protecting qualified individuals with known disabilities, ServiceMaster will attempt to reasonably accommodate those individuals unless doing so would create an undue hardship on the Company.

### Affirmative Action Plans

ServiceMaster is an equal opportunity employer. Our commitment to providing equal employment opportunities in all aspects of the employment process is a primary consideration in the successful operation of our business. Through fair and equal treatment of all people and affirmative action programs, the Company will continue to protect the interests of its associates, customers and shareholders.

| *ServiceMASTER.* | Date Issued: | Revision Date: | Approved Date: |
|---|---|---|---|
| **Policy and Procedures** **Equal Employment** **Opportunity (EEO) &** **Affirmative Action** | October 3, 2005 | February 16, 2007 | February 16, 2007 |
| Approved by ServiceMaster Human Resources | | | |

The continued success of the Company depends heavily on the full and effective utilization of all qualified persons. The Company continues to direct all employment practices toward ensuring equal employment for all. The Company intends that all matters related to all employment practices as well as all Company-sponsored social and recreational programs and all treatment on the job, be free of unlawful discriminatory practices.

In keeping with this policy, the Company will conduct analyses of all personnel actions and undertake affirmative action in compliance with all federal, state, and local requirements to ensure equal opportunity. The ServiceMaster compliance department oversees the affirmative action program, government reporting requirements, and creates affirmative action plans for each location. The ServiceMaster compliance department works directly with the location and the payroll department to get all information needed for all analyses and creation of the affirmative action plans.

**EEO Complaints**

Any questions concerning the Equal Employment Opportunity Policy ("EEO Policy") or conduct inconsistent with the EEO Policy should be reported promptly to the associate's manager, human resources or call the Compliance Helpline.

Managers are required to report any complaint they receive to human resources immediately.

Upon receiving a complaint, human resources will conduct an investigation, protecting to the extent possible, and the confidential nature of the complaint.

Where appropriate, prompt remedial action will be taken to resolve the complaint. Any associate who is uncomfortable for any reason in bringing such matter to the attention of his/her manager, or is not satisfied after bringing the matter to the attention of his/her manager, should report the matter to human resources or contact the Company Compliance Helpline at:

The Helpline phone number is: 1-800-637-9888

E-mail address: ServiceMaster@Alertline.com

Mailing Address: ServiceMaster
         C/O Global Compliance Services Alertline Response
         PMB 3767
         13950 Ballantyne Corporate Place Suite 300
         Charlotte, NC 20277

All complaints will be investigated. All actions taken to investigate and resolve complaints of discrimination will be conducted as confidentially as possible. After investigating the complaint, if the Company determines that the complaint was untruthful, in whole or in part, or that an associate has provided false information regarding the complaint, disciplinary action, up to and including termination, may be taken against an associate who falsified information.

| *ServiceMASTER.* | Data Issued: | Revision Date: | Approved Date: |
|---|---|---|---|
| **Policy and Procedures**<br>**Equal Employment**<br>**Opportunity (EEO) &**<br>**Affirmative Action** | October 3, 2005 | February 16, 2007 | February 16, 2007 |
| Approved by ServiceMaster Human Resources | | | |

### Posting Requirements

The following postings must be posted in each location in a conspicuous place where applicants and associates can see it, even if it has to be posted in more than one (1) location:

- Company Annual Equal Employment Opportunity (EEO) Statement (Statement changes every year)
- Location Equal Employment Opportunity (EEO) Statement and Affirmative Action Policy (Statement is location specific)
- Invitation to Self-Identify (Invitation is standard across all business units)

### Retaliation

Intimidation, threats, coercion, or retaliation in any other form is strictly prohibited against anyone for:

1. making a good faith internal complaint of any conduct violating this policy
2. filing a complaint allowed by any equal employment opportunity law or regulation ("EEO laws")
3. participating in an investigation or any other activity undertaken by the Company or any governmental agency related to compliance with our EEO Policy or any EEO laws
4. opposing in good faith any act or practice that violates any EEO laws
5. exercising any right under any EEO laws

## Responsibilities

### Managers

1. Report any EEO complaint to human resources immediately.
2. Make good faith efforts to reasonably accommodate an associate's good faith expression of religion.
3. Carefully review and familiarize him/herself with both affirmative action plans.
4. Meet with other management in location to discuss the affirmative action programs and their responsibilities as managers to comply with and promote the plan.
5. Sign and post on Company letterhead the location's EEO and Affirmative Action Statement in a conspicuous place where associates and applicants can see it.
6. Post the Company Annual Equal Employment Opportunity poster where applicants and associates can see it.
7. Post the Invitation to Self-Identify where applicants and associates can see it.
8. Post all job openings available to external applicants with the local state employment office as required by the Vietnam Era Veterans Readjustment Assistance Act of 1974 and local outreach organizations.
9. Remind all associates that ServiceMaster is an Affirmative Action and Equal Opportunity Employer and the Affirmative Action Program for Workers with Disabilities and for Disabled Veterans and Veterans of the Vietnam Era is available for review by any applicant or associate during normal business hours.

| *ServiceMASTER*™ Policy and Procedures Equal Employment Opportunity (EEO) & Affirmative Action | Date Issued: October 3, 2005 | Revision Date: February 16, 2007 | Approved Date: February 16, 2007 |
|---|---|---|---|
| Approved by ServiceMaster Human Resources | | | |

**Associates**

1. Responsible for supporting equal opportunities.
2. Assist the Company in meeting our objectives in this area
3. Ensure that the associate's individual conduct conforms to the Company's commitment to equal opportunity.

# ServiceMASTER.

May 1, 2007

## Equal Employment Opportunity (EEO) & Affirmative Action

**Policy Summary**

We believe in the principle of respect for the dignity of each individual.

ServiceMaster provides equal opportunities to individuals without regard to race, color, religion, sex, national origin, citizenship, marital status, sexual orientation, U.S. veteran status, disability, or any other legally protected class.

Employment decisions including but not limited to recruitment, hiring, placement, training, transfer, promotion, demotion, termination, and other terms and conditions of employment, are based on job-related criteria and equal employment opportunity principles.

**Associate's Responsibilities**

Associates are responsible for supporting equal opportunities, assisting ServiceMaster in meeting its objectives in this area, and ensuring that your individual conduct conforms to our commitment to equal opportunities.

**Retaliation**

Intimidation, threats, coercion, or retaliation in any other form is strictly prohibited against anyone for:

1. Making a good faith internal complaint of any conduct violating this policy
2. Filing a complaint allowed by any equal employment opportunity law or regulation ("EEO laws")
3. Participating in an investigation or any other activity undertaken by ServiceMaster or any governmental agency related to compliance with our EEO Policy or any EEO law
4. Opposing in good faith any act or practice that violates any EEO laws
5. Exercising any right under any EEO laws

**EEO Complaints**

Any questions concerning Equal Employment Opportunity (EEO) or conduct inconsistent with the EEO Policy should be reported promptly to your manager, human resources or to the ServiceMaster Compliance Helpline.

Phone number:      1-800-837-9888

E-mail address:    ServiceMaster@Alertline.com

Mailing address:   ServiceMaster
                   C/O Global Compliance Services Alertline Response
                   PMB 3767
                   13950 Ballantyne Corporate Place Suite 300
                   Charlotte, NC 20277

Managers are required to report any complaint they receive to human resources. Upon receiving a complaint, human resources will conduct an investigation, protecting, to the fullest extent possible, the confidential nature of the complaint.

Where appropriate, prompt remedial action will be taken to resolve the complaint.

*ServiceMASTER*®

February 15, 2007

Andrea Gravagna

Dear Ms Gravagna,

It is with sincere pleasure and excitement that I extend you our offer as Commercial Account Manager with Terminix. As was discussed, Terminix is a company which recognizes that it is our people who truly make our success a reality. We look forward to you joining the team and having the opportunity to play a key role in the company's future.

The intent of this letter is to review your employment offer. Please review the following items:

> Salary:  $2,400/month plus allowances and commissions
> Start Date:02/15/07
> Company:Terminix 2372 – NY Commercial
> Position:Commercial Account Manager
> Position Location:30-50 Whitestone Expwy, Flushing NY 11354
> Supervisor:Jennifer Y Howard

I am delighted that you will be a key member of the TerminixTeam. Our success hinges upon the people who make up the team and it is critical to our future that we maintain exceptionally high standards of excellence. We are all excited about the strength you will lend, and look forward to working with you. We all intend to build and maintain an organization of exceptional people, with fair compensation, and to create an environment that enables each individual to realize their maximum potential.

This offer of employment is contingent upon successfully passing a drug-screening test and criminal background check, as well as an MVR if applicable. This offer is contingent upon the completion of verification of the facts you have given on your application for employment. This letter shall not constitute an employment contract and nothing herein changes the terms of the Employment Agreement or your status as an "at-will" employee. If there are any questions we can answer before your start date, please call me at 718/939-4064.

On behalf of all of us at Terminix, we hope to learn of your acceptance of this offer, providing us the opportunity to welcome you to our company.

Sincerely,

Jennifer Y Howard
Branch Manager

Please indicate your acceptance of this offer by signing below and return it to me at your earliest convenience.

_____        2-15-07
Accepted                                Date

Rev. 11/2006

## NEW HIRE 30-60-90 DAY EMPLOYMENT EVALUATION

### (Effective January 2004)

Employee: Andrea Gravagna

Position: B.A.M.

Hire Date: 2/15/07

Branch No.: 7372

Complete this form to appraise the employment progress of each New Hire after 30 days,
60 days, and 90 days of hire. Maintain the completed form in the New Hire's Personnel File in the Branch.
Rate each Performance Category as follows:

2 – Consistently meets exceeds expected standard.
1 – Progress is satisfactory; continued improvement is expected.
0 – Progress is below standard/unacceptable.

| Performance Category | | 30 Days | 60 Days | 90 Days |
|---|---|---|---|---|
| 1. | Has regular and punctual attendance: | 2 | | |
| 2. | Conforms to grooming/dress code: | 1 | | |
| 3. | Exhibits a positive approach to job and Terminix: | 1 | | |
| 4. | Is becoming a "team player" in the Branch: | 1 | | |
| 5. | Demonstrates a passion for serving customers in compliance with Code of Quality of Assurance: | 2 | | |
| 6. | Is progressing on-track with required training levels (including State licensing as applicable): | 2 | | |
| 7. | Demonstrates an increasing knowledge of job: | 2 | | |
| 8. | Level of productivity in job is increasing at an acceptable rate: | 1 | | |
| 9. | Displays pride/care for Company facility and equipment: | 2 | | |

**Complete after each appraisal date.** If terminating employment, state specific reason and justification for termination.

1. **30-Day Appraisal:** ___X___ Continue Employment    _____ Terminate Employment

   Supervisor Signature: _____ Employee Signature: Andrea Gravagna Date: 3-21-07

   Comments: _Focus on self - motivation in the next 30_

2. **60-Day Appraisal:** _to drive your sales & activity!!_ ____ Continue Employment    ____ Terminate Employment

   Supervisor Signature: _____ Employee Signature: _____ Date: _____

   Comments: _____

3. **90-Day Appraisal:** ____ Continue Employment    ____ Terminate Employment

   Supervisor Signature: _____ Employee Signature: _____ Date: _____

   Comments: _____

Employee comments: reverse side

All corrective conversations and actions are to be documented in writing following the conversation and action taken.

Name: <u>Andrea Gravagna</u>                              Date: <u>July 7, 2007</u>

(X) Report of Conference -- 1st ( ); 2nd ( ); 3rd ( )
( ) Report of Suspension for ( ) days without pay
( ) Recommendation for Discharge

1. <u>REASON FOR CONFERENCE: I have made the following observation of employee's conduct / performance:</u>
- Andrea had $3,650 in sales for the month of May, and $1,750 for the month of June.
- Andrea currently has no sales for the month of July.
- As of today, only two "creative" leads have been created by Andrea, with one proposal.

2. <u>STANDARDS EXPECTED: I have informed employee of the following standards that will be expected of him/her in the future:</u>
- Andrea is expected to make budget of $12,000 in sales for July.
- $5,000 in sales need to be turned in by Friday, July 13, 2007.
- Each day, at least three proposals should be submitted to 'creative' contacts; copies are to be submitted to me the next morning.
- Start time in the office is no later than 8:00am.
- One Saturday off per month is guaranteed: Remaining Saturday's off will be performance based, based on above standards.

3. <u>FUTURE CORRECTIVE ACTION, IF REQUIRED: I have advised employee of the following consequences if he/she fails to follow the above standards:</u>
- Failure to follow these standards, and/or to meet budgeted proposals and sales requirements, will result in immediate termination.

---

I acknowledge that I am familiar with the above statements. I wish to submit the following written comments of my won on this matter:

Andrea signed then came back 5 minutes later and took off my desk while I was on the telephone. States she didn't read it and refused to have her signature on file.

Employee's Signature

On this date I talked with this employee about the above statements.

Supervisor's Signature

Signature of Witness – When Applicable

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

------------------------------------------------------------x

ANDREA GRAVAGNA,

                Complainant,

                                    **VERIFIED REBUTTAL**

-against-

                                    DHR Case No.: 10118919
                                    Federal Charge No.: 16GA703979

TERMINIX INTERNATIONAL, INC.

                Respondent.

------------------------------------------------------------x

## INTRODUCTION

As detailed below, Ms. Gravagna believes she was discriminated against with regard to the terms, conditions and privileges of employment on account of her age and in retaliation for her complaints of unlawful employment practices in violation of the Age Discrimination in Employment Act, *29 U.S.C. § 621, et seq.*, the New York State Executive Law *290 et seq.*, the New York City Administrative Code *8-102 et seq.*, as well as other federal, state and local laws.

Terminix International, Inc. (hereinafter "Terminix") hired Ms. Gravagna to be an Account Manager on or about February 16, 2007. The responsibilities of an Account Manager include creating proposals for potential clients, meeting with such clients, and generation of sales. Ms. Gravagna was hired by the Terminix branch location at 30-50 Whitestone Expressway, Flushing, New York.

From the onset of Ms. Gravagna's employment, she was treated differently than other similarly situation employees on account of her age and in retaliation for her complaints of unlawful age discrimination. Ms. Gravagna suffered a multitude of adverse employment actions including but not limited to failure to train, denial of orientation, withholding of performance evaluations, issuance of a false discipline report, verbal harassment, hostile work environment, retaliation after complaints of discrimination, wrongful discharge as well as physical assault.

As detailed in the complaint, Terminix refused to provide Ms. Gravagna with adequate job training including but not limited to refusing to train her on the computer program "Mission", an integral aspect of employment at Terminix. Ms. Gravagna requested the appropriate training but Supervisor Jennifer Howard repeatedly refused her requests and responded with disparaging remarks about Ms. Gravagna's age. Ms. Gravagna complained that she needed computer training to perform the essential function of her position, and felt that Ms. Howard refused to provide proper training on account of her age. Ms. Howard responded to Ms. Gravagna's complaints with further discriminatory remarks concerning Ms. Gravagna's age and further

isolating Ms. Gravagna from her necessary training. Despite the Terminix's failure to train Ms. Gravagna, she received an overwhelmingly positive 30-Day Performance Evaluation.

It quickly became very clear that the decision-making at Terminix was inordinately and unfairly focused and influenced by Ms. Gravagna's age. Ms. Gravagna was at an extreme disadvantage compared to other employees on account of her lack of computer training and the hostility to which she was subjected. Terminix failed to provide Ms. Gravagna 60-Day and 90-Day Performance Evaluations, and then unexpectedly issued a Corrective Action Report, which set unreasonable benchmarks for a new, untrained employee. Terminix would later use this malicious Corrective Action Report as a pretext upon which to base its unlawful, discriminatory actions.

It was apparent that Ms. Gravagna's internal complaints had only an adverse effect. On or about July 7, 2007, Ms. Gravagna informed Ms. Howard that she was going to file a complaint of discrimination. On or about July 9, 2007, Ms. Gravagna submitted a complaint to the New York State Division of Human Rights. On or about July 23, 2007, Ms. Gravagna was terminated and subsequently physically assaulted.

In Respondent counsel's Position Statement, the sole proffered reason for the disparate treatment of Ms. Gravagna was her allegedly inadequate work performance. However, Respondent has provided no evidence to support this bare, conclusory allegation. Respondent has not attached any documentary evidence that substantiates Ms. Gravagna's alleged unsatisfactory work performance. Respondent has not attached any documentary evidence regarding Ms. Gravagna's sales figures. To the contrary, the documentary evidence attached affirmatively establishes that Ms. Gravagna's work exceeded the expectations of her employer. Furthermore, the Position Statement is unsigned, unsworn, and unverified by any Terminix employee. The Position Statement is merely a biased opinion of Terminix's counsel, and nothing more.

## FACTS

**I.     RESPONDENT'S SOLE PROFFERED REASON FOR THE ADVERSE EMPLOYMENT ACTIONS TAKEN AGAINST MS. GRAVAGNA IS SUPPORTED BY BARE CONCLOSORY ALLEGATIONS THAT ARE CONTRADICTED BY DOCUMENTARY EVIDENCE AND LACK ANY INDICIA OF RELIABILITY.**

Respondent's counsel provided bare, conclusory allegations of Ms. Gravagna's unsatisfactory work performance as the sole proffered basis for its adverse employment actions. Respondent's counsel has not corroborated the sole proffered reason for the disparate treatment of Ms. Gravagna with any documentary evidence. Respondent counsel's Position Statement, and the allegations contained therein, are not signed, sworn or verified by any party with knowledge. In fact, Respondent counsel's bare, conclusory allegations are actually contradicted by documentary evidence attached to the Position Statement, and likely further contradicted by documentary evidence that Respondent's counsel purposely failed to attach.

### a.  Ms. Gravagna's 30-Day evaluation demonstrates that she exceeded Terminix's performance expectations.

Respondent counsel's sole proffered basis for the disparate treatment of Ms. Gravagna was her alleged unsatisfactory work performance. The allegation that Ms. Gravagna's work performance

was unsatisfactory is contradicted by documentary evidence. Respondent's counsel affirmatively alleged that Ms. Gravagna's performance met and exceeded Terminix's expectations during the first thirty days of her employment. (See, 30-Day Performance Evaluation dated March 21, 2007, attached to Respondent counsel's Position Statement as Exhibit C, attached hereto as Exhibit A).

The 30-Day Performance Evaluation (hereinafter "30-Day Evaluation") of Ms. Gravagna rated her performance in nine categories on a numerical scale from "0" through "2", with "0" as the lowest score and "2" as the highest score. In five out of the nine categories Ms. Gravagna received the highest rating available of "2" which translates as: "Consistently meets exceeds expected standard". In the remaining four categories Ms. Gravagna received a rating of "1" which translates as: "Progress is satisfactory; continued improvement expected." The 30-Day Evaluation demonstrates that Ms. Gravagna consistently met and exceeded expectations in more than half her responsibilities and was performing satisfactorily in her remaining for responsibilities.

Importantly, the 30-Day Evaluation includes an option for the supervisor to assign a rating of "0" to categories where the employee's "[p]rogress is below standard/unacceptable." Ms. Gravagna did not receive any "0" ratings.

Respondent's counsel alleged that Ms. Gravagna's performance "did not meet Terminix's expectations." (See, Position Statement at 4). However, the 30-Day Evaluation explicitly established the opposite. Rather than accurately portray the contents of the 30-Day Evaluation, Respondent's counsel cherry-picked language that supported its position, but conveniently ignored and failed to mention the bulk and overall tenor of the 30-Day Evaluation. Respondent's counsel alleged that the 30-Day Evaluation demonstrated that "continued improvement was expected" but disregarded dominant language of the 30-Day Evaluation that Ms. Gravagna "[c]onsistently meets and exceeds expected standard."

The 30-Day Evaluation clearly, unambiguously and affirmatively established that Ms. Gravagna work performance met and exceeded Terminix's expectations.

### b. Terminix either intentionally failed to provide Ms. Gravagna with 60-Day and 90-Day evaluations in violation of company policy and practice or intentionally failed to attach such documents to the Position Statement.

Terminix has a company policy and established practice that all employees are entitled to three separate and distinct performance evaluations during the first three months of employment. The 30-Day Evaluation form (effective since January 2004) clearly establishes that Terminix employees are entitled to 30-Day, 60-Day and 90-Day evaluations. (See, 30-Day Employment Evaluation, previously attached hereto as Exhibit A).

Ms. Gravagna was employed at Terminix for more than five months, yet Respondent's counsel merely attached one evaluation to the Position Statement. The logical conclusion is that Terminix either failed to provide Ms. Gravagna with further evaluations to which she was entitled, or that such evaluations were performed but did not corroborate the allegations of the Position Statement and therefore were not attached.

Performance evaluations are of significant benefit to an employee. The evaluations individually and as a collective, cumulative process, bestow a multitude of benefits. Performance evaluations:

> Inform the employee of specific, discrete performance categories in which the employee meets and exceeds the employer's expectations.
> Inform the employee of specific, discrete performance categories in which the employee's progress is satisfactory.
> Inform the employee of specific, discrete performance categories in which continued improvement is expected.
> Inform the employee of specific, discrete performance categories in which progress is below standard/unacceptable.
> Inform the employee of the progression and/or digression of their work performance in specific, discrete performance categories over the course of the first 30, 60 and 90 days of employment.
> Provide the employee with a substantive appraisal of the quality of the employee's work performance and progress.
> Provide the employee with an opportunity for a one-on-one meeting with a supervisor to qualitatively discuss any problems or concerns regarding the workplace.
> Provide the employee with an opportunity to receive productive criticism from a supervisor.
> Provide the employee with an opportunity to learn if their work performance may lead to termination.
> Provide the employee with an opportunity to determine if the employer is treating the employee in a discriminatory manner.

Clearly performance evaluations are of immense value to the employee. A performance evaluation is of even more valuable to an employee performing at an unsatisfactory level, as the evaluations provide such an employee with actual notice that their performance is unsatisfactory and needs improvement, details the specific areas in which such an employee needs to improve, and is an opportunity for the employee to seek advice from a supervisor on how to improve. Terminix's failure to provide Ms. Gravagna with 60-Day and 90-Day Performance Evaluations constitutes a materially adverse employment action.

Failure to comply with the company policy and practice to provide an employee with three performance evaluations leaves an employee in a vulnerable situation. The employee is left in the dark, with no indication if their work is exceptional, average or needs improvement. Respondent's counsel merely attached one review to its Position Statement that demonstrated Ms. Gravagna's high level of work performance. In addition, based on informal reviews and discussions with co-workers, Ms. Gravagna only had reason to believe that her performance was more than satisfactory for a new-hire employee.

If Terminix *had* performed the 60-Day and 90-Day performance evaluation of Ms. Gravagna and provided Ms. Gravagna with a negative assessment, she surely would have contested the legitimacy of the evaluation, in light of her complaints of unlawful discrimination. Ms. Gravagna would have understood such an evaluation to be a pretextual precursor to an unlawful termination. Terminix clearly did not want to perform an illegitimate negative performance evaluation and provide Ms. Gravagna with an opportunity to contest its legitimacy or complain of unlawful employment practices. The alternative would have been to perform legitimate 60-Day and 90-Day Evaluations that would have documented Ms. Gravagna's positive work

performance. However, clearly Terminix did not want to document such accurate facts, as it would conclusively disprove the sole alleged basis for the hostile work environment to which she was subjected and her eventual termination.

Although it is certainly not conceded, even if Ms. Gravagna's work performance was unsatisfactory, the performance evaluation provides the employer with an opportunity to assist an employee to improve. Failure to provide an employee with required performance evaluations must be interpreted as an affirmative effort to hold an employee back and keep such an employee from improvement. Lack of improvement could then be used as a pretext for a hostile work environment and unlawful, discriminatory termination.

It is also a possibility that Terminix did perform the 60-Day and 90-Day Performance Evaluations, but that such documents demonstrate Ms. Gravagna's exceptional work performance as well as her improvements. It is not surprising that such evaluations would not be attached to Respondent counsel's Position Statement as such documents would conclusively establish that Respondent counsel's allegation of unsatisfactory work performance is false.

Terminix either failed to provide Ms. Gravagna with further evaluations to which she was entitled under company policy, or such evaluations were performed but did not corroborate the allegations of the Position Statement and therefore were not attached.

Terminix employees are entitled to 30-Day, 60-Day and 90-Day evaluations. Respondent's counsel merely attached Ms. Gravagna's 30-Day evaluation, and curiously did not attach or even mention the contents of Ms. Gravagna's 60-Day or 90-Day evaluation. It stands to reason that Respondent's counsel failed to attach such documents either because such documents contradicted its Position Statement, or because Ms. Gravagna was prejudiced as Terminix did not provide Ms. Gravagna with the necessary evaluations.

### c.  Terminix did not provide any documentary evidence to support the allegations that Ms. Gravagna's sales numbers were unsatisfactory.

Respondent's counsel did not provide any documentary evidence to support the allegation that Ms. Gravagna's sales numbers were lower than other sales representatives. Respondent did not provide any documentary evidence concerning Ms. Gravagna's sales figures whatsoever.

The sole non-discriminatory reason proffered by Respondent's counsel for the adverse employment actions suffered by Ms. Gravagna was her allegedly unsatisfactory work performance. Given that this is Respondent counsel's only proffered non-discriminatory basis for the diminution of the terms, conditions and privileges of Ms. Gravagna's employment, it is remarkable that Respondent affirmatively omitted any and all documentation of her actual sales figures and the sales figures of other account managers. This documentation surely exists, and the glaring omission of evidence that could corroborate Respondent counsel's proffered non-discriminatory motive, leads to the logical conclusion that such evidence would actually impeach Respondent counsel's own allegations.

It must be noted that the Terminix Employee Handbook, which Respondent's counsel intentionally failed to attach, explicitly states, "All new full-time employees have a six-month (6) orientation period…an adjustment period to become more acquainted with their new company and position." (See, Excerpt from Terminix Employee Handbook attached hereto as Exhibit B). Ms. Gravagna was terminated after merely five months of employment.

Respondent's counsel merely alleged without providing corroborating documents, "her sales numbers were drastically lower than all of the other sale representatives in the Flushing branch." (See, Position Statement at 4). It is unreasonable and disingenuous at best to compare Ms. Gravagna's sales numbers against employees with longer tenure and sufficient training. Ms. Gravagna had not been properly trained and remained in her orientation period throughout the entire duration of her employment.

Respondent's counsel provided no context for the expected performance of new-hire employees, within their 6-month orientation period. Respondent counsel's uncorroborated allegation that one employee hired at the same time as Ms. Gravagna allegedly produced higher sales numbers than Ms. Gravagna, does not demonstrate that Ms. Gravagna's sales numbers were unsatisfactory for an employee in the orientation period.

Furthermore, while Respondent's counsel alleged that Ms. Gravagna's sales figures were lower than other account managers, the Position Statement and thus all allegations contained therein, was not verified by a party with knowledge. The Position Statement expressly states that the allegations contained therein are merely Terminix's counsel's opinion based on counsel's investigation and that "the position statement does not constitute an affidavit." (See, Position Statement at 1, footnote 1). Clearly Terminix did not want to sign and verify a blatantly erroneous and false statement regarding Ms. Gravagna's alleged performance.

### d. Unsigned corrective action report merely established Respondent's conscious production of a pretext.

On or about July 7, 2007, Ms. Howard held a conference with Ms. Gravagna and first informed Ms. Gravagna that her work performance was allegedly unsatisfactory. At this point, Ms. Gravagna had been employed at Terminix for five months, and had only the 30-Day Evaluation from which to assess the quality of her performance, which was resoundingly positive.

During this meeting Ms. Howard said, "I know that you're older than everyone else so it's hard for you to get in the swing of things." Ms. Gravagna replied that she did not feel old. Ms. Gravagna said that the only problem she was having, and the basis for her prior complaints was that she had not been properly trained and that Ms. Howard belittled her on account of her age. Ms. Howard responded, "I don't give a damn, its because you're older than everyone else that you're not computer savvy."

Ms. Howard then presented Ms. Gravagna with a "Corrective Action Report" that detailed unrealistic expectations for Ms. Gravagna in the month of July, in order to produce a supposed legitimate basis upon which to terminate her employment. The Corrective Action Report threatened among many other items, that if Ms. Gravagna did not make $5,000 in sales within the next six days that she would be terminated. Ms. Gravagna vehemently disagreed with the Corrective Action Report, and explained that she needed training on the computer system. Ms. Howard told Ms. Gravagna that she would be fired unless she signed the Report.

After Ms. Gravagna signed the Corrective Action Report she immediately realized that Ms. Howard was going to use the report to terminate her employment. Ms. Gravagna returned to Ms. Howard's office and said, "You're just discriminating against me because I'm older, and I'm going to file a complaint."

On or about July 9, 2007, Ms. Gravagna filed a complaint of age discrimination with the New York State Division of Human Rights. Shortly thereafter, on or about July 23, 2007, Ms. Howard terminated and physically assaulted Ms. Gravagna.

### e. Respondent's Position Statement is not signed, sworn or verified in any manner by any party with knowledge.

Respondent counsel's entire Position Statement lacks any indicia of credibility as it was not signed, sworn, or verified in any manner by any employee of Terminix or any party with actual knowledge. The Position Statement explicitly states on its opening page:

> "...While it is believed to be true and correct in all respects, this position statement does not constitute an affidavit. This statement is submitted on the express condition that it is not to be used as evidence of any kind in any administrative court or proceeding...."
> (See, Position Statement at 1, footnote 1)

Terminix apparently would like to respond to allegations of unlawful, discriminatory conduct on the part of their supervisors, and present justifications and rationalizations for such conduct, but hide behind the shield of legal counsel and not sign, swear or verify the truth of the proposed justifications and rationalizations. Not only has Terminix failed to sign, swear or verify the Position Statement, it has taken explicit care to represent that the proffered explanations for its conduct "does not constitute an affidavit" and cannot "be used as evidence of any kind." Put simply, the Position Statement is not Terminix's Position Statement with regard to Ms. Gravagna's complaint; the Position Statement is merely defense counsel's unverified, independent, conclusory opinion.

## II.   MS. GRAVAGNA DID NOT RECEIVE ADEQUATE TRAINING ON ACCOUNT OF HER AGE.

As alleged in the complaint, throughout the duration of Ms. Gravgana's employment with Terminix she did not receive adequate training. A vital tool for success as an Account Manager at Terminix is ability to access and use the computer program "Mission" that records information such as client lists, client contact information, past appointments, future appointments, and details of proposals submitted to clients. In short, "Mission" is vital to recording and organizing all the information Account Managers need to function efficiently, effectively and maximize sales production. Ms. Gravagna was never trained on or taught how to use the "Mission" program.

On numerous occasions during the term of Ms. Gravagna's employment she requested training from Ms. Howard, but Ms. Howard refused to provide Ms. Gravagna with any instruction whatsoever. Ms. Gravagna was committed to her job at Terminix and realized the importance of the "Mission" system to prolonged success as an Account Manager. Therefore, despite the negative feedback she had received for her proactive desire to better herself as an employee, Ms. Gravagna continued to ask Ms. Howard for "Mission" training. Ms. Howard refused every request.

In mid-April 2007, Ms. Gravagna complained to Ms. Howard that she did not feel she had been treated fairly and equally with regard to her training and Ms. Howard responded, "I know, it's hard for older people to get in the swing of things." Ms. Gravagna told Ms. Howard that she

took offense to the comment, which seemed to have opposite effect Ms. Gravagna expected. Thereafter, comments of this nature from Ms. Howard became commonplace.

In Position Statement, Respondent's counsel affirmatively admitted that Ms. Gravagna was not trained on how to use the "Mission" program. Terminix provided a table that detailed the alleged training provided to Ms. Gravagna. (See, Statement on Position at 3). Although Ms. Gravagna does not concede the truth of Terminix's factual allegations, the table does not include any mention of "Mission" training. The text that describes and explains the contents of the table similarly does not state that Ms. Gravagna received any "Mission" training.

Respondent's counsel alleged that "Ms. Howard offered to help Ms. Gravagna" with respect to the "Mission" system. However, this is a bare allegation lacks any indicia of reliability. Respondent did not allege the date, manner or circumstances in which Ms. Howard made this alleged offer. Ms. Howard did not sign, swear or verify the Position Statement. Respondent's counsel did not allege whether Ms. Gravagna accepted or refused the offer. As Ms. Gravagna had requested "Mission" training throughout her employment, any offer to help extended by Ms. Howard surely would have been accepted. However, Respondent's counsel did not allege whether Ms. Howard actually followed through with this alleged offer to train.

Ms. Gravagna vehemently maintained in her original complaint that she was never provided with training to utilize the "Mission" system, in effect intentionally obstructing Ms. Gravagna chance to succeed at Terminix.

## III.    MS. GRAVAGNA WAS DENIED A 6-MONTH ORIENTATION PERIOD ON ACCOUNT OF HER AGE.

The Terminix Employee Handbook, which Respondent's counsel did not attach to the Position Statement, explicitly states:

> "All new full time employees have a six-month (6) orientation period. This six month period will provide new full-time employees an adjustment period to become more acquainted with their new company and position while providing an opportunity to demonstrate their ability to achieve a satisfactory level of performance." (See, Excerpt of the Terminix Employee Handbook attached hereto as Exhibit B)

Ms. Gravagna was informed upon the commencement of her employment at Terminix that the first 6-month period would be considered an orientation and training period. Consistent with the guarantees of the Employee Handbook, Ms. Gravagna was promised by Ms. Howard that the orientation/training period would provide her with ample training and instruction. It was understood that Ms. Gravagna's performance would not be subject to scrutiny during the orientation/training period, as it would be an "adjustment" period to "become more acquainted" with the company.

Terminix failed to provide Ms. Gravagna with adequate training. Terminix failed to provide Ms. Gravagna with an "adjustment" period. Terminix failed to provide Ms. Gravagna with an opportunity to "become more acquainted" with the company. Respondent's counsel affirmatively alleged that Ms. Gravagna was terminated during her orientation/training period. (See, Statement on Position at 3). Terminix intentionally did not provide Ms. Gravagna an opportunity to succeed.

Respondent's counsel affirmatively admitted that Ms. Gravagna's performance met and exceeded Terminix's expectations during the first thirty days of employment. As has been demonstrated above, though Respondent's counsel alleged that Ms. Gravagna's performance did not meet Terminix's expectations, the supporting documentation submitted with the Position Statement firmly establishes the opposite. (See, Statement on Position at 4 and 30-Day Evaluation previously attached hereto as Exhibit A).

Terminix terminated Ms. Gravagna's employment after merely five months of employment. Ms. Gravagna remained in an orientation period, adjusting to her new position and becoming more acquainted with the company. Ms. Gravagna was subject to adverse employment actions during her orientation period including but not limited to failure to train, failure to provide performance evaluations, issuance of a Corrective Action Report, verbal abuse, hostile work environment, wrongful termination and physical assault. Clearly Terminix did not provide Ms. Gravagna with any period in which to adjust and become acquainted with her new position and new company- a benefit younger employees at Terminix readily enjoy.

## IV. MS. GRAVAGNA WAS SUBJECT TO DISCRIMINATORY COMMENTS AND WAS ULTIMATELY TERMINATED AFTER COMPLAINTS OF AGE DISCRIMINATION

During the term of her employment at Terminix, Ms. Gravagna repeatedly complained to her supervisors that she was subject to a lack of training, verbal harassment, and hostile work environment on account of her age. Ms. Gravagna's complaints were consistent, explicit and clear. Ms. Gravagna's complaints included, but were not limited to the following:

> ➢ In or about mid-April 2007, Ms. Gravagna complained to Ms. Howard that she did not feel she had been treated fairly and equally with regard to her training and Ms. Howard responded, "I know, it's hard for older people to get in the swing of things." Ms. Gravagna told Ms. Howard that she took offense to the comment, which seemed to have opposite effect Ms. Gravagna expected. Thereafter, comments of this nature from Ms. Howard became commonplace.

> ➢ In or about late-April 2007, Ms. Gravagna complained to Ms. Howard regarding her lack of training on the "Mission" program. Ms. Gravagna said, "You're not treating me properly, I need to be taught how to use Mission." Ms. Howard responded, "I know it's hard for older people, they aren't very computer savvy."

> ➢ In or about mid-April 2007, Ms. Gravagna complained to Account Manager Karla Arana, "Jennifer never told me how to do this, she looks at me like I am older, not computer savvy and not as smart."

> ➢ In or about mid-April 2007, Ms. Gravagna complained to Account Manager Jose Morales, "Jennifer never took time to show me because I am older than the rest of you"

> ➢ In or about June 2007, Regional Director Bill Gausch visited the Terminix branch at which Ms. Gravagna worked. Mr. Gausch asked Ms. Gravagna for copies of the proposals from Mission that she had submitted to potential clients. Ms. Gravagna said, "I can't do that, I don't know how to do that." Mr. Gausch responded, "Didn't Jennifer [Howard] show you how to use Mission?" Ms. Gravagna complained, "No, she never did. She doesn't think I can learn how to use the computer because I'm too old."

> On or about July 7, 2007, Ms. Gravagna complained to Ms. Arana, "I'm going to bring her into court for this [forcing her to sign the corrective action report]; I am going to make a complaint of age discrimination."

> On or about July 7, 2007, Ms. Gravagna complained to Ms. Howard, "You're just discriminating against me because I'm older, I'm going to file a complaint."

> On or about July 9, 2007 Ms. Gravagna submitted a complaint to the New York State Division of Human Rights in which she alleged that Terminix discriminated against her with regard to the terms and conditions of employment on account of her age.

Shortly thereafter, on or about July 23, 2007, Ms. Gravagna was terminated.

## V.   MS. HOWARD ASSAULTED MS. GRAVAGNA AFTER COMPLAINTS OF AGE DISCRIMINATION.

On or about July 23, 2007 Ms. Howard terminated and physically assaulted Ms. Gravagna.

Directly after Ms. Howard informed Ms. Gravagna that she was fired, Ms. Gravagna returned to her desk, grabbed her belongings and continued to exit the building. As Ms. Gravagna exited the building, Ms. Howard stopped and harassed her.

Ms. Howard said, "What do you have there? That belongs to Terminix!" Ms. Gravagna responded, "No, these are my belongings." Then, all of a sudden, Ms. Howard violently grabbed Ms. Gravagna, threw her up against the wall, and physically removed Ms. Gravagna's belongings from her grasp. Ms. Gravagna was so frightened by this event that she did not even know how to respond. Ms. Gravagna was, and still is, in a state of shock. Ms. Gravagna is a benevolent, kind person and has never been confronted with a situation where her age and lack of physical strength has been tested, certainly not by a supervisor in a supposedly professional work environment.

Immediately following this incident Secretary Rosa Martinez approached Ms. Gravagna. Ms. Martinez said, "I saw what just happened. You can't let that go, you have to call Human Resources." Ms. Gravagna followed Ms. Martinez's advice.

Later that day Ms. Gravagna called Terminix's Human Resources Department and spoke to Andre Kemp. Ms. Gravagna informed Mr. Kemp of Ms. Howard's history of age discrimination as well as Ms. Howard's physical assault of Ms. Gravagna earlier that day. Ms. Gravagna memorialized that conversation in an email sent later that day. (See, Email correspondence from Andrea Gravagna to Andre Kemp dated July 23, 2007 attached hereto as Exhibit C)

Ms. Gravagna then reported the assault to the police at 109 Precinct, 37-05 Union Station. (See, Incident Report dated July 23, 2007 attached hereto as Exhibit D)

## LEGAL ARGUMENT

Ms. Gravagna has alleged a prima facie case of unlawful employment discrimination. Ms. Gravagna has satisfied her prima facie burden as she has established that she was a member of a protected class, was qualified for the position, and suffered adverse employment action under

circumstances that give rise to an inference of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, (1973). Therefore, the burden shifted to Terminix to produce evidence of a legitimate, non-discriminatory basis for the adverse employment actions taken against Ms. Gravagna. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742 (U.S. 1993); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089 (U.S. 1981).

Terminix failed to produce any evidence whatsoever of a legitimate, non-discriminatory basis for the adverse actions taken against Ms. Gravagna. Although it is not conceded, if Respondent's counsel has demonstrated a legitimate non-discriminatory basis for their actions, the reason given was a mere pretext for unlawful age discrimination.

## I.   MS. GRAVAGNA HAS ALLEGED A PRIMA FACIE CASE OF EMPLOYMENT DISCRIMINATION ON ACOUNT OF AGE AND IN RETALIATION FOR COMPLAINTS OF DISCRIMINATION.

To establish a prima facie case of substantive employment discrimination, a complainant must show that it is (1) qualified for the position at issue, (2) a member of a protected class, and (3) suffered an adverse employment action under circumstances from which one can infer discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, (1973); Vaughn v. Mobile Oil Corp, 707 F.Supp. 595, (S.D.N.Y. 1989); Scott v. Federal Reserve Bank, 704 F. Supp. 441 (S.D.N.Y. 1989); Fahie v. Thornburgh, 746 F.Supp 310 (S.D.N.Y. 1990); Fisher v. Vasser College, 114 F.3d 1332 (2d Cir. 1994).

In the context of retaliation, a complainant must demonstrate: (1) an engagement in a protected activity, (2) the employer's awareness of complainant participation in such activity, (3) adverse employment action and (4) a nexus between the protected activity and the adverse action. Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597 (2d Cir.2006); Wanamaker v. Columbian Rope Co., 108 F.3d 462 (2d Cir.1997).

Ms. Gravagna sufficiently alleged a prima facie case of unlawful age discrimination and retaliation for complaints of discrimination.

### a.  Ms. Gravagna is and was at all material times qualified for the position of Account Manager.

Ms. Gravagna was clearly qualified for the job of Account Manager. Ms. Gravagna's resume demonstrates her work experience in sales. (See, Ms. Gravagna's resume as submitted to Terminix, attached hereto as Exhibit E). In or about February 2007, when Ms. Gravagna interviewed with Ms Howard regarding the position, Terminix agreed that Ms. Gravagna was qualified for the job and therefore extended her a job offer.

To show "qualification" sufficiently to establish a prima facie case, the complainant "need not show perfect performance or even average performance." Powell v. Syracuse Univ., 580 F.2d 1150, 1155 (2d Cir.1978)(quoting Flowers v. Crouch-Walker Corp., 552 F.2d 1277, 1283 (7th Cir.1977)). Instead, the complainant need only make the "minimal showing" that she "possesses the basic skills necessary for performance of [the] job." Owens v. New York City Housing Auth., 934 F.2d 405, 409 (2d Cir.1991) (quoting Powell, 580 F.2d at 1155); De la Cruz v. New York City Human Res. Admin. Dep't of Social Servs., 82 F.3d 16 (2d Cir.1996).

Significantly, in circumstances where "the employer has already hired the employee into the job in question, the inference of minimal qualification is, of course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified." Gregory v. Daly, 243 F.3d 687 (2d Cir. 2001)

Respondent cited Cole v. Millard Fillmore Hosp., 116 F.3d 465 (2d Cir. 1997), for the proposition that a discharged employee must show that he/she was satisfactorily performing the job at the time of the discharge to show that he/she was qualified for the position. In Cole, the court held that on a motion for summary judgment, after discovery had been produced and the defendant had "presented sufficient uncontroverted documentation to demonstrate that, according to its employment standards, [plaintiff] was not performing his job satisfactorily," that the plaintiff had not presented a prima facie case of discrimination. Id. at 465. As stated above, Respondent's counsel did not present any documentary evidence to demonstrate that Ms. Gravagna was not performing her job satisfactorily. Respondent relies on unsworn, unsigned, unverified, bare, conclusory allegations to support this proposition. Respondent's counsel did not attach any documentary evidence that corroborated the allegations that Ms. Gravagna's work performance was unsatisfactory.

To the contrary, Terminix attached the 30-Day Evaluation, which affirmatively demonstrated that Ms. Gravagna's work performance exceeded Terminix's expectations. In Cole, a case cited by Respondent's counsel, the court explicitly stated that on the issue of an employee's qualifications, "courts may rely on evaluations prepared by the employee's supervisors." Id. at 465; Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir.), cert. denied, 474 U.S. 829 (1985).

It is without question that Ms. Gravagna was qualified for the position of Account Manager at the time she was hired. Throughout the term of her employment at Terminix she was subject to adverse employment actions including but not limited to failure to train, failure to provide performance evaluations, issuance of a Corrective Action Report, verbal harassment, hostile work environment, retaliation, wrongful discharge and physical assault, despite her qualifications. At the time Ms. Gravagna was terminated she remained qualified for the position.

### b. Ms. Gravagna suffered adverse employment actions under circumstances that give rise to an inference of discrimination.

Ms. Gravagna has demonstrated that she was subjected to a failure to train, denial of an orientation period, issuance of a Corrective Action Report, hostile work environment, verbal harassment, retaliation, wrongful discharge and physical assault, under circumstances that give rise to an inference of discrimination.

An inference of discrimination is established where the complainant has made "a showing that [1] the employer treated workers in a protected group less favorably than others outside of the group, [2] criticized the plaintiff in a degrading manner, or [3] made invidious comments concerning other members of the protected group." Chambers v. TRM Copy Centers Corp., 43 F.3d 29 (2d Cir. 1994); Ostrowski v. Atlantic Mutual Insurance Companies, 968 F.2d 171, 182 (2d Cir.1992). Allegations of disparate treatment of similarly situated employees motivated by unlawful motives are sufficient to demonstrate an inference of discrimination. McDonnell Douglas, 411 U.S. 792.

Training is a benefit of employment under Title VII protection. Lopez v. Metropolitan Life Ins. Co., 930 F.2d 157, 161 (2d Cir. 1991), cert. denied, 502 U.S. 880, 112 S.Ct. 228 (1991).

Where a complainant alleges an employer's failure to adequately train an employee, and thereafter the employee is subject to adverse actions on account of alleged poor performance, an inference of discrimination shall arise. Schreiber v. Worldco, LLC, 324 F.Supp.2d 512 (S.D.N.Y. 2004)(complainant established a prima facie case of discrimination where "denial training led to their poor performance"); Holtz v. Rockefeller & Co., 258 F.3d 62 (2d Cir. 2001) (plaintiff's evidence that the promise to provide her with training was made when she was hired, and that age was at least a substantial part of the motivation for the denial of training was sufficient to defeat summary judgment).

Ms. Gravagna was denied training that was provided to other similarly situated employees. Ms. Gravagna was explicitly told that the reason she was denied such training was due to her age. Respondent counsel's sole alleged basis for the adverse employment actions of Terminix towards Ms. Gravagna was her alleged unsatisfactory work performance. However, even if Ms. Gravagna's work performance was unsatisfactory, it was due to Terminix's discriminatory practice and failure to train. Clearly the failure to train, coupled with the discriminatory comments and alleged basis for her termination, demonstrates an inference of discrimination.

While "it is true that evidence of disparate treatment may establish the inference of discrimination necessary to satisfy a plaintiff's prima facie case under *McDonnell Douglas*...such evidence is not always necessary...[a complainant] may rely on direct evidence of what the defendant did and said" in satisfying her initial burden. Holtz, 258 F.3d at 77 (citing Tarshis v. Riese Org., 211 F.3d 30 (2d Cir.2000)); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456 (2d Cir. 2001).

Where a complainant alleges discriminatory comments, courts have consistently held that such conduct is sufficient to demonstrate an inference of discrimination. Rivera-Rodriguez v. Frito Lay Snacks Caribbean, 265 F.3d 15, 25 (1st Cir.2001)(finding a prima facie case where comments included "gray hair must mean that an employee is over the age of 60"); Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir.1996) (an inference of discrimination may arise from "actions or remarks made by decision-makers that could be viewed as reflecting a discriminatory animus"); Schreiber, 324 F.Supp.2d at 512 (stating "verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff"); Reeves v. Sanderson Plumbing, Inc., 197 F.3d 688, 691 (5th Cir.1999) (inference of discrimination from two isolated comments that plaintiff "was so old he must have come over on the Mayflower" and that plaintiff "is too damn old to do the job").

Ms. Gravagna was criticized in a degrading, discriminatory and invidious manner. The discriminatory remarks from Terminix employees were both severe and pervasive and were specifically related to Ms. Gravagna's age and her employment. As stated above, Ms. Howard repeatedly made comments to Ms. Gravagna including, but not limited to, "I know it's hard for older people to get in the swing of things", "I don't give a damn, its because you're older than everyone else" and "I know it's [Mission] hard for older people, they aren't very computer savvy." Comments of this nature sufficiently demonstrate an inference of discrimination for Terminix's many adverse employment actions.

    **c. Ms. Gravagna was subjected to adverse employment actions under circumstances that give rise to an inference of retaliation.**

The close, temporal proximity between Ms. Gravagna's complaints of discrimination and unlawful employment practices, and the adverse employment actions of Terminix, including but not limited to the failure to train, denial of an orientation period, issuance of a Corrective Action Report, hostile work environment, verbal harassment, retaliation, wrongful discharge and physical assault, give rise to an inference of retaliation.

Close temporal proximity of complaints and adverse actions give rise to an inference of retaliation. Quinn v. Green Tree Credit Corp., 159 F.3d 759 (2d Cir.1998)(retaliatory intent inferred from termination within two months of complaint of sexual harassment); Lovejoy-Wilson v. NOCO Motor Fuel Inc., 263 F.3d 208 (2d Cir.2001)(stating that the causal connection needed for a prima facie case can be "established indirectly by showing that the protected activity was closely followed in time by the adverse action"); Cifra v G.E. Co., 263 F.3d 208.

Ms. Gravagna repeatedly complained about the disparate treatment, hostile work environment and unlawful discrimination to which she was subjected at Terminix. As stated above, throughout the term of her employment, Ms. Gravagna complained on numerous occasions to her supervisors and co-workers regarding the unlawful employment practices. Directly following Ms. Gravagna's complaints, she was often subjected to invidious discriminatory remarks from her supervisor Ms. Howard, followed by a failure to train, denial of her orientation period, issuance of a Corrective Action Report, verbal harassment and hostile work environment.

The final incident of retaliation occurred in response to Ms. Howard's issuance of a Corrective Action Report on or about July 7, 2007. Ms. Gravagna complained to Ms. Howard, "You're just discriminating against me because I'm older, I'm going to file a complaint." On or about July 9, 2007, Ms. Gravagna submitted a complaint to the New York State Division of Human Rights in which she alleged that Terminix discriminated against her with regard to the terms and conditions of employment on account of her age. Merely two weeks later, on or about July 23, 2007, Ms. Gravagna was terminated and physically assaulted by Ms. Howard.

The close, temporal proximity of Ms. Gravagna's complaints, and the subsequent adverse employment actions, including but not limited to the ultimate termination and physical assault of Ms. Gravagna shortly following her complaint of discrimination to the Division of Human Rights, clearly demonstrates an inference of retaliation.

## II. RESPONDENT FAILED TO SATISFY ITS BURDEN TO PRODUCE EVIDENCE OF A LEGITIMATE, NON-DISCRIMINATORY MOTIVE FOR ITS ADVERSE EMPLOYMENT ACTIONS.

The establishment of a prima facie case of discrimination by a complainant creates a presumption that the employer unlawfully discriminated against the employee. Hicks, 509 U.S. at 502; Burdine, 450 U.S. at 248.

The presumption places upon the respondent the burden of producing an explanation to rebut the prima facie case, "the burden of **producing evidence** that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." Hicks, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 254)(emphasis added). That is, "the defendant must clearly set forth, through the introduction of admissible evidence," reasons for its actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. Burdine, 450 U.S at 254-255.

Respondent's counsel provided bare, conclusory allegations of Ms. Gravagna's unsatisfactory work performance as the sole proffered basis for its adverse employment actions. Respondent's counsel did not produce any evidence whatsoever to corroborate the sole legitimate, non-discriminatory basis proffered for Terminix's adverse employment actions. In fact, the evidence produced by Respondent's counsel demonstrates that Ms. Gravagna's work performance exceeded her employer's expectations. (See, 30-Day Evaluation previously attached hereto as Exhibit A)

A respondent's proffered legitimate, non-discriminatory reason for its adverse employment actions must be more than bare, conclusory allegations. Weber v. Parfums Givenchy, Inc., 49 F.Supp.2d 343 (S.D.N.Y. 1999)(stating "in cases in which courts have found defendants to have proffered a legitimate, non-discriminatory reason for the adverse employment action, that reason has been more substantial than conclusory assertions")

Furthermore, the Position Statement submitted in response to Ms. Gravagna's complaint is not a statement of Terminix or any employee with actual knowledge of the allegations contained therein. The Position Statement is unsigned, unsworn, and unverified by any Terminix employee. The Position Statement is merely a biased opinion of Terminix's counsel, and nothing more. On the front page of the Position Statement, Respondent's counsel made this explicitly clear, stating, "this position statement does not constitute an affidavit. This statement is submitted on the express condition that it is not to be used as evidence of any kind in any administrative court or proceeding...."

Respondent's counsel has submitted merely bare, conclusory allegations of Ms.Gravagna's unsatisfactory work performance. Respondent has produced no evidence to establish its allegations, and the evidence provided actually bolsters Ms. Gravagna's allegations. The allegations of the Position Statement were not signed, sworn or verified in any manner. Respondent's counsel has clearly failed to rebut the presumption of discrimination established by complainant's prima facie case.

## III.  RESPONDENT'S PROFFERED LEGITIMATE, NON-DISCRIMINATORY REASON FOR ITS ADVERSE EMPLOYMENT ACTIONS IS A MERE PRETEXT FOR UNLAWFUL DISCRIMINATION AND RETALIAION.

Respondent counsel's sole proffered motive for the failure to train, denial of orientation, issuance of the Corrective Action Report, verbal harassment, hostile work environment, retaliation, wrongful discharge and physical assault of Ms. Gravagna was her alleged unsatisfactory work performance. As has been demonstrated these are bare, conclusory allegations, are not corroborated by any documentary evidence and are not signed, sworn or verified in any manner by any party with knowledge. Respondent has not substantiated these allegations with any documentary evidence. Documentary evidence attached to Respondent's Position Statement establishes that Ms. Gravagna's work performance exceeded the expectations of respondent.

To establish pretext, complainant can clearly show both that Respondent counsel's alleged basis for the adverse employment actions "was false, and that discrimination was the real reason." Hicks, 509 U.S. at 502.

Respondent's proffered legitimate, non-discriminatory basis for the adverse employment actions-Ms. Gravagna's alleged unsatisfactory performance -is false. The sole document provided as evidence of Ms. Gravagna's work performance is her 30-Day Evaluation. The 30-Day

- 16 -

Evaluation demonstrates that in the majority of performance categories Ms. Gravagna "meets and exceeds expected standard" and in the remaining categories "progress is satisfactory." It was only after months of discrimination complaints, and no documentation of Ms. Gravagna's alleged unsatisfactory work performance, that Terminix issued a Corrective Action Report that required Ms. Gravagna to meet unreasonable sales standards or she would be terminated. At the time Ms. Gravagna was issued the Corrective Action Report, the positive 30-Day Evaluation was the sole document that substantiated Ms. Gravagna's work performance. (See, 30-Day Evaluation previously attached hereto as Exhibit A). Respondent provided no evidence to support the proposition that Ms. Gravagna's work performance was unsatisfactory.

Furthermore, Ms. Gravagna was merely a new-hire within the term of a company established orientation period. According to the Terminix Employee Handbook, which Respondent failed to attach to its Position Statement, the first 6-months of employment are an orientation period to "provide new full-time employees an adjustment period to become more acquainted with their company and position." (See, Excerpt from Terminix Employee Handbook, previously attached hereto as Exhibit B). Respondent terminated Ms. Gravagna for alleged unsatisfactory work performance, while she remained in an orientation period, and had only positive performance reviews during her employment.

Clearly, Ms. Gravagna was performing at a satisfactory level, or her unsatisfactory would have been documented in a 60-Day or 90-Day performance evaluation, which are performed in accordance with Terminix custom and practice. Respondent did not attach any 60-Day or 90-Day performance evaluations. The 60-Day and 90-Day Performance Evaluations were either not performed due to Terminix's desire not to document Ms. Gravagna's positive work performance, or were performed but contradicted Respondent counsel's allegations. The sole document that concerns Ms. Gravagna's work performance is the 30-Day Evaluation, which firmly established her high level of work.

It is clear that Ms. Gravagna's work performance as not unsatisfactory. The evidence actually indicates that Ms. Gravagna's work performance was more than satisfactory, her performance actually exceeded Terminix's expectations. Therefore, Respondent counsel's proffered basis for its adverse employment actions are blatantly false.

There is an abundance of evidence that the real basis for the adverse actions taken against Ms. Gravagna was age discrimination and retaliation for complaints of such discrimination.

Ms. Gravagna alleged invidious, discriminatory remarks by Ms. Howard, throughout the duration of Ms. Gravagna's employment. Ms. Howard repeatedly made comments including but not limited to, "I know it's hard for older people, they aren't very computer savvy", "I know that you're older than everyone else so it's hard for you to get in the swing of things" and "I don't give a damn, its because you're older than everyone else that you're not computer savvy."

Following Ms. Gravagna's complaints of discrimination, her work environment precipitously worsened. Ms. Gravagna suffered adverse employment actions at the hands of Terminix, including but not limited to failure to train, denial of orientation, and issuance of a Corrective Action Report. Ms. Gravagna ultimately complained to the Division of Human Rights on or about July 9, 2007. Shortly thereafter, on or about July 23, 2007 Ms. Gravagna was terminated and subsequently physically assaulted by Ms. Howard.

- 17 -

The false reason proffered for the adverse actions taken against Ms. Gravagna, coupled with the invidious, discriminatory remarks of Ms. Howard, clearly demonstrate that the proffered basis for Terminix's adverse actions is a mere pretext for unlawful age discrimination and retaliation.

## CONCLUSION

Terminix is liable for unlawful employment practices. At Terminix, Ms. Gravagna suffered a multitude of adverse employment actions on account of her age, including but not limited to failure to train, denial of orientation, withholding of performance evaluations, issuance of a Corrective Action Report, verbal harassment, hostile work environment, retaliation after complaints of discrimination, wrongful discharge as well as physical assault. Ms. Gravagna has demonstrated a prima facie case of discrimination, and Respondent has not produced any evidence of a legitimate non-discriminatory basis for its adverse actions. Respondent's proffered non-discriminatory reason for its unlawful employment actions is false, and a mere pretext for unlawful discrimination and retaliation. Therefore, "probable cause" exists to believe that Terminix engaged in unlawful, discriminatory employment practices.

Dated: New York, NY
      November 1, 2007

                             MARK L. LUBELSKY & ASSOCIATES

                             David Gottlieb, Esq.
                             Attorneys for Complainant
                             123 West 18th Street
                             Eighth Floor
                             New York, NY 10011
                             (212) 242-7480

## NEW HIRE 30-60-90 DAY EMPLOYMENT EVALUATION

*(Effective January 2004)*

Employee: **Andrea Gravagna**

Position: **B.A.A.**

Hire Date: **2/15/07**

Branch No.: **7372**

Complete this form to appraise the employment progress of each New Hire after 30 days,
60 days, and 90 days of hire. Maintain the completed form in the New Hire's Personnel File in the Branch.
Rate each Performance Category as follows:

    2 – Consistently meets exceeds expected standard.
    1 – Progress is satisfactory; continued improvement is expected.
    0 – Progress is below standard/unacceptable.

| Performance Category | 30 Days | 60 Days | 90 Days |
|---|---|---|---|
| 1.  Has regular and punctual attendance: | 2 | | |
| 2.  Conforms to grooming/dress code: | 1 | | |
| 3.  Exhibits a positive approach to job and Terminix: | 1 | | |
| 4.  Is becoming a "team player" in the Branch: | 1 | | |
| 5.  Demonstrates a passion for serving customers in compliance with Code of Quality of Assurance: | 2 | | |
| 6.  Is progressing on-track with required training levels (Including State licensing as applicable): | 2 | | |
| 7.  Demonstrates an increasing knowledge of job: | 2 | | |
| 8.  Level of productivity in job is increasing at an acceptable rate: | 1 | | |
| 9.  Displays pride/care for Company facility and equipment: | 2 | | |

**Complete after each appraisal date.** If terminating employment, state specific reason and justification for termination.

1. **30-Day Appraisal:** ___X___ Continue Employment     _____ Terminate Employment

    Supervisor Signature: _____ Employee Signature *Andrea Gravagna* Date: *3-31-07*

    Comments: Focus on self - motivation in the next 30 to drive your sales & activity!!

2. **60-Day Appraisal:** _____ Continue Employment     _____ Terminate Employment

    Supervisor Signature: _____ Employee Signature: _____ Date: _____

    Comments: _____

3. **90-Day Appraisal:** _____ Continue Employment     _____ Terminate Employment

    Supervisor Signature: _____ Employee Signature: _____ Date: _____

    Comments: _____

Employee comments: reverse side

# TERMINIX INTERNATIONAL GUIDELINES FOR THE WORKPLACE

## SIX MONTH ORIENTATION PERIOD

All new full-time employees have a six-month (6) orientation period. This six-month period will provide new full-time employees an adjustment period to become more acquainted with their new company and position while providing an opportunity to demonstrate their ability to achieve a satisfactory level of performance.

## INTERNAL TRANSFERS

It is the policy of this company that all new hires or internal candidates must remain or have been in their initial positions twelve months (12) prior to being considered for an internal move, transfer to another business unit or promotion. Employees must be in good standing (i.e. good attendance record and no counseling of any type within a twelve month (12) period). The Corporate Human Resources Manager or the appropriate Regional Human Resources Manager must approve any exception.

## PERSONAL APPEARANCE

It is expected that the personal appearance and grooming of each employee will project a professional business image. Each employee is expected to report to work dressed and groomed in a way that conforms to generally accepted standards for a professional business work place, the duties they perform and the amount of face-to-face public contact they encounter.

(18)

Yahoo!  My Yahoo!  Mail  Tutorials  More

**YAHOO! MAIL**

Search: [ ] Web Search

Welcome, andreagravagna Sign Out  Help

---

| Mail | Addresses | Calendar | Notepad | | Mail For Mobile - Mail Upgrades - Options |

| Check Mail | Compose | | | Search Mail | Search the Web |

See your credit score - free

**Folders**   [Add - Edit]
**Inbox (12)**
Draft
Sent
**Bulk (1)**   [Empty]
Trash   [Empty]

**My Folders**   [Hide]
plll

**Search Shortcuts**
My Photos
My Attachments

Netflix
Only $9.99/mo.

Free People Search

Find Old Friends

Find Any Email Address

Previous | Next | Back to Messages

| Delete | Reply | Forward | Move... |

This message is not flagged. [ Flag Message - Mark as Unread ]

Printable View

**Date:** Mon, 23 Jul 2007 14:18:10 -0700 (PDT)
**From:** "andrea gravagna" <andreagravagna@yahoo.com>  Add to Address Book  Add Mobile Alert
**Subject:** Harrassment
**To:** andre.kemp@servicemaster.com

Andre,

Please allow this email to serve as confirmation of our telephone conversation of today, Monday, July 23, 2007, as I have have already informed you of the previous harrassment as well as today's harrassment by my Branch Manager, Ms. Jennifer Howard. This will memorialize the following.

First and foremost, it was a devastating way of terminating me and further, it was a horrible experience for me personally, when Ms. Jennifer Howard put her hands on me and proceeded to push me, taking copies of papers that were mine. I was utterly shocked and feel extremely violated to say the least.

Please be advised that I have in fact sought legal counsel in this matter and have been directed to immediately file for unemployment. Thank you for your consideration in this matter.

Sincerely,

Andrea Gravagna

(719) 767-1042

---

Boardwalk for $500? In 2007? Ha! Play Monopoly Here and Now (it's updated for today's economy) at Yahoo! Games.
http://get.games.yahoo.com/proddesc?gamekey=monopolyherenow

| Delete | Reply | Forward | Move... |

Previous | Next | Back to Messages

Save Message Text | Full Headers

| Check Mail | Compose | | | Search Mail | Search the Web |

---

Copyright © 1994-2007 Yahoo! Inc. All rights reserved. Terms of Service - Copyright/IP Policy - Guidelines
NOTICE: We collect personal information on this site.

**INCIDENT INFORMATION SLIP**
P 42 321-164 (Rev. 3-98)-Perc (RMU)

Date: 7/23/07
718-321-2250

...come to 109 Precinct  37-05 Union Street
(Command)          (Address)          (Telephone No.)

...hope that your business with us was handled satisfactorily. Your particular matter has been assigned the following number(s):

...plaint Report No.: 6670 ... Accident Report No.: ... Arded Report No.: _____

...orted to: PO Johnson 2574 Date of Occurrence: 7/23/07 Time: 0915
(Rank)  (Name)  (Shield No.)

...ation of Occurrence: 30-50 Whitestone Exp.

...re: Harassment

...ase keep this report should you have to refer to this matter in the future. If you need any further assistance feel free to

...tact us at telephone number 718-321-2256/57/58 . Please let us know if you have any suggestions on how we can

...ter serve you. As you may already know, we will provide you with a crime prevention survey of your residence or business.

...ase ask for more information on this and other crime prevention initiatives. Our goal is to make you and your property safe.

### COURTESY — PROFESSIONALISM — RESPECT

### REMEMBER: CALL "911" FOR EMERGENCIES ONLY!!!!

p.5    718-767-1042    nicholas grevagna    Jul 24 07 04:09p

# Andrea Gravagna

(718) 761-1042
ajgravagna@yahoo.com

166-31 9th Ave
Whitestone, N.Y 11357

## Sales Represent/ Receptionist

| | |
|---|---|
| June 2005 – To present | *On Demand Printing*, Long Island City, New York 11101<br>Assistant to President<br><br>Managed day to day office function, president's calendar, coordinated meetings and travel arrangement, correspondence, tracking accounts invoices, day-to-day client contacts. |
| Jan. 1995 – Mar. 2005 | *ESM Metro/Ferolie*, Montvale, New Jersey 07845<br>Outside Sales Representative<br><br>Visited client base, creation of promotional marking and sale. Supervised and monitored all new products and distribution. Hands on credit disputes and/or out dated product removal. Set new sales promo quotas for new and current client. |
| Jan. 1994 – Jan. 1995 | *Shelf Tech*, Fort Lee, New Jersey<br>Outside Sales Represent-in-house Sales trainer<br><br>Created marketing strategies, setup of new product lines, customer support and advocacy. |
| Jan. 1983 – Dec.1993 | *Ultima, Ltd.* Little Neck, New York 11362<br>Receptionist/ Book keeper for upscale shop<br><br>Coordinated desk, bills, calendar, appointments and all products – in charge of all invoices. |
| Feb. 1978 – Dec. 1982 | *Lancôme Cosmetic (Cosmair, Inc)*<br>In-store sales representative<br><br>Presented new product line, sales reports, inventory control and product setups/sales goals. |
| Education | Flushing High School<br>Real Estate School<br>ACS Computer Training School |
| Skills | Microsoft Word- Power Point-Hand held computer Excel presently taking classes |
| Community – Service | Board of Education-School District #25-Whitestone, New York11352<br>Coordinated fundraisers, setup of agenda for school events and activities, member of Parents Association and advocate for needy of students<br><br>Grace Lutheran Community Church-Volunteer For Nursery School |

References available upon request

MARK L. LUBELSKY AND ASSOCIATES
ATTORNEYS AT LAW

123 WEST 18ᵗʰ STREET, 8ᵗʰ FLOOR
NEW YORK, NEW YORK 10011
TELEPHONE: (212) 242-7480
FACSIMILE: (646) 619-4631

November 1, 2007

Mr. William LaMot
Division of Human Rights
Brooklyn Regional Office
55 Hanson Place, room 304
Brooklyn, NY 11217

Re:     Gravagna, Andrea v. Terminix International, Inc.
DHR No.: 10118919
File no.:   6575

Dear Mr. LaMot:

Enclosed is complainant Andrea Gravagna's Verified Rebuttal, submitted in response to Terminix's Position Statement dated September 24, 2007.

Please feel free to contact our office for any reason.

Very truly yours,

MARK L. LUBELSKY AND ASSOCIATES

David Gottlieb

enc.

## CLIENT VERIFICATION

ANDREA GRAVAGNA, being duly sworn deposes and says the following under the penalties of perjury:

I am the plaintiff in the within action, and as such, I am fully familiar with all the facts and circumstances herein.

I have read the foregoing VERIFIED REBUTTAL, and know the contents thereof; the same is true to my own knowledge, except as to the matters therein alleged to be on information and belief, and as to those matters, I believe them to be true.

Dated:    New York, New York
          November 1, 2007

                                                ANDREA GRAVAGNA

State of New York        )
                         ) ss.:
County of New York       )
On the 1st day of November in the year 2007 before me, the undersigned, a Notary Public in and for the State, personally appeared Andrea Gravagna Personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument

FLORENCE D KOVENSKY
NOTARY PUBLIC STATE OF NEW YORK
NO. 01K04614396
QUALIFIED IN SUFFOLK COUNTY
COMMISSION EXPIRES 03/30/20 //

# MARK L. LUBELSKY AND ASSOCIATES
ATTORNEYS AT LAW

123 WEST 18th STREET, 8th FLOOR
NEW YORK, NEW YORK 10011
TELEPHONE: (212) 242-7480
FACSIMILE: (646) 619-4631

**VIA FACSIMILE AND FIRST CLASS MAIL**

January 10, 2008

Ms. Rosemary Joyce
Seyfarth Shaw
620 Eighth Avenue
New York, NY 10018

> Re: Gravagna, Andrea v. Terminix
> DHR Case No.: 10118919
> Federal Case No.: 16GA703979
> File no.: 6575

Dear Rosemary:

I write this letter to memorialize our conversation of January 9, 2008.

During that conversation we discussed the above-referenced matter. I indicated our intention to remove the action from the State Division of Human Rights prior to the currently scheduled conference of January 15, 2008, and commence a state court action and/or file an EEOC charge of discrimination, the administrative prerequisite to commencement in federal court.

We discussed a potential resolution of the matter and you indicated that defense counsel would respond to plaintiff's counsel by today, January 10, 2008, so that plaintiff's counsel could proceed accordingly.

Please promptly advise of your position on this matter.

Thank you.

Very truly yours,

MARK L. LUBELSKY AND ASSOCIATES

David Gottlieb

# FACSIMILE COVER SHEET

## Mark L. Lubelsky And Associates
### 123 West 18th Street, 8th Floor
### New York, NY 10011
### 212-242-7480
### fax: 646-619-4631

If there is a problem with transmission or if all pages are not received, please call 212-242-7480 for retransmission.

**TO: Rosemary Joyce, Esq.**              FAX #: (212) 218-5526

FROM: David Gottlieb, Esq.              DATE: January 10, 2008

RE: Gravagna, Andrea v. Terminix International

Number of pages including this cover page: 2

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original to us by mail without making a copy. Thank you.

Comments:
Please see attached correspondence.

**Diana Morales**

| | |
|---|---|
| From: | send@mail.efax.com |
| Sent: | Thursday, January 10, 2008 2:57 PM |
| To: | dmorales@mllassociates.com |
| Subject: | Successful transmission to 12122185526. Re: |

Dear Mark Lubelsky,

Re:

The 2 page fax you sent through eFax.com to 12122185526 was  successfully transmitted at 2008-01-10 19:57:27 (GMT).

The length of transmission was 45 seconds.

The receiving machine's fax ID: Seyfarth Shaw.


If you need additional assistance, please visit our online help center at http://www.efax.com/help/. Thank you for using the eFax service.

Best Regards,
eFax.com

Customer Service
Help: http://www.efax.com/help/
Tel: 323-817-3205 (US) or 0870 711 2211 (UK)
Email: help@mail.efax.com

08.01.10.08 fax to Joyce on Gravagna

# MARK L. LUBELSKY AND ASSOCIATES
ATTORNEYS AT LAW

123 WEST 18th STREET, 8th FLOOR
NEW YORK, NEW YORK 10011
TELEPHONE: (212) 242-7480
FACSIMILE: (646) 619-4631

**VIA FACSIMILE AND FIRST CLASS MAIL**

January 11, 2008

Ms. Rosemary Joyce
Seyfarth Shaw
620 Eighth Avenue
New York, NY 10018

> Re: Gravagna, Andrea v. Terminix International
> File no.: 6575

Dear Rosemary:

I write this letter to inform you that the above-referenced matter has been withdrawn from the State Division of Human Rights.

Please advise if you will accept service of the state court complaint.

A courtesy copy of our EEOC charge of discrimination will be forthcoming as well.

Please feel free to contact me.

Very truly yours,

MARK L. LUBELSKY AND ASSOCIATES

David Gottlieb

## MARK L. LUBELSKY AND ASSOCIATES
ATTORNEYS AT LAW

123 WEST 18th STREET, 8th FLOOR
NEW YORK, NEW YORK 10011
TELEPHONE: (212) 242-7480
FACSIMILE: (646) 619-4631

January 11, 2008

Mr. Stewart Palatnik
State Division of Human Rights
Brooklyn Regional Office
55 Hanson Place, Room 304
Brooklyn, NY 11217

Re: Gravagna, Andrea v. Terminix
DHR Case No.: 10118919
Federal Case No.: 16GA703979
File no.: 6575

Dear Stewart:

I write this letter to memorialize our conversation earlier today, January 11, 2008.

During that conversation I explained that our client Andrea Gravagna, complainant in the above referenced matter, respectfully requests that the State Division of Human Rights dismiss her complaint on the grounds that the election of remedies is annulled. Ms. Gravagna shall maintain all rights to bring suit as if no complaint had been filed with the State Division of Human Rights.

Thank you for all your efforts on this matter. Please feel free to contact me for any reason.

Very truly yours,

MARK L. LUBELSKY AND ASSOCIATES

David Gottlieb

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION OF
HUMAN RIGHTS on the Complaint of

ANDREA GRAVAGNA,

                    Complainant,

                v.

TERMINIX INTERNATIONAL, INC.,

                    Respondent.

---

ANNULMENT
DETERMINATION

Case No.
10118919

Federal Charge No. 16GA703979

On 7/10/2007, Andrea Gravagna filed a verified complaint
with the New York State Division of Human Rights ("Division")
charging the above-named respondent with an unlawful
discriminatory practice relating to employment because of age in
violation of N.Y. Exec. Law, art 15 ("Human Rights Law").

Pursuant to Section 297.9 of the Human Rights Law, a
complainant, at any time prior to a hearing before a hearing
officer, may request that the Division dismiss the complaint and
annul the election of remedies so that the case may be pursued
in court, and the Division may, upon such request, dismiss that
case on the grounds that the complainant's election of an
administrative remedy is annulled.

The above named complainant has made such a request.    The
complaint is ordered dismissed, on the grounds that the
complainant's election of an administrative remedy is annulled.

Section 297.9 of the Human Rights Law provides that:

    ... where the Division has dismissed such complaint on
    the grounds of the administrative convenience, ...
    such person shall maintain all rights to bring suit as
    if no complaint had been filed.   ...   [I]f a complaint
    is so annulled by the division, upon the request of
    the party bringing such complaint before the division,
    such party's rights to bring such cause of action
    before a court of appropriate jurisdiction shall be
    limited by the statute of limitations in effect in

such court at the time the complaint was initially
filed with the division.

PLEASE TAKE NOTICE that any party to this proceeding may
appeal this Determination to the New York State Supreme Court in
the County wherein the alleged unlawful discriminatory practice
took place by filing directly with such court a Notice of
Petition and Petition within sixty (60) days after service of
this Determination.  A copy of this Notice and Petition must
also be served on all parties including General Counsel, State
Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx,
New York 10458.  DO NOT FILE THE ORIGINAL NOTICE AND PETITION
WITH THE STATE DIVISION OF HUMAN RIGHTS.

Dated:  1/15/07
        Brooklyn, New York

                    STATE DIVISION OF HUMAN RIGHTS

          By:  _____
                    Joyce Yearwood-Drury
                    Director O.S.H.I.

- 2 -

**David Gottlieb**

| | |
|---|---|
| **From:** | Joyce, Rosemary [RJoyce@seyfarth.com] |
| **Sent:** | Thursday, January 17, 2008 11:29 AM |
| **To:** | dgottlieb@mllassociates.com |
| **Subject:** | Andrea Gravagna |



E-Copy Scan
01162008.pdf

Mr. Gottlieb,

Further to our discussion yesterday, attached please find a copy of the Arbitration Agreement signed by Ms. Gravagna. As I noted during our conversation, we are authorized to accept service on behalf of our client, but we assume that you will be filing and serving a demand for arbitration in light of the attached agreement. Please be advised that if you do initiate a state court action, we will be forced to move to compel arbitration and will seek attorneys' fees and costs associated therewith.

<<E-Copy Scan 01162008.pdf>>

Please do not hesitate to contact me if you have any questions.

Thank you,
Rosemary

Please note our new office address:
Rosemary P. Joyce
Seyfarth Shaw LLP
620 Eighth Avenue
New York, New York  10018-1405
(212) 218-5549 - Direct
(917) 344-1207 - Fax
rjoyce@seyfarth.com

Any tax information or written tax advice contained herein (including any attachments) is not intended to be and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer. (The foregoing legend has been affixed pursuant to U.S. Treasury Regulations governing tax practice.)

This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). If you are not the intended recipient, any disclosure, copying, distribution, or use of the contents of this information is prohibited and may be unlawful. If you have received this electronic transmission in error, please reply immediately to the sender that you have received the message in error, and delete it. Thank you.

1

# TERMINIX

## THE TERMINIX INTERNATIONAL COMPANY LIMITED PARTNERSHIP ARBITRATION AGREEMENT

This Arbitration Agreement ("Agreement") is between The Terminix International Company Limited Partnership ("Employer" or "Company") and Employee, in consideration for the promises and undertakings set forth below, Employer and Employee agree to the following terms:

1. **Agreement to Arbitrate All Employment Disputes.** Private arbitration is the referral of a dispute to an impartial third party, instead of a court or jury, for a final and binding decision. Any dispute arising out of Employee's employment and/or termination of employment with Employer will be submitted to binding arbitration in accordance with the then-current National Rules for the Resolution of Employment Disputes of the American Arbitration Association ("AAA"). Employer and Employee each expressly waive entitlement, if any, to have any such dispute heard before a court or a jury.

2. **Arbitrable Claims.** Except as otherwise provided by law, this Agreement applies to any dispute arising out of or related to Employee's employment and/or termination of employment with Employer, including but not limited to, claims for breach of contract, express or implied, claims of discrimination and/or retaliation, claims alleging violation of public policy, whistleblower claims, torts and/or any other claims based upon any federal, state or local ordinance, regulation, statute, constitutional provision and any other non-statutory claims (excluding claims for workers compensation benefits and unemployment insurance benefits).

3. **Initiating Arbitration.** In the case of a dispute involving statutory claims, arbitration is initiated by filing a demand for arbitration with the AAA in accordance with the AAA's applicable rules and procedures within the time limit established by statute. In the case of a dispute involving non-statutory claims, arbitration is initiated by filing a demand for arbitration with the AAA in accordance with the AAA's applicable rules and procedures within one year of the occurrence of the event giving rise to the non-statutory claim.

4. **Time Limits for Initiating Arbitration.** Failure to initiate arbitration within the applicable statutory period or within the applicable one-year non-statutory period, or such extended period as may be mutually agreed upon in writing, will constitute a waiver of any and all claims and such claims will be forever barred. The arbitrator will resolve all disputes regarding the timeliness or propriety of the demand for arbitration. Rules and forms of the AAA may be obtained at any AAA office, at www.adr.org or by calling the AAA at 1-800-778-7879.

5. **Selection of the Arbitrator.** Both parties will attempt to agree upon a mutually acceptable arbitrator from the AAA's (or other mutually agreeable arbitration association/group) national employment panel. If the parties are unable to agree upon an arbitrator, then an arbitrator will be selected in accordance with the then-current National Rules for the Resolution of Employment Disputes of the AAA. The location of the arbitration proceeding will be in the general geographical vicinity of the place where the Employee last worked for the Company, unless each party to the arbitration agrees in writing otherwise.

6. **Arbitrator's Authority.** The arbitration will be conducted in accordance with the then-current National Rules for the Resolution of Employment Disputes of the AAA. The Arbitrator will base the decision on the evidence presented at the hearing and in accordance with governing law, including statutory and judicial authority. The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies will be limited to those that would be available to a party in a court of law for the claims presented to and decided by the Arbitrator. The Arbitrator will issue a written decision, which will contain the essential findings and conclusions on which the decision is based. The Arbitrator's decision will be final and binding upon all parties.

7. **Discovery.** The parties may engage in discovery in accordance with the then-current National Rules for the Resolution of Employment Disputes of the AAA. The arbitrator will rule on all

1

Revised 01/04/07

# TERMINIX

discovery disputes and may limit discovery to that reasonably necessary to arbitrate the issues presented.

8.    Fees. Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. The Employee will bear only those costs of arbitration that he or she would have borne if the Employee brought a claim covered by this Agreement in court.

9.    Award. Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties. A court of competent jurisdiction will have the authority to enter a judgment upon the award made pursuant to the arbitration.

10.    Right to File Administrative Complaint. Nothing in the Agreement will prevent Employee from filing a complaint with the Equal Employment Opportunity Commission or National Labor Relations Board, or any other federal or state agency.

11.    Governing Law. This Agreement will be governed and construed in accordance with the Federal Arbitration Act, 9 U.S.C. § 1 et seq.

12.    Integration. This Agreement and the Employee's Employment Agreement reflect the parties' full and final agreement relating to the resolution of arbitrable claims.

13.    Survivability. This Agreement will continue in full force and effect for the duration of the Employee's employment with the Company and will continue thereafter until termination through a written instrument signed by both parties. This Agreement, however, does not extend or waive any statutes of limitations or other provisions of law that specify the time within which any claim must be brought.

The Terminix International Company L.P.:

By: _____

Its: _____

Date: 2/15/07

Employee: _____

_Andrea J. Travagna_
(Print Name)

2-15-07
Date

2                                    Revised 01/04/07

MARK L. LUBELSKY AND ASSOCIATES
ATTORNEYS AT LAW

123 WEST 18ᵗʰ STREET, 8ᵗʰ FLOOR
NEW YORK, NEW YORK 10011
TELEPHONE: (212) 242-7480
FACSIMILE: (646) 619-4631

VIA FACSIMILE AND FIRST CLASS MAIL

March 14, 2008

Rosemary Joyce, Esq.
Seyfarth Shaw
620 Eighth Avenue
New York, NY 10018

    Re: Gravagna, Andrea v. Terminix
    File no.: 6575

Dear Rosemary:

I write this letter to follow up on our conversation earlier today.

On January 9, 2008 plaintiff's counsel and defense counsel spoke regarding Ms. Gravagna's action pending in the State Division of Human Rights (hereinafter, "State Division"). I indicated our intention to remove the action from the State Division, prior to a conference scheduled for January 15, 2008, in order to commence a state court action and file an EEOC charge. We also discussed a potential settlement. (See, attached correspondence dated January 10, 2008)

On January 11, 2008 we spoke again and defense counsel informed me that it was not interested in a settlement at that time. As a result, I informed both defendant and the State Division that Ms. Gravagna's complaint would be withdrawn to pursue a state court remedy. Correspondence to both the State Division and defense counsel explained that a state court action would be commenced. In correspondence to defense counsel, I inquired as to whether service of a state court complaint would be accepted on behalf of the defendant. Of course, I did not know that an arbitration agreement existed, as it would preclude commencement of a state court action (See, attached correspondences dated January 11, 2008)

On January 15, 2008, the State Division dismissed Ms. Gravagna's complaint. (See, attached Determination dated January 15, 2008)

On January 16, 2008, defense counsel informed me for the first time of the existence of an arbitration agreement. (See, attached email correspondence from Rosemary Joyce dated January 17, 2008). In our conversation earlier today, defense counsel also confirmed that it had not informed the State Division of the arbitration agreement.

As you know, Ms. Gravagna was terminated two weeks after she filed a complaint of discrimination with the State Division. Ms. Gravagna even informed her supervisor that she would file such a

complaint. Ms. Gravagna filed the complaint of discrimination on or about July 9, 2007 and she was terminated on or about July 23, 2008. On the date that Ms. Gravagna was terminated, she was assaulted by her supervisor. Ms. Gravagna reported the assault to the local police precinct.

Please advise if you would like to resolve this case or if we should proceed to motion practice on the waiver of defendant's arbitration agreement.

Very truly yours,

MARK L. LUBELSKY AND ASSOCIATES

David Gottlieb

enc.

# MARK L. LUBELSKY AND ASSOCIATES
ATTORNEYS AT LAW

123 WEST 18ᵗʰ STREET, 8ᵗʰ FLOOR
NEW YORK, NEW YORK 10011
TELEPHONE: (212) 242-7480
FACSIMILE: (646) 619-4631

## VIA FACSIMILE AND FIRST CLASS MAIL

January 10, 2008

Ms. Rosemary Joyce
Seyfarth Shaw
620 Eighth Avenue
New York, NY 10018

Re:  Gravagna, Andrea v. Terminix
DHR Case No.: 10118919
Federal Case No.: 16GA703979
File no.: 6575

Dear Rosemary:

I write this letter to memorialize our conversation of January 9, 2008.

During that conversation we discussed the above-referenced matter.  I indicated our intention to remove the action from the State Division of Human Rights prior to the currently scheduled conference of January 15, 2008, and commence a state court action and/or file an EEOC charge of discrimination, the administrative prerequisite to commencement in federal court.

We discussed a potential resolution of the matter and you indicated that defense counsel would respond to plaintiff's counsel by today, January 10, 2008, so that plaintiff's counsel could proceed accordingly.

Please promptly advise of your position on this matter.

Thank you.

Very truly yours,

MARK L. LUBELSKY AND ASSOCIATES

David Gottlieb

# MARK L. LUBELSKY AND ASSOCIATES
ATTORNEYS AT LAW

123 WEST 18th STREET, 8th FLOOR
NEW YORK, NEW YORK 10011
TELEPHONE: (212) 242-7480
FACSIMILE: (646) 619-4631

**VIA FACSIMILE AND FIRST CLASS MAIL**

January 11, 2008

Ms. Rosemary Joyce
Seyfarth Shaw
620 Eighth Avenue
New York, NY 10018

> Re: Gravagna, Andrea v. Terminix International
> File no.: 6575

Dear Rosemary:

I write this letter to inform you that the above-referenced matter has been withdrawn from the State Division of Human Rights.

Please advise if you will accept service of the state court complaint.

A courtesy copy of our EEOC charge of discrimination will be forthcoming as well.

Please feel free to contact me.

Very truly yours,

MARK L. LUBELSKY AND ASSOCIATES

David Gottlieb

MARK L. LUBELSKY AND ASSOCIATES
ATTORNEYS AT LAW

123 WEST 18th STREET, 8th FLOOR
NEW YORK, NEW YORK 10011
TELEPHONE: (212) 242-7480
FACSIMILE: (646) 619-4631

January 11, 2008

Mr. Stewart Palatnik
State Division of Human Rights
Brooklyn Regional Office
55 Hanson Place, Room 304
Brooklyn, NY 11217

                         Re: Gravagna, Andrea v. Terminix
                         DHR Case No.: 10118919
                         Federal Case No.: 16GA703979
                         File no.: 6575

Dear Stewart:

I write this letter to memorialize our conversation earlier today, January 11, 2008.

During that conversation I explained that our client Andrea Gravagna, complainant in the above referenced matter, respectfully requests that the State Division of Human Rights dismiss her complaint on the grounds that the election of remedies is annulled. Ms. Gravagna shall maintain all rights to bring suit as if no complaint had been filed with the State Division of Human Rights.

Thank you for all your efforts on this matter. Please feel free to contact me for any reason.

Very truly yours,

MARK L. LUBELSKY AND ASSOCIATES

David Gottlieb

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION OF
HUMAN RIGHTS on the Complaint of

ANDREA GRAVAGNA,

                              Complainant,

                    v.

TERMINIX INTERNATIONAL, INC.,

                              Respondent.

ANNULMENT
DETERMINATION

Case No.
10118919

---

Federal Charge No. 16GA703979


    On 7/10/2007, Andrea Gravagna filed a verified complaint
with the New York State Division of Human Rights ("Division")
charging the above-named respondent with an unlawful
discriminatory practice relating to employment because of age in
violation of N.Y. Exec. Law, art 15 ("Human Rights Law").

    Pursuant to Section 297.9 of the Human Rights Law, a
complainant, at any time prior to a hearing before a hearing
officer, may request that the Division dismiss the complaint and
annul the election of remedies so that the case may be pursued
in court, and the Division may, upon such request, dismiss that
case on the grounds that the complainant's election of an
administrative remedy is annulled.

    The above named complainant has made such a request.  The
complaint is ordered dismissed, on the grounds that the
complainant's election of an administrative remedy is annulled.

    Section 297.9 of the Human Rights Law provides that:

    ... where the Division has dismissed such complaint on
    the grounds of the administrative convenience, ...
    such person shall maintain all rights to bring suit as
    if no complaint had been filed.  ... [I]f a complaint
    is so annulled by the division, upon the request of
    the party bringing such complaint before the division,
    such party's rights to bring such cause of action
    before a court of appropriate jurisdiction shall be
    limited by the statute of limitations in effect in

such court at the time the complaint was initially filed with the division.

PLEASE TAKE NOTICE that any party to this proceeding may appeal this Determination to the New York State Supreme Court in the County wherein the alleged unlawful discriminatory practice took place by filing directly with such court a Notice of Petition and Petition within sixty (60) days after service of this Determination. A copy of this Notice and Petition must also be served on all parties including General Counsel, State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. DO NOT FILE THE ORIGINAL NOTICE AND PETITION WITH THE STATE DIVISION OF HUMAN RIGHTS.

Dated: 1/15/07
       Brooklyn, New York

                    STATE DIVISION OF HUMAN RIGHTS

          By:  _____
               Joyce Yearwood-Drury
               Director O.S.H.I.

- 2 -

## David Gottlieb

| | |
|---|---|
| From: | Joyce, Rosemary [RJoyce@seyfarth.com] |
| Sent: | Thursday, January 17, 2008 11:29 AM |
| To: | dgottlieb@mllassociates.com |
| Subject: | Andrea Gravagna |



E-Copy Scan
01162008.pdf

Mr. Gottlieb,

Further to our discussion yesterday, attached please find a copy of the
Arbitration Agreement signed by Ms. Gravagna.  As I noted during our
conversation, we are authorized to accept service on behalf of our
client, but we assume that you will be filing and serving a demand for
arbitration in light of the attached agreement.  Please be advised that
if you do initiate a state court action, we will be forced to move to
compel arbitration and will seek attorneys' fees and costs associated
therewith.

  <<E-Copy Scan 01162008.pdf>>

Please do not hesitate to contact me if you have any questions.

Thank you,
Rosemary

Please note our new office address:
Rosemary P. Joyce
Seyfarth Shaw LLP
620 Eighth Avenue
New York, New York  10018-1405
(212) 218-5549 - Direct
(917) 344-1207 - Fax
rjoyce@seyfarth.com

Any tax information or written tax advice contained herein (including any attachments) is
not intended to be and cannot be used by any taxpayer for the purpose of avoiding tax
penalties that may be imposed on the taxpayer. (The foregoing legend has been affixed
pursuant to U.S. Treasury Regulations governing tax practice.)

This email may contain privileged or confidential information and is for the sole use of
the intended recipient(s). If you are not the intended recipient, any disclosure, copying,
distribution, or use of the contents of this information is prohibited and may be
unlawful. If you have received this electronic transmission in error, please reply
immediately to the sender that you have received the message in error, and delete it.
Thank you.

**Diana Morales**

From:           send@mail.efax.com
Sent:           Friday, March 14, 2008 4:06 PM
To:             dmorales@mllassociates.com
Subject:        Successful transmission to 12122185526. Re:


Dear Mark Lubelsky,

Re:

The 9 page fax you sent through eFax.com to 12122185526 was  successfully transmitted at
2008-03-14 20:06:27 (GMT).

The length of transmission was 159 seconds.

The receiving machine's fax ID: Seyfarth Shaw.


If you need additional assistance, please visit our online help center at
http://www.efax.com/help/. Thank you for using the eFax service.

Best Regards,
eFax.com

Customer Service
Help: http://www.efax.com/help/
Tel: 323-817-3205 (US) or 0870 711 2211 (UK)
Email: help@mail.efax.com

08.03.14.08 fax to Rosemarie on Gravagna

1

# FACSIMILE COVER SHEET

## Mark L. Lubelsky And Associates
### 123 West 18th Street, 8th Floor
### New York, NY 10011
### 212-242-7480
### fax: 646-619-4631

If there is a problem with transmission or if all pages are not received, please call 212-242-7480 for retransmission.

**TO: Rosmarie Joyce, Esq.**                    FAX #: 212-218-5526

COMPANY: Seyfarth Shaw

FROM: Diana Morales                        DATE: March 14, 2008

RE: Gravagna, Andrea v. Terminex

Number of pages including this cover page: 09

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original to us by mail without making a copy. Thank you.

Comments:
Please see attached correspondence with attachments.

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                     )    ss. :
COUNTY OF NEW YORK   )

 DIANA MORALES, being duly sworn, deposes and says:
Deponent is not a party to the action, is over 18 years of age, and resides at Bronx, New York.

 That on the 26th day of June 2008, deponent served PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION with all exhibits, *VIA MESSENGER*, upon:

Dov Kesselman
Seyfarth Shaw, LLP
Attorneys for Defendant
620 Eighth Avenue
New York, NY 10018-1405

         Diana Morales

Sworn before me on 26th day of June 2008

Notary Public

**David Evan Gottlieb**
**Notary Public**
**State of New York**
**No. 02G06181079**
**My Commission Exp 01-22-20 *12***